UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMYIAH COHOON, a minor, by and through her parents
and legal guardians, RICHARD COHOON and ANGELA
COHOON,

      Plaintiff,

                                                Case No. 20-

v.

JOSEPH KONRATH, in his personal and official capacity
as Sheriff of Marquette County, Wisconsin, and

CAMERON KLUMP, in his personal and official capacity
as Patrol Sergeant for the Marquette County Sheriff's
Office

      Defendants.

---

## COMPLAINT

---

      Plaintiff Amyiah Cohoon, a minor, by and through her parents and legal guardians, Richard and Angela Cohoon, by and through undersigned counsel, brings this Complaint against Defendants Joseph Konrath and Cameron Klump. In support of this Complaint, Plaintiff alleges as follows:

### INTRODUCTION

      1.     The First Amendment's protection of speech, especially online speech, is as vital as ever during the ongoing COVID-19 pandemic. The unprecedented stay-at-home orders throughout the nation have made social media one of the few outlets people have to communicate with friends and family. This case is about preserving the right to share our experiences with each other during this difficult time. A high school student who had a scare with COVID-19 posted

- 1 -

about her experience on Instagram, and a few days later, a deputy sheriff showed up at her home and demanded that she remove her post or be cited for disorderly conduct, arrested, and jailed. The offending post? A picture of the student, while she was hospitalized for what doctors told her was likely COVID-19, with the caption, "I am still on breathing treatment but have beaten the coronavirus. Stay home and be safe." The sheriff's actions blatantly violated the First Amendment, and Plaintiff is entitled to recognition of that fact.

## PARTIES

2.      Plaintiff Amyiah Cohoon is a sixteen-year-old sophomore at Westfield Area High School in Westfield, Wisconsin. She is a citizen and resident of the United States and the State of Wisconsin. She resides at 207 Fran Court in Oxford, WI 53952.

3.      Richard and Angela Cohoon are the biological parents and legal guardians of Amyiah Cohoon, and bring this lawsuit on behalf of their daughter Amyiah. *See* Fed. R. Civ. P. 17(c). Richard and Angela Cohoon are adult citizens and residents of the United States and the State of Wisconsin. They reside at 207 Fran Court in Oxford, WI 53952.

4.      Defendant Joseph Konrath is the Sheriff of Marquette County, Wisconsin, and is sued in both his personal and official capacity. As Sheriff, Konrath has "final policymaking authority" for the Marquette County Sheriff's Office. *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1013 (7th Cir. 2000).

5.      Defendant Cameron Klump is a Patrol Sergeant for the Marquette County Sheriff's Office and is sued in both his personal and official capacity.

6.      At all times pertinent and with respect to all matters alleged herein, each of the Defendants acted under color of state law.

## JURISDICTION AND VENUE

7.    The cause of action in this case arises under the Constitution and laws of the United States, and subject matter jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343. This Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57. It has authority to award damages and to issue injunctive relief pursuant to 42 U.S.C. § 1983. It has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

8.    All events or omissions giving rise to this cause of action occurred in Marquette County, Wisconsin, which is within the Eastern District of Wisconsin, Milwaukee Division. Venue is therefore proper under 18 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

9.    Amyiah Cohoon is a sophomore at Westfield Area High School in Westfield, Wisconsin.

10.    Between March 7 and March 15, Amyiah went on a spring break trip to Disney World and Universal Studios in Florida with her high school's band class.

11.    While Amyiah and her classmates were in Florida, the country began shutting down due to the COVID-19 pandemic.

12.    On March 9, Florida Governor Ron DeSantis declared a public health emergency for the State of Florida. *See* Executive Order Number 20-52, State of Florida, Office of the Governor.[1]

---

[1] https://www.flgov.com/wp-content/uploads/2020/03/EO-20-52.pdf

13.     On March 12, Universal Orlando Resort in Florida announced that its theme parks would close on March 15 due to COVID-19. *See* Universal Orlando Resort Update, (Mar. 12, 2020).[2]

14.     Also on March 12, Wisconsin Governor Tony Evers declared a public health emergency for the State of Wisconsin. *See* Executive Order #72, Relating to a Proclamation Declaring a Health Emergency in Response to the COVID-19 Coronavirus, State of Wisconsin, Office of the Governor.[3]

15.     On March 13, the Wisconsin Department of Health Services, at the direction of Governor Tony Evers, ordered all Wisconsin Schools to close beginning March 18. *See* Order for Statewide School Closure, Wisconsin Department of Health Services.[4]

16.     Amyiah and the others on the spring break trip returned home on March 15, earlier than planned, due to the closures in Florida.

17.     Four or five days after she returned from Florida, Amyiah began feeling ill. Her symptoms included a fever and dry cough, symptoms consistent with COVID-19.

18.     On March 22—one week after returning from Florida—Amyiah began having difficulty breathing, so her mother took her to the emergency room at Divine Savior Hospital in Portage, Wisconsin.

19.     The doctors there evaluated Amyiah and concluded that her symptoms matched those of COVID-19, but they could not test her due to the criteria at the time. They sent Amyiah home with an inhaler and instructions to strictly self-quarantine and to return if her condition deteriorated. They also told Mr. and Mrs. Cohoon to self-quarantine for 14 days.

---

[2] https://www.facebook.com/UniversalOrlandoResort/photos/a.208747882851/10157344068117852/?type=3&theater
[3] https://evers.wi.gov/Documents/EO/EO072-DeclaringHealthEmergencyCOVID-19.pdf
[4] https://evers.wi.gov/Documents/EO/SignedSchoolClosure.pdf

20.     The discharge order, a true and accurate copy of which is attached hereto as Exhibit 1, diagnosed Amyiah with an "[a]cute upper respiratory infection, unspecified."

21.     The doctors also gave the Cohoons a work release form, a true and accurate copy of which is attached hereto as Exhibit 2, specifying that "Amyiah has symptoms consistent with COVID-19."

22.     Based on the information supplied by the doctors at Divine Savior Hospital, Amyiah and her parents believed and still believe that her symptoms were caused by COVID-19.

23.     After they left the hospital on March 22, Mrs. Cohoon called the band teacher in charge of the spring break trip to notify her about Amyiah's condition so that the school could warn other families with students on the trip that Amyiah may have contracted COVID-19. Mrs. Cohoon was unable to reach the teacher, so she left a voicemail but never heard back.

24.     After she got home from Divine Savior, Amyiah posted a picture of herself from the spring break trip with the caption, "Hey guys… sorry I've been on a long break.. I wont be back for a while longer due to me no[w] having the COVID-19 virus… I don't want the attention its just the truth… I am now in self quarantine and am not allow[e]d to leave my room and have an inhaler since they said to go home… best of wishes. love you guys." A true and accurate copy of this post is attached hereto as Exhibit 3.

25.     Amyiah was self-quarantined at home from March 22 until March 25.

26.     On March 25, Amyiah's symptoms worsened, including significant difficulty breathing, so Mrs. Cohoon took her back to the emergency room at Divine Savior Hospital.

27.     Divine Savior redirected Amyiah to the UW Children's Hospital in Madison and took her there via ambulance.

28.     While at the hospital in Madison, Mrs. Cohoon received a call from the principal of Westfield High School on an unrelated matter. Mrs. Cohoon told the principal about Amyiah's situation, including that she had left a voicemail for the band teacher, and once again suggested that the school may wish to notify other parents with students on the Florida spring break trip. The principal told Mrs. Cohoon that he would follow up with the band teacher, but the Cohoons never heard back from either the principal or the teacher.

29.     On March 25, Amyiah posted a short update to Instagram that she was "in the ER might need to stay…" The Cohoons do not have a screenshot of this post because it was deleted automatically after 24 hours.

30.     Amyiah was finally tested for COVID-19 in the evening of March 25 and received the results the following morning. The test came back negative, but the doctors told the Cohoons that Amyiah still likely had COVID-19 and had missed the window for testing positive.

31.     Consistent with what the doctors told the Cohoons, some health experts believe that "nearly one in three patients who are infected [with COVID-19] are nevertheless getting a negative test result." *See* Christopher Weaver, *Questions About Accuracy of Coronavirus Tests Sow Worry*, Wall Street Journal (Apr. 2, 2020).[5]

32.     Amyiah returned home from the hospital in Madison on March 26. At that time, Amyiah and her parents continued to believe and still believe that her symptoms were caused by COVID-19.

33.     After she returned home, Amyiah posted again to Instagram, this time a picture of herself at the hospital with an oxygen mask on her face. The caption on this post read, "I am finally home after being hospitalized for a day and a half. I am still on breathing treatment but have beaten

---

[5] https://www.wsj.com/articles/questions-about-accuracy-of-coronavirus-tests-sow-worry-11585836001

the coronavirus. Stay home and be safe." A true and accurate copy of the picture Amyiah posted is attached hereto as Exhibit 4. The Cohoons do not have a screenshot of this Instagram post because Amyiah deleted it in response to the threat of citation and/or arrest, as described below.

34.     During the evening on March 27, Defendant Patrol Sergeant Cameron Klump from the Marquette County Sheriff's office came to the Cohoons' home. Amyiah answered the door, and Sergeant Klump said he needed to speak with her father.

35.     After Mr. Cohoon came outside, Sergeant Klump explained that the school "superintendent" had complained to Defendant Sheriff Joseph Konrath about one of Amyiah's Instagram posts. Sergeant Klump showed Mr. Cohoon a screenshot of Amyiah's third Instagram post (described in paragraph 33 above). A true and accurate copy of the cropped screenshot Sergeant Klump showed Mr. Cohoon is attached hereto as Exhibit 5.

36.     Sergeant Klump stated that he had direct orders from Sheriff Konrath to demand that Amyiah delete this post, and, if she did not, to cite Amyiah and/or her parents for disorderly conduct and to "start taking people to jail."

37.     Sergeant Klump's incident report, a true and accurate copy of which is attached hereto as Exhibit 6, confirms Defendants' unlawful actions. Klump's report explains that "Sheriff Konrath advised me he wished for me to respond to the residence and have the post removed from her social media." Ex. 5 at 4. The report also states that Klump "advise[d] Richard [Cohoon] that if they were not willing to take the post down, that there would be the possibility of a County Ordinance Disorderly Conduct or being arrested for Disorderly Conduct." Ex. 5 at 5.

38.     Sergeant Klump stated that Sheriff Konrath wanted the post removed because there were no *confirmed* cases of COVID-19 in the county at that time.

39.     But neither Klump, nor Konrath, nor anyone from the school district had contacted Amyiah or the Cohoons to discuss Amyiah's symptoms or to learn what the doctors who treated Amyiah had told the Cohoons, even though the Cohoons had notified both the principal and band teacher about Amyiah's symptoms.

40.     Mr. Cohoon offered to show Sergeant Klump the documents they received from the doctors at Divine Savior indicating that Amyiah's symptoms were consistent with COVID-19, but Sergeant Klump stated that he was not there to gather information, but to complete Sheriff's Konrath's orders.

41.     Mr. Cohoon responded that Sheriff Konrath and Sergeant Klump had no right to demand that Amyiah remove her Instagram post, that he would refuse the order if it were his post, but that he would allow Amyiah to decide for herself.

42.     Mr. Cohoon then called Amyiah back outside. He told her that Sergeant Klump was going to ask her to remove one of her Instagram posts. Mr. Cohoon told Amyiah that she did not have to remove the post if she did not want to, but that it was up to her.

43.     Sergeant Klump then showed Amyiah the screenshot of her post and told her that, if she did not remove it, he had orders from the Sheriff to begin issuing citations for disorderly conduct and taking people to jail.

44.     Out of fear that Sergeant Klump would follow through on his threat to arrest and jail her or her parents, Amyiah agreed to delete the post. She showed Sergeant Klump her Instagram account on her phone as proof that she had removed it.

45.     Sergeant Klump then left the Cohoons' home.

46.     After Sergeant Klump left, out of an abundance of caution and fear, Amyiah also deleted her first Instagram post (see paragraph 24 above), but not until saving a screenshot of it.

47.     Later that evening, the Cohoons discovered that, earlier in the day, Westfield District Administrator Bob Meicher had sent an update to families in the school district that included a statement about Amyiah's posts. A true and accurate copy of that update is attached hereto as Exhibit 7.

48.     Administrator Meicher's update stated that, "It was brought to my attention today that there was a rumor floating out there that one of our students contracted Covid-19 while on the band trip to Florida two weeks ago. Let me assure you there is NO truth to this. This was a foolish means to get attention and the source of the rumor has been addressed. This rumor had caught the attention of our Public Health Department and she was involved in putting a stop to this nonsense. In times like this, the last thing we need out there is misinformation. I asked her to prepare a short statement for the purpose of this update. I've pasted it below."

49.     Although this statement does not name Amyiah or the Cohoons, most of Amyiah's teachers and classmates would have been aware that it was about her, given that many of them saw Amyiah's Instagram posts.

50.     Sheriff Konrath's and Sergeant Klump's threats to cite and arrest Amyiah for posting about her experience are especially troubling in light of Meicher's statements accusing Amyiah of not being truthful and engaging in "a foolish means to get attention." With the threats of law enforcement looming over her head, Amyiah has felt unable to respond on social media to Meicher's allegations, and she is now afraid of returning to school for fear of what her classmates and teachers will think about her.

51.     On April 3, undersigned counsel sent a letter to Sheriff Konrath on the Cohoons' behalf explaining that his actions (and those of Sergeant Klump) violated Amyiah's First Amendment rights and asking him to acknowledge the violation and to provide written assurance

that the Marquette County Sheriff's Office will not violate Amyiah's First Amendment rights going forward. A true and accurate copy of that letter is attached hereto as Exhibit 8.

52.     Between April 6 and April 13, counsel for Sheriff Konrath and Plaintiff's counsel exchanged emails regarding the letter sent to Sheriff Konrath. A true and accurate copy of this exchange is attached hereto as Exhibit 9.

53.     Sheriff Konrath declined to acknowledge the First Amendment violation or to provide any assurance that Amyiah or her parents will not be cited, arrested, or jailed for future, similar speech about Amyiah's experience with COVID-19. Instead, Sheriff Konrath stated that Amyiah's speech was not protected by the First Amendment, but was the equivalent of "screaming fire in a crowed movie theater." Ex. 9 at 1.

54.     The *only* thing Sheriff Konrath offered the Cohoons was a letter stating that "his Department's investigation into [Amyiah's prior posts] is complete." Ex. 9 at 1. But this does not provide Amyiah or the Cohoons any assurance whatsoever that they will not be threatened again for future speech. Of course, the investigation into Amyiah's prior posts is closed—Amyiah did exactly what Defendants Konrath and Klump unlawfully demanded and deleted her posts.

55.     Given Defendants' prior threats and Sheriff Konrath's unwillingness to acknowledge the First Amendment violation, Amyiah reasonably fears that her social media is being monitored the Marquette County Sheriff's Office and that another deputy may show up at her door if she posts anything in the future about her experience, or responds directly to Meicher's accusations.

56.     Amyiah wishes to continue to post about her experience with COVID-19 and her recovery, and to address Meicher's statements about her, but is afraid to do so.

**CAUSES OF ACTION**

**CLAIM ONE: Violation of the First and Fourteenth Amendments**

57.     Plaintiff realleges and incorporates by reference all previous allegations.

58.     The First Amendment to the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

59.     The First Amendment's free-speech guarantee applies to the States through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

60.     Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." At all times and with respect to all matters alleged herein, each of the Defendants was acting under color of state law.

61.     The First Amendment prohibits government officials from "subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citation omitted). Any form of penalty for protected speech "is forbidden." *Surita v. Hyde*, 665 F.3d 860, 871 (7th Cir. 2011).

62.     This principle applies equally to law enforcement. Officers may not cite, arrest, jail, or threaten individuals with any of the above, for engaging in protected speech. *See, e.g.*, *Nieves*, 139 S. Ct. at 1722 (setting forth the standard for retaliatory-arrest claims); *Steffel v. Thompson*,

415 U.S. 452 (1974) (holding that the threat of arrest is sufficient for a First Amendment claim); *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

63. Plaintiffs alleging that they have been penalized for protected speech must show three things: "(1) that they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the [official's] decision." *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012); *see Nieves*, 139 S. Ct. at 1725.

64. For retaliatory arrest claims in particular, plaintiffs must also show the absence of probable cause for the arrest. *Nieves*, 139 S. Ct. at 1724.

65. Amyiah's Instagram posts were unquestionably speech protected by the First Amendment.

66. As the Supreme Court has recognized, social media is, for many, the "principal source[ ] for … speaking and listening in the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017). That is especially so during the ongoing pandemic and stay-at-home orders.

67. And while certain categories of speech are excluded from First Amendment protection—obscenity, defamation, true threats, inciting violence, etc.—none of those narrow exceptions apply to Amyiah's posts. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (surveying the exceptions).

68. Through her posts, Amyiah simply wished to share with her friends and family the significant scare she had with COVID-19; such speech is presumptively protected by the First Amendment.

69.     There is also no question that Defendants' threats of citation, arrest, and jail are a sufficient "deprivation" to violate the First Amendment. The Supreme Court has long recognized that "a realistic threat of arrest is enough to chill First Amendment rights," *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (listing cases); *e.g.*, *Steffel*, 415 U.S. 452, and that people need not "expose [themselves] to actual arrest or prosecution" to bring a First Amendment challenge to such threats, *Steffel*, 415 U.S. at 459.

70.     Amyiah's protected speech on Instagram was not only a "motivating factor" behind Sheriff Konrath's and Sergeant Klump's threat of citation or arrest, it was the entire basis for their threats; Sheriff Konrath sent Sergeant Klump to the Cohoons' home with direct orders to make Amyiah remove her posts and to cite, arrest, and jail her or her parents if she did not comply.

71.     Finally, Defendants did not have probable cause—or come even remotely close to having probable cause—to cite or arrest Amyiah or her parents for disorderly conduct.

72.     Marquette County's disorderly conduct ordinance, which is identical to the state statute, prohibits "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Marquette County Ordinance § 50.03; Wis. Stat. § 947.01(1).

73.     Amyiah's Instagram posts about her experience in the hospital were in no way violent, abusive, indecent, profane, boisterous, or unreasonably loud, nor could they reasonably be characterized as "disorderly conduct … tend[ing] to cause or provoke a disturbance."

74.     Even assuming, *arguendo*, that Amyiah's posts could, somehow, fall within the catchall for "otherwise disorderly conduct," the Wisconsin Supreme Court has squarely held that the disorderly conduct statute may not be applied to First Amendment protected speech. *In re Douglas D.*, 2001 WI 47, ¶ 41, 243 Wis. 2d 204, 626 N.W.2d 725.

75.     Therefore, the threats to cite, arrest, and jail Amyiah or her parents violated Amyiah's First Amendment rights.

76.     Defendant Sergeant Klump is responsible for this violation because he directly threatened Amyiah and her parents.

77.     Defendant Sheriff Konrath also caused, and is liable for, this First Amendment violation because he directly ordered Sergeant Klump to demand that Amyiah remove the posts, and if she did not comply, to cite or arrest her or her parents for disorderly conduct.

78.     And as the "final policymaking authority" for the Marquette County Sheriff's Office, Sheriff Konrath's decision in this matter represents the official "policy" of that Office for purposes of liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700 (1978). *See Brokaw*, 235 F.3d at 1013.

WHEREFORE, Plaintiff requests the following relief:

1.     A declaration that Amyiah's Instagram posts were speech protected by the First Amendment and that Defendants' threats to cite Amyiah or her parents for disorderly conduct and arrest and jail them if Amyiah did not remove her posts violated Amyiah's First Amendment rights;

2.     A declaration that Defendants' may not cite Amyiah or her parents for disorderly conduct (or any other crime), arrest them, jail them, or threaten any of the above, for exercising First Amendment rights, including on social media;

3.     An injunction prohibiting Defendants from citing Amyiah or her parents for disorderly conduct (or any other crime), arresting them, jailing them, or threatening any of the above, for exercising First Amendment rights, including on social media;

4.     Nominal damages; and

5.     Such other relief as the Court deems proper.

Dated: April 16, 2020.

Respectfully submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (SBN 1005622)
(414) 727-6367 | rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (SBN 1095644)
(414) 727-7361 | luke@will-law.org

Anthony F. LoCoco (SBN 1101773)
(414) 727-7419 | alococo@will-law.org

Lucas T. Vebber (SBN 1067543)
(414) 727-7415 | lucas@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385

Attorneys for Plaintiff