IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

AMYIAH COHOON, a minor,
by and through her parents,
Richard Cohoon and Angela Cohoon,

    *Plaintiff*,

                              Case No. 2:20-CV-620-JPS

v.

JOSEPH KONRATH and CAMERON KLUMP,

    *Defendants*.

---

### DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendants, Sheriff Joseph Konrath and Sergeant Cameron Klump, by and through their attorneys, hereby submit this Brief in Support of Defendants' Motion for Summary Judgment.

### Introduction

The Plaintiff, Ms. Amyiah Cohoon, filed this lawsuit alleging retaliation in violation of the First Amendment to the United States Constitution. While the Plaintiff was not arrested, the Plaintiff claims that she was threatened with arrest and therefore postures her claim as a retaliatory arrest claim.

To establish her First Amendment Retaliation case against law enforcement, the Plaintiff must establish each of the following: (1) the plaintiff engaged in protected speech; (2) the officers' adverse actions caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing the activity; and (3) the First Amendment activity was a motivating factor in the officer's adverse action. *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003). In light of the Supreme Court's recent ruling in *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019),

in cases alleging retaliation in the form of an arrest (and presumably an allegedly threatened arrest), the existence of probable cause is usually a bar to such a claim. *See also Lund v. City of Rockford*, --- F.3d ---, 2020 WL 1912223, Case No, 19-1945 (7th Cir. Apr. 20, 2020).

In addition to filing her Complaint, Plaintiff also filed a motion for preliminary injunction that was supported by sworn declarations from Plaintiff herself and her parents, Mr. Richard Cohoon and Mrs. Angela Cohoon[1]. However, these sworn declarations are far from the final word on the events giving rise to this lawsuit. At the time of Sergeant Cameron Klump's visit to the Cohoon home, he had a dashboard camera and microphone recording the events that transpired, which tell a very different story of the events material to this case.

Importantly, what occurred at the Cahoon home, based on the video, appears to contradict the sworn declarations filed both by Ms. Cohoon and by Mr. Cohoon. For example, when discussing Ms. Cohoon's medical records, Mr. Cohoon stated: "I offered to show [Sergeant Klump] the documents we received from Divine Savior, but Sergeant Klump responded that he was not there to gather information, just to complete Sheriff Konrath's orders." (Dkt. No. 3-3 at ¶ 17.) The foregoing exchange simply never happened and Sergeant Klump did in fact look at Ms. Cohoon's Divine Savior records on multiple occasions. (PFOF ¶ 138.)

More significant to the claim in this case, according to Ms. Cohoon's sworn declaration:

> "A little while later, my dad called me back outside and explained that the officer was going to ask me to remove an Instagram post. My dad said I did not have to delete my post, and that he wouldn't delete it if it were his post, but he would let me decide."

(Dkt. No. 3-2 at ¶ 17.) In his sworn declaration, Mr. Cohoon swore to similar facts. (Dkt. No. 3-3 at ¶ 19.) However, despite being included in sworn declarations, the foregoing did not occur.

Most significantly, according to Ms. Cohoon's sworn declaration:

---

[1] Hereinafter, Amyiah Cohoon will be referred to as "Ms. Cohoon," Richard Cohoon will be referred to as "Mr. Cohoon," and Angela Cohoon will be referred to as "Mrs. Cohoon."

2

> "The officer then showed me a screenshot of one of my Instagram
> posts and told me that if I did not remove it, he had direct orders
> from the Sheriff to begin issuing citations for disorderly conduct
> and taking people to jail. I was afraid that the officer would do
> what he said, so I agreed to delete my post…"

(Dkt. No. 3-2 at ¶¶ 18-19.) In his sworn declaration, Mr. Cohoon averred similar material facts.

(Dkt. No. 3-3 at ¶¶ 19-20.) However, despite being included in sworn declarations, the foregoing

did not occur. (PFOF ¶ 136-137.) Instead, Ms. Cohoon twice responded that she would remove

the social media post. The video establishes that it was after that consent and after Ms. Cohoon

re-entered the home, and out of Sergeant Klump's presence, that the reference to disorderly

conduct occurred in discussions with Mr. Cohoon. Simply put, the words "disorderly conduct,"

"arrest" or "jail" were never uttered in the presence of Ms. Cohoon.

In light of the undisputed evidence assembled in this case in the form of the audio and

video from March 27, 2020, Defendants maintain that dismissal of this action, as a matter of law,

is appropriate for any of the following reasons:

1. Plaintiff was not subject to any retaliation, penalty, arrest, or threatened
   arrest as a matter of law;

2. The contact between Sergeant Klump and Ms. Cohoon did not constitute a
   deprivation sufficient to deter First Amendment activity in a person of
   ordinary firmness as a matter of law; and

3. There was probable cause for violation of Wisconsin law or county
   ordinance.

Beyond the foregoing, Defendants also maintain that dismissal is appropriate based on

qualified immunity related to several elements of Plaintiff's claim. For the reasons detailed

further below, Defendants request that the Court grant Defendants' motion for summary

judgment and dismiss this action with prejudice.

## FACTUAL BACKGROUND

The relevant factual background is set forth in detail in Defendants' Proposed Findings of Fact submitted with this memorandum along with citations to supporting declarations and evidence. In brief, Ms. Cohoon was on a band trip in Florida that was cut short as a result of the COVID-19 pandemic. (Defendants' Proposed Findings of Fact ("PFOF") ¶ 1-4.) After returning to Wisconsin, Ms. Cohoon began feeling ill and on March 22, 2020, she sought treatment at Divine Savior Hospital in Portage, Wisconsin. (Dkt. No. 1, ¶ 17-20.) She was not tested for COVID-19 and was ultimately discharged with a diagnosis of "acute upper respiratory infection, unspecified." (Dkt. No. 1, ¶ 20.) Over the next few days, Ms. Cohoon's condition apparently deteriorated and she was taken back to Divine Savior Hospital on March 25, 2020. (Dkt. No. 1, ¶ 26-27; PFOF 41-42.) She was tested[2] for COVID-19 on March 25, 2020 and her results came back negative on March 26, 2020. (PFOF ¶ 35, 38, 43.)

During the morning of March 26, 2020, the Marquette County Health Department received notification through the state's reporting system that Ms. Cohoon had been tested for COVID-19 and that her test was <u>negative</u>. (PFOF ¶ 22, 43.) However, the Health Department was advised of a social media post by Ms. Cohoon, after she returned home from testing negative, stating that she had "beaten COVID-19." (PFOF ¶ 36-49.) The Health Department and school district received numerous phone calls from concerned, upset, and panicked citizens regarding Ms. Cohoon's social media posting stating that she had recovered from COVID-19. (PFOF ¶ 48-55.) The Department's attempts to alleviate concerns did not appear to be able to keep pace with the growing disturbance and concern within the community. (PFOF ¶ 53-54.)

Ultimately, the Health Department contacted the Marquette County Sheriff's Department explaining the situation and its concerns. (PFOF ¶ 56-78.) Given the panic, concern, and

---

[2] For a detailed explanation of the COVID-19 testing process, see PFOF ¶ 5-34.

4

disturbance within the community created by this social media post, and in light of the fact Ms. Cohoon actually tested negative for COVID-19, the Department requested that the Sheriff's Department make contact with the Cohoon family to see if Ms. Cohoon would agree to remove her social media post stating that she had beaten COVID-19. (PFOF ¶ 78-90.)

Marquette County Sheriff Joseph Konrath forwarded an email of Ms. Cohoon's social media post to Sergeant Klump and requested that Sergeant Klump make contact with the Cohoon family and inquire whether Ms. Cohoon would voluntarily remove the social media post stating that she had beat COVID-19. (PFOF ¶ 81, 90.) If Ms. Cohoon would not agree to remove the social media post voluntarily, Sheriff Konrath discussed with Sergeant Klump that there would be a wide range of potential options; however, Sergeant Klump would assess the situation further and he would contact Sheriff Konrath before he proceeded with any further action, particularly as it related to potentially making a referral for disorderly conduct. (PFOF ¶ 91-100, 126-128.)

As shown on the audiovisual recording from Sergeant Klump's squad car, Sergeant Klump began by speaking with Mr. Cohoon outside while Ms. Cohoon remained inside the home. (PFOF ¶ 101-107.) After several minutes, Sergeant Klump explained the reason he was there: to discuss Ms. Cohoon's social media[3] post in which she stated she had "beaten COVID-19," even though she had in fact tested negative. (PFOF ¶ 108.) Sergeant Klump relayed to Mr. and Mrs. Cohoon that this post was causing many issues with students and parents within the school district. (PFOF ¶ 109.) Sergeant Klump also explained to Mr. and Mrs. Cohoon that Sheriff Konrath had been contacted by the Marquette County Health Department requesting that the Sheriff's Department make contact with the Cohoon family and talk to their daughter to see if she would delete her post. (PFOF ¶ 110.) Mrs. Cohoon then responded "okay," which Sergeant

---

[3] At the time their encounter began, Sergeant Klump believed that the post in question had been made on Facebook. It was later confirmed that the post had been made on Instagram.

5

Klump interpreted as her agreement to take the post down, though he understood that Mrs. Cohoon may not have been speaking for her daughter, who appeared to have actually authored the post. (PFOF ¶ 111.)

Minutes later, Ms. Cohoon stepped outside of the residence for the first time. (PFOF ¶ 112.) Sergeant Klump explained to the Cohoon family that all he was there for was to figure out what the post was about, seeing that Ms. Cohoon tested negative, and to see if she would take the post down. (PFOF ¶ 113, 140-141.) In response to Sergeant Klump's statement, Ms. Cohoon immediately responded by saying "I'll do it." (PFOF ¶ 114.) Sergeant Klump took Ms. Cohoon's statement to be a voluntary willingness to delete her Instagram post. (PFOF ¶ 115.) After additional conversation about Ms. Cohoon's medical course during the past week, Sergeant Klump stated: "Nonetheless, can we get the post taken down?" (PFOF ¶ 116-117.) In response to his question, both Ms. Cohoon and Mrs. Cohoon immediately agreed to take down the post, by stating "yes." (PFOF ¶ 118-119.) After agreeing to remove the post, Ms. Cohoon walked inside the home and closed the door behind her. (PFOF ¶ 121.)

While Ms. Cohoon was outside of Sergeant Klump's presence and after she had already twice indicated that she would remove the Instagram post, Sergeant Klump did state to Mr. Cohoon: "Richard, I don't want to go this far, it was as simple as me coming out here and just getting the post taken down and walking away." (PFOF ¶ 122.) When he made these statements and mentioned disorderly conduct and arrest, Ms. Cohoon was not present, but rather, was inside the home with the door closed. (PFOF ¶ 122-125.) Several minutes later, Ms. Cohoon re-emerged from the house with her phone in hand and confirmed that the social media post had been completely taken down. (PFOF ¶ 129-134.) Sergeant Klump told Ms. Cohoon that he appreciated her taking the social media post down and she responded "of course." (PFOF ¶ 135.)

6

Importantly, the preceding factual description of what occurred at the Cohoon home, based on the video, appears to contradict the sworn declarations filed both by Plaintiff and by Mr. Cohoon. As discussed above, Ms. Cohoon's sworn statement that Sergeant Klump told her that he had direct orders to issue a citation for disorderly conduct or to take people to jail <u>did not occur</u>. From the video, it is evident that there was <u>never any threat made to Ms. Cohoon</u> and that the reference to disorderly conduct occurred outside of her presence. (PFOF ¶ 136-139.)

## ARGUMENT

### I. STANDARD OF REVIEW

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court should not "weigh the evidence and determine the truth of the matter but…determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. The Court "must 'view the facts in the light most favorable to the non-moving party,' and draw 'all reasonable inferences from those facts in [the non-moving party's] favor,' but need not ignore facts unfavorable to the non-moving party because it only receives the benefit of the doubt if the record has evidence on both sides of a question." *Holder v. Fraser Shipyards, Inc.*, 288 F.Supp.3d 911, 927 (W.D. Wis. 2018).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there are no 'genuine issues for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), *quoting First Nat'l Bank of Arizona v. Cities*

*Service Co.*, 391 U.S. 253, 289 (1968). Notably, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added). Here, the undisputed facts show that Defendants are entitled to judgment as a matter of law on Plaintiff's claims.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

In order to succeed on her First Amendment retaliation claim, Ms. Cohoon must show "(1) [s]he engaged in activity protected by the First Amendment; (2) [s]he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in . . . [Defendants'] decision to take the retaliatory action." *Black v. Clarke*, 285 F. Supp. 3d 1070, 1081 (E.D. Wis. 2018), *quoting Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citations and internal marks omitted)). "As to the second factor, retaliatory speech is generally actionable 'only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action will immediately follow.'" *Id.* (emphasis added), *quoting Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016)).

### A. Defendants Did Not Engage in Any Adverse Acts Toward Ms. Cohoon

Ms. Cohoon alleges that, after showing her a screenshot of her Instagram post, Sergeant Klump "told her that, if she did not remove it, he had orders from the Sheriff to begin issuing citations for disorderly conduct and taking people to jail." (Dkt. No. 1, ¶ 43.) Ms. Cohoon and Mr. Cohoon both submitted sworn declarations echoing this allegation that Sergeant Klump told Ms. Cohoon if she did not remove her Instagram post, he had orders to begin issuing citations and taking people to jail. (Dkt. No. 3-2, ¶ 18; Dkt. No. 3-3, ¶ 19.) For purposes of the second

8

element of her retaliation claim—an adverse act or deprivation—Ms. Cohoon characterizes the alleged statements Sergeant Klump made to her as a "threat" of arrest. (*See* Dkt. No. 1, ¶¶ 33, 44–46, 69; Dkt. No. 3-1, p. 3–4, 7, 10–11.)

However, as established by the recording, Sergeant Klump never spoke to Ms. Cohoon about citations for disorderly conduct, taking people to jail, or even the notion of arrest before (or after) Ms. Cohoon had voluntarily deleted the Instagram post. (PFOF ¶ 136-137.) Rather, the recording shows a brief, straightforward exchange between Sergeant Klump and Ms. Cohoon, where Sergeant Klump asks Ms. Cohoon to remove the Instagram post, and both Ms. Cohoon and Mrs. Cohoon voluntarily agree to do so. (PFOF ¶¶ 110-115, 118-120, 135.)

In short, the allegations and sworn statements that Sergeant Klump threatened Ms. Cohoon with citation, arrest, or jail if she failed to remove the Instagram post are, at best, misstatements. In light of the recording clearly showing the entire conversation, the Court is under no obligation to accept Ms. Cohoon's and Mr. Cohoon's false version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018); *Mitchell v. Richter*, Case No. 15-CV-1520-JPS, 2017 WL 752162, at *8 (E.D. Wis. Feb. 27, 2017).

Moreover, given the blatant contradiction in the sworn declarations submitted by Ms. Cohoon and Mr. Cohoon, the cases on which Ms. Cohoon relies in her brief are inapplicable here. (Dkt. No. 3-1, p. 9-10, *citing Steffel v. Thompson*, 415 U.S. 452 (1974); *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004).) Even notwithstanding the fact that Sergeant Klump did not threaten Ms.

9

Cohoon with arrest, Ms. Cohoon's reliance on these cases is misguided because they are factually distinguishable from the circumstances in this case.

The Seventh Circuit's decision in *Fairley* did not involve alleged retaliatory threats of arrest of a citizen, but instead focused on retaliatory death threats jail guards made against former co-workers who attempted to file internal complaints and planned to testify about witnessing the mistreatment of inmates. *Fairley,* 578 F.3d at 520. Thus, *Fairley* provides no support for Plaintiff's position, particularly in light of the inaccurate statements in Ms. Cohoon's and Mr. Cohoon's declarations that Sergeant Klump directly threatened her with arrest.

*Steffel* and *Hodgkins* are even further from the mark, as neither of those cases involved First Amendment retaliation claims. In *Steffel*, the Supreme Court held that a plaintiff could challenge the constitutionality of a state criminal statute under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, even in the absence of state prosecution because a "genuine threat of enforcement of a disputed state criminal statute" constituted an "actual controversy" under the Act. *Steffel*, 415 U.S. at 475. Thus, the *Steffel* Court was <u>not</u> asked to determine whether the threat of arrest—the existence and probability of which was not disputed in that case—was sufficient to constitute a deprivation for purposes of a First Amendment retaliation claim; it was asked only whether the realistic threat of enforcing an allegedly unconstitutional statute was sufficient to create an "actual controversy" such that a plaintiff could seek declaratory relief relating to the constitutionality of the statute under the Federal Declaratory Judgment Act. *Id.* at 455–56, 475. Therefore, the *Steffel* holding is inapplicable to the present case.

Similarly, in *Hodgkins*, the Seventh Circuit upheld a class-action facial constitutional challenge to an Indiana curfew law because the law was "not narrowly tailored to serve a significant governmental interest," and "restrict[ed] a minor's access to any public forum during

10

curfew hours," with no significant reduction in the chance that a minor could be arrested for exercising his or her First Amendment rights. *Hodgkins*, 355 F.3d at 1051–53, 1064. One of the minor plaintiffs in fact had been arrested under a previous version of the curfew law that the district court had found unconstitutional. *Id.* Although an amended version law was before the Seventh Circuit, the court reasoned that the "concrete possibility of arrest" for violating the law made the amended version "no better than the prior version, which contained no provision at all for the exercise of a minor's First Amendment rights . . . ." *Id.* Thus, the "threat of arrest" referenced in *Hodgkins* did not refer to a law enforcement officer's alleged threat of arrest made to a citizen in order to chill speech, but instead referred to the reasoning in *Steffel* that a facial challenge to an allegedly unconstitutional criminal statute could be maintained absent prior or ongoing prosecution of the plaintiff pursuant that criminal statute. *Id.* at 1056, *citing Steffel*, 415 U.S. at 462. Therefore, the facts and reasoning in *Hodgkins* are uninstructive in this case, where Ms. Cohoon alleges that her First Amendment deprivation resulted from the threat of arrest by a specific law enforcement officer—not by a facially unconstitutional criminal statute.

In light of the clear audiovisual evidence and the cause of action alleged, *Fairley*, *Steffel*, and *Hodgkins* are all inconsequential here. Those cases either dealt with actual arrests or explicit threats, or they did not deal with retaliation claims at all. By contrast, Ms. Cohoon's sole theory of First Amendment retaliation is premised on her unsupported allegation that Sergeant Klump threatened her with arrest.

Based on the claim alleged and video evidence, this Court's decision in *Black* is far more instructive than the *Fairley*, *Steffel*, and *Hodgkins*. *Black*, 285 F. Supp. 3d at 1082-83. In *Black*, this Court held that, as a matter of law, Milwaukee County's former sheriff, Clarke, did not deprive the plaintiff, Black, of his First Amendment right to free speech by directing "deputies to

11

stop and interview him at the airport in response to Black having stared and shaken his head in displeasure at Clarke on the plane." *Id.* at 1080–83.

Turning to whether the act of directing deputies to interview Black constituted an adverse act of retaliation, the Court considered whether that act would have deterred a person of "ordinary firmness" from exercising his First Amendment rights. *Id.* Importantly, the Court noted that "Black <u>voluntarily submitted to an interview</u> with deputies at the airport." *Id.* (emphasis added). To that end, the Court found that Black was "not 'deprived' of anything, or made to do something he did not agree to." *Id.* The Court noted that, for instance, had Black been issued a citation, fined, or arrested, then perhaps the retaliation analysis would have been different. *Id.* However, concluding that summary judgment was appropriate, the Court found that Black had not shown that simply being "stopped for fifteen minutes in order to voluntarily respond to deputies' questions would likely deter First Amendment activity in the future." *Id.*[4]

The same is true here. The entirety of Ms. Cohoon's First Amendment claim hinges on her and Mr. Cohoon's allegation that the removal of her Instagram post was prompted by Sergeant Klump's threat of arrest directed at Ms. Cohoon. (Dkt. No. 1, ¶¶ 33, 44–46, 69; Dkt. No. 3-1, p. 3–4, 7, 10–11.) Because the audiovisual evidence clearly shows that no such threat of arrest was made to Ms. Cohoon, her interaction with Sergeant Klump—while in the presence of both of her parents—looks much more like the brief, voluntary interview Black experienced at the airport. No threats were made, no citations were issued, and no arrests resulted from the exchange. Just as in *Black*, Ms. Cohoon has not cited any "authority for the proposition that

---

[4] The lack of deprivation flowing from the voluntary airport encounter was highlighted by the Court's additional finding that Clarke's subsequent Facebook posts raised questions of fact as to whether those posts could be construed as viable, retaliatory threats adverse to Black's First Amendment rights. *See Black*, 285 F. Supp. 3d at 1083. Those Facebook posts included statements like, "'[n]ext time [Black] or anyone else pulls this stunt on a plane they may get knocked out,'" and "'if Sheriff Clarke were to really harass you, you wouldn't be around to whine about it . . . .'" *Id.* The brief and calm exchange between Ms. Cohoon and Sergeant Klump depicted in the audiovisual evidence is clearly more analogous to Black's encounter with deputies at the airport, as opposed to the allegedly explicit Facebook statements Clarke allegedly directed at Black.

12

being asked to submit to voluntary questioning by police, in response to a [presumably] protected speech act, would deter a person from exercising h[er] speech rights in the future." *Black*, 285 F. Supp. 3d 1082–83. Thus, Ms. Cohoon cannot show that Sergeant Klump engaged in an adverse act—specifically, the adverse act of threatening arrest—such that the act could be construed as a First Amendment deprivation under this circuit's case law. Accordingly, summary judgment is appropriate.

**B.      Ms. Cohoon Did Not Suffer a Constitutional Injury Because She Consented to Sergeant Klump's Request.**

The audiovisual evidence not only shows the lack of accuracy within the sworn statements relating to the supposed threat of arrest—it also shows the falsity of the alleged circumstances surrounding Ms. Cohoon's actual removal of the Instagram post. Ms. Cohoon's sworn declaration states:

> 18.      <u>The officer</u> then showed me a screenshot of one of my Instagram posts and <u>told me that if I did not remove it, he had direct orders from the Sheriff to begin</u> issuing citations for disorderly conduct and <u>taking people to jail</u>.

> 19.      <u>I was afraid that the officer would do what he said, so I agreed to delete my post</u>. . . . .

(Dkt. No. 3-2, ¶¶ 18–19 (emphasis added).) Mr. Cohoon's sworn declaration is in lockstep with Ms. Cohoon's inaccurate description. (*See* Dkt. No. 3-3, ¶¶ 19-20.)

However, the recording shows that no such exchange occurred.  (PFOF ¶¶ PFOF ¶¶ 113-115, 118-120, 135.) Rather, at 19:07 of the video, Ms. Cohoon states "I'll do it" in response to the request to remove the social media post. (PFOF ¶ 114 .) Additionally, starting at 19:10 of the video, Mrs. Cohoon and Ms. Cohoon both respond "yes" when Sergeant Klump asks "can we get the post taken down?" (PFOF ¶¶ 117-118.) Moments after that exchange, Mrs. Cohoon instructs Ms. Cohoon to "go inside" (PFOF ¶ 112.) At no time during the period that Ms. Cohoon was in

13

his presence, did Sergeant Klump threaten, coerce, or otherwise force Ms. Cohoon to remove the Instagram post. (PFOF ¶¶ 136-137.) Rather, Mrs. Cohoon and Ms. Cohoon immediately and voluntarily agreed to remove the post at Sergeant Klump's request. (PFOF ¶¶ 110-115, 118-120, 135.) While Ms. Cohoon was inside the house and Sergeant Klump continued conversing with Mr. and Mrs. Cohoon, Mrs. Cohoon stepped inside the house for a moment, and stepped back outside at 19:11 to inform Sergeant Klump that "she's taking it down now." (PFOF ¶¶ 129.)

Constitutional case law has recognized citizens' ability to consent to specific acts and ability to consent to proceed under specific circumstances that might otherwise be interpreted as an encroachment of constitutional rights. For example, although the Fourth Amendment prohibits unreasonable searches and seizures, it also "permits police to conduct a warrantless search without probable cause if an authorized individual voluntarily consents to the search." *U.S. v. Duran*, 957 F.2d 499, 501 (7th Cir. 1992). This is true even when law enforcement fails to advise the person asked to give consent of his or her right to refuse. *U.S. v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005).

Here, as shown by the clear audiovisual evidence, Ms. Cohoon and Mrs. Cohoon, while in the presence of Mr. Cohoon, voluntarily consented to Sergeant Klump's request to remove the subject Instagram post. (PFOF ¶¶ 110-115, 118-120, 135__.) Just as the plaintiff in *Black*, who "voluntarily respond[ed] to deputies' questions" and was not "made to do something he did not agree to do," 285 F. Supp. 3d 1082–83, Ms. Cohoon cannot produce any admissible evidence to contradict the audiovisual evidence showing her voluntarily consenting to Sergeant Klump's request. The unequivocal, voluntary consent of both Ms. Cohoon and Mrs. Cohoon dismantles Ms. Cohoon's present characterization of the removal of the Instagram post as a choice she made under threat of arrest. Thus, because Ms. Cohoon gave informed, voluntary consent to Sergeant

14

Klump's request to remove her Instagram post, she cannot establish that she suffered a constitutional injury or deprivation as a matter of law. Accordingly, summary judgment is appropriate.

### C. The Contact With Sergeant Klump was Not Sufficient to Deter First Amendment Activity in a Person of Ordinary Firmness

The Plaintiff cannot succeed on her First Amendment retaliation claim because she cannot establish that Defendants' conduct caused her to suffer an injury that would likely chill a person of ordinary firmness from exercising First Amendment activity. According to Plaintiff, Defendants' alleged "threat to cite, arrest and jail her has caused her or her parents if she did not remove them has had an ongoing chilling effect on Amyiah's speech." (Dkt. No. 3-1, p. 12). Specifically, Ms. Cohoon alleges:

43. Sergeant Klump then showed Amyiah the screenshot of her post and told her that if she did not remove it, he had orders from the Sheriff to begin issuing citations for disorderly conduct and taking people to jail.

44. Out of fear that Sergeant Klump would follow through on his threat to arrest and jail her and her parents, Amyiah agreed to delete the post. She showed Sergeant Klump her Instagram account on her phone as proof that she had removed it.

(*See* Dkt. No. 1, ¶¶ 43-44.)

In support of her claim, Ms. Cohoon cites to *Hodkins* for the proposition that a "realistic threat of arrest is enough to chill First Amendment rights." *Hodkins*, 355 F.3d at 1056. As established in the preceding section, Sergeant Klump never threatened Ms. Cohoon with arrest or any other adverse law enforcement action if she did not remove her Instagram post. In other words, as was the case in *Black*, there were no actions or statements made by the Sheriff or Sergeant Klump on March 27, 2020 that would likely chill a person of ordinary firmness from continuing to engage in [an] activity. *Black*, 285 F. Supp. 3d at 1082-83

The interaction between Sergeant Klump and Ms. Cohoon was cordial and far from even approaching the level of a threat sufficient to chill speech of a person of ordinary firmness. Throughout the entirety of the contact, Sergeant Klump's interactions with the Cohoon family were professional and straightforward in that he listened to the Cohoons, reviewed documents provided to him, and explained to the family more than once that he was there only to see if Ms. Cohoon would take down the social media post given the panic and concern it was creating in the community. (PFOF ¶ 103-137.) The undisputed record shows Ms. Cohoon agreed on two separate occasions to take the post down prior to there being any suggestion, insinuation or alleged threat that anyone could face arrest or any other adverse law enforcement action. (PFOF ¶¶ 113-115, 118-120, 135.)

The recording of the incident dispels any allegation that Ms. Cohoon only removed the Instagram post because of Sergeant Klump's threats of jail and arrest. While Sergeant Klump later had a short discussion with Mr. and Mrs. Cohoon about the potential for disorderly conduct due to the fact that the post was causing a disturbance to the public, this was outside the presence of Ms. Cohoon and took place <u>after</u> she already agreed twice to remove the Instagram post. (PFOF ¶ 121-125.)

Perhaps even more telling is the fact that the March 27, 2020 contact with Sergeant Klump did not chill or otherwise impact Mr. Cohoon from engaging in or continuing to exercise his First Amendment rights. Again, unlike the Plaintiff, Mr. Cohoon <u>was present</u> for Sergeant Klump's reference to disorderly conduct. (PFOF ¶ 123.) However, Mr. Cohoon has continued to publicly voice his opinions and thoughts about his daughter's diagnosis and the encounter with the Marquette County Sheriff's Department. (PFOF ¶ 143.) On March 28, 2020, Mr. Cohoon posted on Facebook about the conversation with Sergeant Klump. (PFOF ¶ 144.) In a lengthy

16

posting, Mr. Cohoon relayed his version of what took place and encouraged all to share his post by stating "SHARE THE HELL OUT OF IT." (PFOF ¶ 144.) Mr. Cohoon continued to post about the incident by referencing a photograph of Ms. Cohoon in the hospital and asserting that the Sheriff and School Administrator "forced Amyiah to remove by threats of arrest and disorderly conduct citations." (PFOF ¶ 145.) Mr. Cohoon continued to post numerous times about the interaction and his actions belie any argument that Defendants' actions would deter a person of ordinary firmness from exercising his or her First Amendment rights.

**D.      There was Probable Cause for Violation of State Law or County Ordinance.**

Courts have explicitly stated that in most cases, the existence of probable cause is a defense to a First Amendment Retaliation claim based on arrest. *Nieves v. Bartlett,* 139 S. Ct. 1715, 1722 (2019). As the Plaintiff points out, presumably the same defense would exist for retaliation claims based on the threat of arrest.

**1.      Probable Cause Generally**

Probable cause is a "fluid concept that relies on the common-sense judgment of the officers based on the totality of circumstances." *U.S. v. Reed*, 443 F. 3d 600, 603 (7th Cir. 2006). It "is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind*., 320 F. 3d 733, 742–43 (7th Cir. 2003).

At the heart of the probable cause analysis is "what the police know, not whether they know the truth . . . ." *Gramenos v. Jewel Companies, Inc*., 797 F.2d 432, 439 (7th Cir. 1986). Thus, in making the determination, the test is an objective one: "whether a reasonable officer would have believed the person had committed a crime. If so, the arrest is lawful even if the belief would have been mistaken." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998).

Importantly, an eye witness's complaint or information is sufficient, in and of itself, to form probable cause. *See, e.g., Grimm v. Churchill,* 932 F. 2d 674, 675–76 (7th Cir. 1991), *citing Gramenos v. Jewel Companies, Inc.,* 797 F. 2d 432, 439–40 (7th Cir. 1986). Probable cause to justify an arrest means that the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. *See Ornelas v. U.S.*, 517 U.S. 690 (1996).

### 2. There Was Probable Cause to Believe Amyiah Cohoon Engaged in Disorderly Conduct.

Wisconsin's disorderly conduct statute states: "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance" is guilty of disorderly conduct. *See* Wis. Stat. § 947.01. Marquette County Ordinance § 50.03 is identical to the state statute. The phrase "otherwise disorderly conduct" as used in the statute means conduct of a type not previously enumerated but similar thereto and having a tendency to cause or provoke a disturbance. *State v. Givens,* 28 Wis.2d 109, 135 N.W.2d 780 (1965).

The disorderly conduct statute does not require a showing that there was, in fact, a public disturbance; rather, disorderly conduct includes behavior that "may have" or "tended" to have provoked or aided in making a breach of peace. *State v. Schwebke,* 2002 WI 55, ¶ 32, 253 Wis. 2d 1, 644 N.W.2d 666. Wisconsin's disorderly conduct statute does not proscribe all conduct that tends to annoy other persons, but rather, only that which reasonably offends the sense of decency or propriety of community. *State v. Vinje,* 201 Wis.2d 98, 548 N.W.2d 118 (Ct. App. 1996).

18

Both probable cause and disorderly conduct are flexible concepts, without a fixed definition. *See Ornelas*, 517 U.S. at 695-696; *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987).

A police officer's probable cause determination depends on the elements of the applicable criminal statute. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006). To determine whether there was probable cause to believe that Ms. Cohoon's social media post met the definition of disorderly conduct, the Court should look at two elements: 1) did she engage in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct; and 2) did her conduct occur under circumstances where such conduct tends to cause or provoke a disturbance. *See State v. Maker*, 48 Wis.2d 612, 616, 180 N.W.2d 707 (1970). Under both elements, "[i]t is the combination of conduct and circumstances that is crucial in applying the statute to a particular situation." *Id.*

At the time Sergeant Klump arrived at Ms. Cohoon's residence, he knew that Sheriff Konrath had already been contacted by the Marquette County Health Department regarding concerns over a social media posting made by Ms. Cohoon. (PFOF ¶ 92-94.) In the posting, she stated she had been afflicted with and ultimately beaten COVID-19. (PFOF ¶ 75, 92.) According to the information that Sheriff Konrath and Sergeant Klump received from the Marquette County Health Department, Ms. Cohoon had actually tested negative for COVID-19. (PFOF ¶ 82.) Sergeant Klump was further informed that Ms. Cohoon's social media posting was causing significant disturbance, anxiety, fear, concern, and even panic among other citizens, especially because of Ms. Cohoon's recent attendance on a band trip with dozens of other students, faculty, staff, and parent chaperones. (PFOF ¶ 83-84.) As far as law enforcement understood the Plaintiff's post to be knowingly false and touching on an area of significant consequence to

19

public health, the foregoing constituted at least probable cause for the "otherwise disorderly conduct" element.

As further evidence of otherwise disorderly conduct and disturbance in the community, Sheriff Konrath was advised by Nurse Davey that she had received several calls from community residents who were concerned, panicked, and disturbed about this posting and the claim that Ms. Cohoon had tested positive for COVID-19; this would mean that numerous others in the community may have been exposed to the illness. (PFOF ¶ 83-84, 142.) These citizens were understandably concerned about whether they had been exposed to COVID-19, whether they needed to be tested and/or treated, and whether they needed to miss work and potentially self-quarantine away from other family members and away from the community to stem further spread of COVID-19. (PFOF ¶ 65-69, 142.) The need to field the litany of telephone calls about Ms. Cohoon's panic-inducing social media post by the Health Department and the school district further pressed the already-strained resources of the Department. (PFOF ¶ 72.) This information supported a reasonable belief that Ms. Cohoon engaged in "otherwise disorderly conduct."

The second element requires a determination of whether, under the circumstances as they existed at the time, Ms. Cohoon's statement tended to cause or provoke a disturbance. It is not necessary that an actual disturbance result from the conduct of a defendant. *City of Oak Creek v. King,* 148 Wis. 2d 532, 545, 436 N.W.2d 285 (1989). Instead, the Court needs only examine whether the conduct was of the type that tends to cause or provoke a disturbance under the circumstances as they then existed. *Id.*

Ms. Cohoon's posting was the embodiment of the type of conduct that would tend to cause or provoke a disturbance, especially when viewed in light of the unique and unprecedented circumstances as they existed at the time. The highly contagious novel coronavirus with which

20

Ms. Cohoon publically claimed to be afflicted had already resulted in the World Health Organization declaring a public health emergency, declarations of a public health emergency by multiple states including Florida and Wisconsin, a proclamation of a national emergency by the President of the United States, and the closure of all public and private schools in the State of Wisconsin. (PFOF ¶ 146.) As of March 23, 2020, positive cases of COVID-19 in the United States had risen 119% in the previous 72 hours and five Wisconsinites had already died. (PFOF ¶ 147.) There was and still is no known cure or vaccine for COVID-19. (PFOF ¶ 148.)

Understandably, the public was becoming increasingly concerned with contracting COVID-19 as demonstrated by the inundation of concerned calls the Health Department received as a result of Ms. Cohoon's post. In light of these circumstances, it is difficult to imagine how an individual, who law enforcement believed had falsely claimed to have been afflicted with COVID-19 after returning from a class trip where she was in close contact with numerous adults and minors, would not be deemed to have engaged in conduct that tended to menace, disrupt, or destroy public order. Such conduct certainly constitutes a disturbance.

Both the potential effects and the actual effects of a defendant's conduct are probative in disorderly conduct cases. *See Maker*, 48 Wis.2d 612. In this case, the reaction to Ms. Cohoon's social media post and the actual effects of her conduct are also probative. In particular, Ms. Cohoon's classmates, their parents, and other County residents were stricken with fear, anxiety, and panic. (PFOF ¶ 142.) A small sampling of community members impacted by the Plaintiff's social media posts have submitted sworn declarations attesting to their response. (PFOF ¶ 142.)

Ms. Cohoon's social media post, which was believed to be inaccurate, not only tended to cause or provoke a disturbance, but actually did cause a disturbance in the community. Therefore, Defendants possessed probable cause that Ms. Cohoon engaged in disorderly conduct

21

prior to any law enforcement interactions with her or her parents. As a result, Ms. Cohoon's First Amendment claim fails as a matter of law.

## III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

### A.    Qualified Immunity Standard

Summary judgment is also appropriate because Defendants are entitled to qualified immunity. Defendants could not reasonably have known that their conduct violated Plaintiff's First Amendment rights. Under the qualified immunity doctrine, "government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (2006), *quoting Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Seventh Circuit instructs that "[a]lthough the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007). In determining whether Defendants are entitled to qualified immunity, the trial court conducts a two-step inquiry, but it can choose to start with either step. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, this Court must determine whether the disputed conduct violated a constitutional right. *Borello*, 446 F.3d at 746. Additionally, this Court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.*, *quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal

rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about the legality of his or her conduct. *Saucier*, 533 U.S. at 205-06.

"It is insufficient for a plaintiff simply to point out a recognized constitutional right and claim that the right has been violated." *Borello*, 446 F.3d at 750, *citing Brosseu v. Haugen*, 543 U.S. 194 (2004). The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987).

**B.     It was Not Clearly Established that Sergeant Klump's Contact with the Plaintiff and her Family Amounted to any form of Actionable Retaliation**

In the context presented in this case, it is not clearly established that a First Amendment Retaliation claim is viable against law enforcement in the absence of a direct threat of arrest to the Plaintiff.  Further, considering that Ms. Cohoon, in the presence of her parents, consented to remove her own post, and that she and Mrs. Cohoon agreed to do so in response to a request, not a threat, it is not clearly established that a law enforcement officer could face First Amendment liability under the circumstances presented in this case. There were no threats of arrest during the interaction with Ms. Cohoon, and any notion of citation or arrest, as alleged in the Complaint, deals in a hypothetical scenario that simply never came to fruition due to Ms. Cohoon's consent.

Thus, it was not clearly established that the nature of the contact between Sergeant Klump and Ms. Cohoon constituted an act of retaliation. A simple recitation of citizens' First

Amendment rights against retaliation does not define the First Amendment right in question with the requisite specificity. *See Volkman v. Ryker*, 736 F.3d 1084, 1089–91 (7th Cir. 2013) (holding that, by only "demonstrate[ing] little more than that the First Amendment right against retaliation, writ large," the plaintiff failed to cite to clearly established law). Further, as discussed above, the information provided to Sergeant Klump established probable cause to initiate the contact with Ms. Cohoon such that a reasonable officer in his position would not have believed that requesting the removal of the post constituted an adverse act that would deprive Ms. Cohoon of her First Amendment rights. *See, e.g.*, *Collins v. City of New York*, 295 F. Supp. 3d 350, 367–68 (S.D.N.Y. 2018).

C. **It was Not Clearly Established that the Nature of the Contact Between Sergeant Klump and Ms. Cohoon amounted to a Deprivation Sufficient to Deter First Amendment Activity in a Person of Ordinary Firmness**

Here, it is not clearly established that the nature of the contact between Sergeant Klump and Ms. Cohoon amounts to a deprivation sufficient to deter First Amendment activity in a person of ordinary firmness. Plaintiff cannot point to any authority clearly establishing that the manner in which Sergeant Klump interacted with Ms. Cohoon violated her rights and her allegations are simply not enough to establish a viable claim or defeat qualified immunity.

The interaction between Sergeant Klump and Ms. Cohoon was cordial and far from even approaching the level of a threat sufficient to chill speech of a person of ordinary firmness. There is no authority that has established that this type of cordial and non-threatening conduct and interaction amounted to a deprivation sufficient to deter First Amendment activity in a person of ordinary firmness. As there is no authority that has established liability in the circumstances presented in this case, Sergeant Klump is protected by qualified immunity.

24

**D.   In the Unique Facts and Circumstances of this Case and the Worldwide Pandemic, it was Not Clearly Established that the Plaintiff's Social Media Post was Protected by the First Amendment**

The First Amendment protects "the cherished rights of mind and spirit." *Malloy v. Hogan*, 378 U.S. 1, 5 (1964). There is no doubt that the First Amendment rights of free speech and expression are fundamental and highly prized, and "need breathing space to survive." *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963). The First Amendment protects conduct, symbols, and non-verbal speech that attempt to express an idea or convey a message that will likely be understood by the viewer. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 296 (1984). It even protects certain demonstrably false speech. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-283 (1964).  Nevertheless, the First Amendment's protections are not absolute. Unprotected speech includes obscenity, defamation, fraud, incitement, and speech integral to criminal conduct.  *U.S. v. Stevens*, 559 U.S. 460, 468 (2010).

In addition to the Constitutional requirements described above, law enforcement also must attempt to reconcile the current realities in state law that in some cases may seem to conflict with our traditional appreciation of First Amendment freedoms.  In light of the COVID-19 pandemic, local health departments, such as the Marquette County Public Health Department, are responsible for "do[ing] what is reasonable and necessary for the prevention and suppression of disease," including taking actions that might otherwise be considered infringements of First Amendment rights. *See* Wis. Stat. § 252.03 (2) (authorizing departments to forbid public gatherings); *see also* § Wis. Stat. 252.02(3)-(4). Health departments are responsible for disease surveillance, contract tracing, improving communication, and public outreach. § Wis. Stat. 252.185.  In fact, the Health Department "may authorize and implement all emergency measures necessary to control communicable diseases." § Wis. Stat. 252.02(6). Any person who violates or

obstructs any statute, rule or health department order related to public health is subject to imprisonment or fines. *See* Wis. Stat. § 252.25.

The word "unprecedented" may seem ubiquitous in the current climate—to the point that it has lost some of its meaning. Nevertheless, the present, ongoing worldwide pandemic is indeed unprecedented. These are unique, extraordinary, and often frightening times in which reasonable fear may be stoked by the most well-meaning gesture or statement. Given the upheaval, uncertainty, concern, and anxiety arising from everything pandemic-related, the Health Department asked the Sheriff to assist in an effort to address the public's growing panic about the pandemic and potential infection caused by Ms. Cohoon's post. To be clear, the Health Department did not ask for Ms. Cohoon to be arrested or for any sort of legally adverse action to be taken against her. Instead, the Health Department requested the law enforcement intervene to request that the social media post be taken down and that is exactly what occurred.

Under these circumstances, it was entirely reasonable for Defendants to believe that they were within their authority to carry out the request of the Health Department in order to ensure that potentially dangerous misinformation about the pandemic would not spread. It was also entirely reasonable for Defendants to believe, even if ultimately incorrectly, that falsely claiming to have COVID-19 is the modern-day equivalent to shouting fire in a crowded theater 100 years ago[5] and therefore does not constitute protected speech. In light of the specific—and

---

[5] One need not look long or far for examples of extreme, dangerous, and even deadly behavior induced by COVID-related misinformation and fear. For example, CNN reported on March 25, 2020 that an Arizona couple tried to self-medicate with fish tank cleaner that contained chloroquine phosphate after hearing reports that it might help treat COVID-19. *See* https://www.cnn.com/2020/03/23/health/arizona-coronavirus-chloroquine-death/index.html, last accessed on April 24, 2020. The husband died and the wife was in critical condition. A federal district court in Florida issued an emergency temporary injunction ordering a supplier to stop selling "an unproven and potentially harmful treatment for Covid-19" that involved the ingestion of a bleach solution. *See U.S. v. Genesis II Church of Health and Healing*, 20-cv-21601 pending in the United States District Court for the Southern District of Florida. And a Wisconsin man was recently charged with killing his wife and sister-in-law after believing he had to kill them to protect them from COVID-19. *See*

unprecedented—context of this case, Plaintiff can do nothing more than forward general propositions and "point out a recognized constitutional right and claim that the right has been violated." *Borello*, 446 F.3d at 750. But this fails to demonstrate that a reasonable official in the position of Defendants would understand that such a false claim would be protected under the First Amendment. Therefore, Defendants are entitled to qualified immunity.

### E. There was Arguable Probable Cause

The probable-cause standard inherently allows room for reasonable mistakes, *see Brinegar v. U.S.*, 338 U.S. 160, 176 (1949), but qualified immunity affords an added layer of protection by shielding officers from "suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' " *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Often termed "arguable probable cause," qualified immunity protects officers who reasonably but mistakenly believe that probable cause exists. *See Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714–15 (7th Cir. 2013). Arguable probable cause also depends on the elements of the predicate offense. *DeFillippo*, 443 U.S. at 36, 99 S.Ct. 2627. Arguable probable cause to arrest for an offense is all that is required. *See Devenpeck v. Alford*, 543 U.S. 146 (2004).

Beyond disorderly conduct there was arguable probable cause for a violation of Marquette County Municipal Code 50.15 (B)(1), which prohibits using a computerized communication system to send a message that a reasonable person would interpret was sent to annoy or offend another person.[6] Acting on the belief Ms. Cohoon knew she was negative for

---

https://www.jsonline.com/story/communities/waukesha/news/waukesha/2020/04/08/waukesha-man-charged-stabbing-left-2-dead-2-injured/2972486001/ (last accessed on April 24, 2020.)

[6] Wisconsin Statute §800.02(6), allows an officer to arrest without a warrant for an ordinance violation if the officer has "reasonable grounds to believe that the person is violating or has violated the ordinance."

COVID-19 and still posted she had COVID-19 to persons she had close contact with would cause a reasonable officer to believe the post was done to annoy or offend others.

Even if this Court does not find actual probable cause existed, it was at least objectively reasonable for Sheriff Konrath and Sergeant Klump to believe probable cause existed for either disorderly conduct or a violation of Marquette County Municipal Code 50.15.

## IV.    ANY OFFICIAL-CAPACITY OR *MONELL* CLAIM FAILS AS A MATTER OF LAW

Plaintiff has not named Marquette County as a defendant in this action, but she appears to make official-capacity claims against Sheriff Konrath and Sergeant Klump. (*See* Dkt. No. 1, ¶¶ 4–5.) "An official capacity claim is tantamount to a claim against the government entity itself." *Gusman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007); *Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013); *see also Monell v. Dept. of Social Serv*, 436 U.S. 658, 690 (1978). For the reasons outlined below, Plaintiff's official-capacity claims against Sheriff Konrath and Sergeant Klump fail as a matter of law.

### A.    Plaintiff's Official-Capacity Claims Fail as a Matter of Law Because Plaintiff Cannot Establish a Constitutional Deprivation.

As a threshold matter, there can be no municipal liability where a plaintiff fails to establish a constitutional deprivation from the underlying encounter. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597–98 (7th Cir. 1997). In other words, if this Court determines there is no constitutional basis for individual-capacity liability against Sheriff Konrath and Sergeant Klump, there is no need to address Plaintiff's official-capacity claims. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 527 (7th Cir. 2001).

As explained throughout Defendants' Brief, Plaintiff's First Amendment claim fails as a matter of law. Because Sheriff Konrath and Sergeant Klump did not violate Plaintiff's

constitutional rights individually, there can be no municipal liability via the official capacity claims against Sheriff Konrath or Sergeant Klump as a matter of law. Therefore, summary judgment is appropriate.

### B. No Final Policymaker's Decision Deprived Plaintiff of Her First Amendment Rights as a Matter of Law.

In general, to succeed on an official capacity claim, a plaintiff must demonstrate that a policy or custom caused a deprivation of her constitutional rights. *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). Specifically, a plaintiff must establish: "the requisite culpability (a 'policy or custom' attributable to municipal policymakers) and the requisite causation (a policy or custom was 'moving force' behind the constitutional deprivation)." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

Although she alleges that she intends to sue Sergeant Klump in his official capacity, Plaintiff does not allege that Sergeant Klump had final policymaking authority over the subject matter at issue. (*See* Dkt. No. 1, ¶ 5.) For that reason alone, the official-capacity claim against Sergeant Klump fails as a matter of law and should be dismissed. *See, e.g.*, *Ryan v. Sawyer County*, No. 13-cv-782-jdp, 2014 WL 7014921, at *6 n.3 (W.D. Wis. Dec. 11, 2014).

Thus, Plaintiff's sole official capacity claim is premised on her bald allegation that, "as the 'final policymaking authority' for the Marquette County Sheriff's Office, Sheriff Konrath's decision in this matter represents the official 'policy' of that Office for purposes of liability under *Monell* . . . ." (Dkt. No. 1, ¶ 78.) However, "not every action taken by employees with decisionmaking authority gives rise to the potential for liability . . . ." *Eversole v. Steele*, 59 F.3d 710, 715 (7th Cir. 1995) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986)); "The fact that a particular official—even a policymaking official—has discretion in the exercise

of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82.

In order to prevail on an official capacity claim premised on a policymaker's alleged decision, Plaintiff must show that a "policymaker responsible for establishing final policy with respect to the subject matter in question made a deliberate choice to follow a course of action from among various alternatives." *De Smet v. Snyder*, 653 F. Supp. 797, 802 (E.D. Wis. 1987); *Pembaur*, 475 U.S. at 483. In other words, Plaintiff must show that the "policymaker's act [was] in conformance with, or in the creation of, governmental rules that have the effect of law (and then the rule must violate the plaintiff's constitutional rights)." *McGreal v. Ostrov*, 2002 WL 1784461, * 3 (N.D. Ill. 2002), *citing Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). In kind, "a policymaker's decision will rarely have the force of policy unless the decision will govern similar issues in the future." *Id.*

Here, neither Plaintiff's allegations nor the evidence satisfy the elements for an official capacity, policymaker-*Monell* claim against Sheriff Konrath. The evidence is insufficient to support Plaintiff's official capacity theory. Sheriff Konrath spoke to Sergeant Klump about the Health Department's request that the Sheriff's Department make contact with Ms. Cohoon and ask her if she would be willing to voluntarily remove her Instagram post incorrectly stating that she had overcome COVID-19. Sergeant Klump went to Ms. Cohoon's residence, asked if she was willing to remove the post, and she voluntarily complied. Sheriff Konrath specifically instructed Sergeant Klump to contact him in the event that Ms. Cohoon did not voluntarily remove the Instagram post so that further decisions could be made. However, because Ms. Cohoon consented to Sergeant Klump's request, no additional decisions were made. Thus, because Sergeant Klump's encounter with Ms. Cohoon started and ended with her agreement to

Case 2:20-cv-00620-JPS   Filed 04/24/20   Page 30 of 31   Document 15

remove the Instagram post, Sheriff Konrath was never faced with making a "deliberate choice to follow a course of action from among various alternatives." *De Smet*, 653 F. Supp. at 802; *Pembaur*, 475 U.S. at 483.

Plaintiff's official-capacity claim against Sheriff Konrath thus amounts to nothing more than a cursory allegation that Sheriff Konrath is a policymaker for the Sheriff's Department. As the lack of supporting evidence shows, that allegation effectively seeks to hold Marquette County vicariously liable for the routine acts of its sheriff. This circuit's case law has routinely rejected such attempts at expanding *Monell* liability.

## Conclusion

Based on the foregoing, the Defendants respectfully request that the Court deny the Plaintiff's Motion for Preliminary Injunction and grant the Defendants' Motion for Summary Judgment, dismissing this action with prejudice and costs.

Dated this 24th day of April, 2020.

By:   s/ Sara C. Mills
      SAMUEL C. HALL, JR.
      State Bar No.: 1045476
      SARA C. MILLS
      State Bar No.: 1029470
      CRIVELLO CARLSON, S.C.
      Attorneys for Defendants, Joseph Konrath
      and Cameron Klump
      710 N. Plankinton Avenue
      Milwaukee, WI 53203
      Telephone: 414.271.7722
      Fax: 414.271.4438
      Email: shall@crivellocarlson.com
             smills@crivellocarlson.com