AMYIAH COHOON, a minor,
by and through her parents,
Richard Cohoon and Angela Cohoon,

     *Plaintiff*,

                             Case No. 2:20-CV-620-JPS

v.

JOSEPH KONRATH and CAMERON KLUMP,

     *Defendants*.

## DEFENDANTS' PROPOSED FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT

Defendants, Sheriff Joseph Konrath and Sergeant Cameron Klump, by and through their attorneys, hereby submit the following Proposed Facts in Support of Defendants' Motion for Summary Judgment:

1.     In March 2020, the Westfield School District took approximately 100 students, teachers, and chaperones on this trip. (Dec. of Sopha, ¶ 19.)

2.     While Ms. Cohoon and her classmates were in Florida, states, counties, and municipalities around the country began enacting various orders limiting public gatherings and requiring the closure of non-essential businesses due to the emerging COVID-19 pandemic. (*See* Dkt. No. 1, ¶ 11; *see also* Dec. of Mills, Ex. 5 (Emergency Order # 12 "Safer at Home Order"); Dec. of Ezell, ¶ 6.)

3.     Before the School District's trip, the Director of Marquette County's Health Department, Jayme Sopha, and Marquette County Public Health Nurse Allison Davey met with School District Superintendent Robert Meicher and School District

Nurse Wollert to discuss the public health issues in taking the trip regarding COVID-19, including states that were facing community spread issues at the time, quarantine requirements, or no-travel recommendations. (Dec. of Sopha, ¶ 20.)

4.     The School District decided to proceed with the bus trip to Florida, during which states increased their responses to the spreading virus, including issuing stay-at-home orders and no-travel recommendations. (Dec. of Sopha, ¶ 20.)

5.     Local public health departments like Marquette County's Health Department have close working relationships with the Wisconsin Bureau of Communicable Disease and the Wisconsin Lab of Hygiene. (Dec. of Sopha, ¶ 6.)

6.     It is State Protocol that the Health Department is notified of diagnosis and testing of Category 1 diseases immediately upon identification. (Dec. of Davey, ¶ 3).

7.     COVID-19 is a Category 1 disease, meaning under Wisconsin Department of Health Services Administrative Codes, a diagnosis of COVID-19 must be reported immediately to the local health officer. (Dec. of Davey, ¶ 3).

8.     These state agencies have issued guidelines to local public health departments to respond to the COVID-19 crisis. (Dec. of Sopha, ¶ 6.)

9.     The most widely used laboratory test for the virus is the PCR test, which stands for Polymerase Chain Reaction. (Dec. of Sopha, ¶ 7.)

10.     State officials from the Bureau of Communicable Disease and Wisconsin State Lab of Hygiene have stated to local health departments the PCR test yields a high degree accuracy rate. (Dec. of Sopha, ¶ 7.)

11.     Recent data from the state shows that of 49,660 COVID-19 tests, 4,346 returned positive, meaning 8.7% of tests administered to (likely symptomatic) cases returned as positive. (Dec. of Sopha, ¶ 8).

12.     Failures of the PCR test are generally attributable to three circumstances: using an improper testing method, improper storage or shipping methods, or testing outside of the infectious period. (Dec. of Sopha, ¶ 9).

13.     An improper testing method under the PCR test means the biological sample taken from the tested subject was insufficient to test. (Dec. of Sopha, ¶ 10).

14.     An insufficient sample could be due to an unsuccessful Nasopharyngeal Swab that is necessary for the test. (Dec. of Sopha, ¶ 10).

15.     The Nasopharyngeal Swab can be physically uncomfortable for the tested individual, and is thus at times difficult for the individual to complete at times. (Dec. of Sopha, ¶ 10).

16.     Regardless of the reason why a sample is insufficient, an insufficient sample yields no results to the test, meaning neither a positive nor negative result is obtained. (Dec. of Sopha, ¶ 10).

17.     Re-testing a sufficient sample is the only way the test will yield a positive or negative result. (Dec. of Sopha, ¶ 10).

18.     The state notifies local health departments if a COVID-19 testing sample is inadequate, or, when the sample was sufficient, the positive or negative result of the test. (Dec. of Sopha, ¶ 11).

19.     Improper storage or shipping methods means that the collected sample was not stored in the correct transfer media, was not kept adequately cool, or was not received by the lab within the required timeframe.  (Dec. of Sopha, ¶ 12).

20.     In cases of improper storage or shipping, the lab indicates that the sample was not tested due to these factors. (Dec. of Sopha, ¶ 12).

21.     The testing period for COVID-19 is during the infectious period. (Dec. of Sopha, ¶ 13).

22.     When a citizen tests positive for COVID-19, the County Health Department is notified of that result through the state's reporting system, the Wisconsin Electronic Disease Surveillance System. (Dec. of Sopha, ¶ 18).

23.     Based upon data to date, a person becomes infectious about 48 hours before they develop symptoms and remain infectious until they have been symptom free for the past 72 hours, without the aid of medication. (Dec. of Sopha, ¶ 13).

24.     If a person has COVID-19 and is experiencing symptoms, they are shedding the virus regardless of the medical treatment received. (Dec. of Sopha, ¶ 13).

25.     This data and infectious period criteria means the person will test positive for the virus with a significant degree of certainty within the infectious period, including when they are symptomatic. (Dec. of Sopha, ¶ 13).

26.     If the person is tested outside this infectious period, they are asymptomatic. (Dec. of Sopha, ¶ 14).

27.     If the person is tested outside this infectious period, confirmation of the disease is unlikely. (Dec. of Sopha, ¶ 15).

28.     Diagnosing the virus without testing is not recommended by the state agencies because the symptoms of COVID-19 have continually changed over the last month and a half. (Dec. of Sopha, ¶ 16).

29.     Original symptoms for COVID-19 were identified as fever, cough, and shortness of breath. (Dec. of Sopha, ¶ 16).

30.     These original symptoms of COVID-19 were also characteristic of the common cold, pneumonia, and influenza, to name a few other illnesses. (Dec. of Sopha, ¶ 16).

31.     Symptoms of COVID-19 have expanded to include gastrointestinal symptoms like nausea, vomiting, and diarrhea, as well as loss of taste, smell, and other symptoms. (Dec. of Sopha, ¶ 16).

32.     These expanded symptoms of COVID-19 are also found in cases of food poisoning, allergies, or the common cold. (Dec. of Sopha, ¶ 16).

33.     Accordingly, anyone experiencing the original or expanded symptoms of COVID-19 could be incorrectly diagnosed as having COVID-19 without proper testing. (Dec. of Sopha, ¶ 16).

34.     The state guidelines do not require investigation by local health departments without a confirmed positive test. (Dec. of Sopha, ¶ 16).

35.     When a citizen tests positive for COVID-19, the County Health Department is notified of that result through the state's reporting system, the Wisconsin Electronic Disease Surveillance System. (Dec. of Sopha, ¶ 11, 18.)

36.     On March 25, 2020, Marquette County Public Health Nurse Davey received an email from the Westfield School District nurse, Nicole Wollert, stating that

the school district had learned in the past week from a mother of a Marquette County student that her daughter had contracted COVID-19 while on the recent band trip to Florida and that the student was now in a hospital and may be placed on a "respirator." (Dec. of Davey, ¶ 2.)

37.     In this email, Nurse Wollert asked Nurse Davey if there were any confirmed cases of COVID-19 in Marquette County. (Dec. of Davey, ¶ 2.)

38.     Nurse Davey called Nurse Wollert and advised her that the Department had not received any notice through the Wisconsin Electronic Disease Surveillance System and that there were no confirmed cases of COVID-19 in the County at that time. (Dec. of Davey, ¶ 3.)

39.     Nevertheless, Nurse Davey requested contact information for the student's family so that she could reach out to the family, ask how the student was doing, and offer the County's assistance. (Dec. of Davey, ¶ 3.)

40.     This was the County Health Department's standard protocol regarding potential threats of communicable diseases. (Dec. of Davey, ¶ 3.)

41.     Nurse Davey called Ms. Cohoon's mother, Mrs. Angela Cohoon, later on March 25, 2020. Mrs. Cohoon stated in this conversation that they had taken Ms. Cohoon to the emergency room at Divine Savior Hospital. (Dec. of Davey, ¶ 4.)

42.     Nurse Davey then called the Divine Savior emergency room and spoke with a nurse, named Lindsey, who confirmed that Ms. Cohoon was in the emergency room and was most likely going to be tested for COVID-19 and transferred to the children's hospital at UW-Madison. (Dec. of Davey, ¶ 6.)

43.     During the morning of March 26, 2020, the Marquette County Health Department received notification through the state's reporting system that Ms. Cohoon had been tested for COVID-19 and that her test was negative. (Dec. of Davey, ¶ 9; Dec. of Sopha, ¶ 29.)

44.     Nurse Davey then advised Nurse Wollert on March 26th that there were still no confirmed cases of COVID-19 in Marquette County. (Dec. of Davey, ¶ 10.)

45.     Later on March 26, 2020, the Westfield School District's superintendent, Robert Meicher, contacted Nurse Davey advising of a social media post by Ms. Cohoon stating that she had COVID-19 and asked Nurse Davey whether there were any confirmed COVID-19 cases in Marquette County. (Dec. of Davey, ¶11.)

46.     Nurse Davey advised Mr. Meicher that there were no confirmed cases and that the School District would be notified of any confirmed cases through the County's Emergency Operation Center. (Dec. of Davey, ¶11.)

47.     The Emergency Operation Center is a Marquette County system implemented to deal with the County's coordinated response to the spreading virus operationally across County departments.  Health Department Director Jayme Sopha is in charge, with different tasks delegated to different County officials. (Dec. of Davey, ¶ 12.)

48.     Leading up to and after the School District's trip, the County Health Department received telephone calls from concerned citizens in the community who were supposed to go on the trip and other community members who were concerned about their fellow citizens taking the trip under the then-current health circumstances. (Dec. of Sopha, ¶ 21; Dec. of Davey, ¶13.)

49.     After Ms. Cohoon's posting on social media, the Health Department received phone calls from other parents and concerned citizens regarding Ms. Cohoon's social media postings about having COVID-19. (Dec. of Davey, ¶ 13.)

50.     Marquette County has a population of approximately 15,200. The County's Health Department has a staff of approximately eight employees, all of whom have had to devote most of their daily tasks to responding to COVID-19, including policy making, documentation for incident command, tracking financial data, disclosing public information, responding to issues from public business, contact tracing, and responding to individual citizens' issues and concerns. (Dec. of Sopha, ¶ 4.)

51.     As a result of the concern created by Ms. Cohoon's claim that she had tested positive for COVID-19, Heath Department resources were shifted away from other day to day tasks of dealing with COVID-19 issues and other public health issues to responding to these numerous calls. (Dec. of Davey, ¶ 13.)

52.     The Health Department, including Nurse Davey, had received telephone calls from other parents and concerned citizens regarding Amyiah Cohoon's social media postings about having COVID-19. (Dec. of Davey, ¶ 13).

53.     Health Department officials explained to the concerned citizens that there were no confirmed cases of COVID-19 in the County and tried to alleviate their concerns and fear about the positive COVID-19 that Ms. Cohoon's social media posting portrayed. (Dec. of Davey, ¶ 13.)

54.     However, the Department's attempts to alleviate concerns did not appear to be able to keep pace with the growing disturbance and concern within the community. (Dec. of Davey, ¶ 13.)

55.     The Health Department was also made aware by Nurse Wollert that the School District had been receiving numerous telephone call from concerned citizens and parents regarding Amyiah Cohoon's social media postings about having COVID-19, expressing increased concern and fear about the potential positive COVID-19 case.. (Dec. of Davey, ¶ 13-14.)

56.     Director Sopha discussed with Health Department staff the option of contacting the Sheriff's Department to request assistance in dealing with the increasing unrest and fear in the community regarding Ms. Cohoon's claim of a positive COVID-19 case. (Dec. of Sopha, ¶ 25; Dec. of Davey, ¶ 17.)

57.     After learning of the increasing telephone calls to the School District and County Health Department from concerned citizens and people who went on the band trip, Director Sopha contacted Marquette County Sheriff Joseph Konrath to forewarn him that there appeared to be increasing concern or unrest in the community regarding a potential positive COVID-19 case, even though there were no confirmed cases. (Dec. of Sopha, ¶ 23.)

58.     Sheriff Konrath and Director Sopha discussed possible options for responding to the escalating situation. (Dec. of Sopha, ¶ 24.)

59.     As part of their conversation about the unfolding events, Sheriff Konrath and Director Sopha discussed a nearby community's response to a citizen's false claim of having tested positive for COVID-19 that had been recently covered in the media. (Dec. of Sopha, ¶ 24.)

60.     The incident occurred in Lodi, a city in neighboring Columbia County. The Lodi citizen posted on social media that she was diagnosed with COVID-19, even

though she had not, which led other local citizens to contact government officials about the threat and resulted in a local business not allowing its employees to report to work, all allegedly because of the false claim. (Dec. of Sopha, ¶ 24.)

61.     The Lodi Police Department had recommended that the citizen be charged with disorderly conduct as a result of the false claim. (Dec. of Sopha, ¶ 24, Ex. 4.)

62.     As Director and Health Officer of the Health Department, Director Sopha's biggest concern during this COVID-19 crisis has been maximizing the Health Department's ability to prevent the spread of the virus and to effectively respond to the community's needs. (Dec. of Sopha, ¶ 26.)

63.     False reporting of COVID-19, like Ms. Cohoon's social media posting, caused an unnecessary disturbance and additional mental distress and panic in the community. (Dec. of Sopha, ¶ 26.)

64.     After careful consideration and discussions with Health Department staff and the Sheriff, Director Sopha determined that contacting the Sheriff's Department may be an option in their efforts to present accurate information on the virus to the community and may allow the Health Department to continue to respond to the community's needs as effectively as possible. (Dec. of Sopha, ¶ 25.)

65.     A positive test result of COVID-19 for Amyiah Cohoon would have required contacting each of the people who were on the band trip to screen for their symptoms. (Dec. of Sopha, ¶ 27).

66.     A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to advise each person on the band trip to

quarantine themselves at home for 14 days, including being off from work in critical positions within the community, such as healthcare. (Dec. of Sopha, ¶ 27).

67.    A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to check-in with each person by phone twice a day to screen for symptoms. (Dec. of Sopha, ¶ 27).

68.    A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to ensure those who reported symptoms to be referred for testing for COVID-19. (Dec. of Sopha, ¶ 27).

69.    If symptoms or positive tests occurred, each person who tested positive would have been interviewed by the Health Department for contact tracing – they would have been asked who they had had recent contact with, and for contact information for those people so the County could follow up with them as well. (Dec. of Sopha, ¶ 27).

70.    In order to respond to a positive diagnosis of COVID-19 of Amyiah Cohoon, the County began to plan, in coordination with other County officials, for resource requirements, including pulling other County employees, including from the Human Services and Zoning Departments, into the Health Department's efforts, as well as summoning on-call EMTs to assist with contact-tracing. (Dec. of Sopha, ¶ 28).

71.    New staff brought in for the Health Department's response to a positive COVID-19 diagnosis would have had to be trained on confidentiality and screening policies and procedures. (Dec. of Sopha, ¶ 28).

72.    Increased civil unrest in the community about a false positive test added to the significant strain on resources within the Marquette County Health Department in its efforts of responding to the virus. (Dec. of Sopha, ¶ 30).

73. Staff resources were diverted to responding to community concerns about Amyiah's social media postings and claim of having COVID-19. (Dec. of Sopha, ¶ 30).

74. These diverted resources hinder the Department's ability to attempt to respond to the changing circumstances of the virus. (Dec. of Sopha, ¶ 30).

75. Around 5:30 p.m. on March 27, 2020, Nurse Davey received a telephone call from School District Nurse Wollert and learned that parents of students continued to call the School District regarding Amyiah's social media postings regarding being positive for COVID-19. (Dec. of Davey, ¶ 14).

76. Nurse Wollert emailed Nurse Davey a copy of Amyiah Cohoon's latest social media posting in which she stated she was "finally home after being hospitalized for a day and a half. [She was] still on breathing treatment but ha[d] beaten the corona virus. Stay home and be safe." (Dec. of Davey, ¶ 14).

77. The posting forwarded by Nurse Wollert included a photograph of Amyiah Cohoon in a hospital gown, on a hospital bed, with a breathing mask on. (Dec. of Davey, ¶ 14).

78. Following her communication with Nurse Wollert, Nurse Davey called Sheriff Joseph Konrath and asked if he would follow up with Amyiah Cohoon regarding her social media postings on having COVID-19. (Dec. of Davey, ¶ 15; Dec. of Konrath, ¶ 3).

79. Nurse Davey told the Sheriff the County has not had any confirmed COVID-19 cases to date, yet Amyiah Cohoon was still posting she had the virus and had been treated for it, which was causing a disturbance within the community, including unfounded panic and fear. (Dec. of Davey, ¶ 15).

80.     Nurse Davey's intent in requesting the Sheriff to follow up with Amyiah Cohoon was to hopefully have the social media postings voluntarily taken down. (Dec. of Davey, ¶ 16).

81.     Nurse Davey sent Sheriff Konrath an email showing a recent social media post made by Ms. Cohoon in which Ms. Cohoon stated as follows: "I am finally home after being hospitalized for a day and a half. I am still om (sic) breathing treatment but have beaten the corona virus.  Stay home and be safe" (Dec. of Konrath, ¶ 4.)

82.     Sheriff Konrath understood from Nurse Davey that this post had been made after Ms. Cohoon returned from the UW Hospital and after she tested negative for COVID-19. (Dec. of Konrath, ¶ 5.)

83.     Nurse Davey also advised Sheriff Konrath that this social media post was creating unfounded concern, disturbance, and panic amongst the parents and students who had been on the same high school band trip to Florida, among the Westfield School District, in other individuals who had contact with those on the trip, and even from people who had simply seen the posting. (Dec. of Konrath, ¶ 6.)

84.     Sheriff Konrath was advised that the Marquette County Health Department also received several calls from community residents who were disturbed and inquiring about this posting and whether Ms. Cohoon had tested positive for COVID-19. (Dec. of Konrath, ¶ 6.)

85.     These calls to the Health Department were negatively impacting the already-strained resources of the Marquette County Health Department. (Dec. of Konrath, ¶ 6.)

86.     Sheriff Konrath was also advised that school officials also were forced to respond to repeated inquiries related to this social media post. (Dec. of Konrath, ¶ 6.)

87.     Ms. Cohoon's social media post was concerning to Sheriff Konrath as well, because it appeared to convey false information, given the negative test result as described to the Sheriff by the County Health Department. (Dec. of Konrath, ¶ 7.)

88.     It was also concerning because it was causing panic, concern, and disturbance with community members who may have had contact with Ms. Cohoon or others on the class field trip. (Dec. of Konrath, ¶ 7.)

89.     It was the Sheriff's understanding that these individuals understandably expressed concern over whether they potentially had COVID-19 in light of being in contact with Ms. Cohoon on the school trip and were worried whether they needed to be tested and whether they needed to call off of work and self-isolate away from other family members. (Dec. of Konrath, ¶ 7.)

90.     Given the panic, concern, and disturbance within the community created by this social media post, and in light of the fact Ms. Cohoon actually tested negative for COVID-19, Nurse Davey requested that the Sheriff's Department talk to the Cohoon family to see if Ms. Cohoon would agree to remove the social media post in which she stated she had beaten COVID-19. (Dec. of Konrath. ¶ 8.)

91.     Shortly after speaking with Nurse Davey, Sheriff Konrath spoke with Patrol Sergeant Klump, who was on duty at the time. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 3-4.)

92.     Sheriff Konrath relayed to Sergeant Klump that Ms. Cohoon had made a post on social media in which she reported that she had beat COVID-19, but the

Marquette County Health Department had advised that Ms. Cohoon tested negative. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 4, Ex. 3.)

93.    Sheriff Konrath also relayed to Sergeant Klump that such posting was concerning as it was conveying false information given the negative result and it was now creating a disturbance, panic, and unfounded concerns with the parents and students in the Westfield School District, the Marquette County Health Department, and other County residents. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 4.)

94.    Sheriff Konrath explained to Sergeant Klump that both the Marquette County Health Department and the school district were having their resources depleted due to the need to attempt to respond to all of the inquiries related to the inaccurate social media post. (Dec. of Konrath, ¶ 9.)

95.    Sheriff Konrath forwarded to Sergeant Klump the email of the social media post and requested that Sergeant Klump respond to the Cohoon residence, make contact with the Cohoon family, and inquire whether Ms. Cohoon would voluntarily remove the social media post stating that she had beat COVID-19. (Dec. of Konrath, ¶¶ 9-10; Dec. of Klump, ¶ 4.)

96.    If Ms. Cohoon would not agree to remove the social media post voluntarily, Sheriff Konrath mentioned to Sergeant Klump that the Sheriff's Department could proceed with several options. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5.)

97.    Sheriff Konrath discussed with Sergeant Klump that there would be a wide range of options if Ms. Cohoon refused to remove the post, including a referral for Disorderly Conduct, working with the Health Department, and contacting Facebook to see if the posting could be removed. (Dec. of Konrath, ¶ 11.)

98.     Sheriff Konrath never directed Sergeant Klump to arrest or issue a disorderly conduct ticket to Ms. Cohoon if she did not agree to voluntarily remove the posting.  (Dec. of Konrath, ¶ 11.)

99.     Rather, if Ms. Cohoon refused to take the social media post down, Patrol Sergeant Klump would assess the situation further. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5, 24.)

100.     Sergeant Klump would contact Sheriff Konrath before he proceeded with any further action, particularly the issuance of a citation or making a referral for disorderly conduct. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5, 24.)

101.     The law enforcement contact at the Cohoon home on March 27, 2020 was the subject of both an audio and video recording. (See generally, Dec. of Warren ¶ 2-4, Ex. 2; Dec of Klump, ¶ 7.)

102.     Upon arriving at the Cohoon home, Sergeant Klump requested to speak to Amyiah Cohoon's father. Mr. Richard Cohoon came to the door and then stepped outside to speak with Patrol Sergeant Klump, closing the front door behind him while Ms. Cohoon remained in the home.  (Dec. of Klump, ¶ 6-9; Ex. 2.)

103.     Sergeant Klump initially asked Mr. Cohoon questions about his daughter, her school trip, about whether she thought she had COVID-19, and whether she had been tested.  (Dec. of Klump, ¶ 10; Ex. 2.)

104.     Mr. Cohoon began to explain Ms. Cohoon's hospital course and offered to show Sergeant Klump a copy of records from Ms. Cohoon's emergency room visit on March 22, 2020. Mr. Cohoon then stepped into the home briefly, presumably to ask Mrs.

Cohoon to bring the record outside, and then re-emerged from the house and indicated that Mrs. Cohoon would bring the hospital record.  (Dec. of Klump, ¶ 11; Ex. 2.)

105.    Shortly thereafter, Mrs. Cohoon provided Patrol Sergeant Klump with a Divine Savior record from March 22, 2020, which he reviewed. When provided these records by the Cohoons, Patrol Sergeant Klump never said anything remotely similar to the allegation contained in the Complaint that he stated that he "was not there to gather information, just to complete Sheriff Konrath's orders."  (Dec. of Klump, ¶ 12; Ex. 2.)

106.    Rather, Mr. Cohoon described Ms. Cohoon's medical history over the course of the last week. This included information confirming Ms. Cohoon had been tested for COVID-19 at the UW Children's Hospital on March 25, 2020 and that the test came back negative on the morning of March 26, 2020. (Dec. of Klump, ¶ 13; Ex. 2.)

107.    Mr. Cohoon confirmed the negative test a second time during their conversation. (Dec. of Klump, ¶ 13.)

108.    At approximately 19:02:51 in the video, for the first time, Sergeant Klump explained the reason he was there: to discuss Ms. Cohoon's social media[1] post in which she stated she had "beaten COVID-19," even though she had in fact tested negative. (Dec. of Klump, ¶ 14; Ex. 2.)

109.    Sergeant Klump relayed to Mr. and Mrs. Cohoon that this post was causing many issues with students and parents within the school district and showed Mr. Cohoon the screenshot of the post he had received via email from the Sheriff.  (Dec. of Klump, ¶ 14; Ex. 2.)

---

[1] At the time their encounter began, Sergeant Klump believed that the post in question had been made on Facebook. It was later confirmed that the post had been made on Instagram. (Dec. of Klump, ¶ 15.)

110.    Sergeant Klump explained to Mr. and Mrs. Cohoon that Sheriff Konrath had been contacted by the Marquette County Health Department requesting that the Sheriff's Department make contact with the Cohoon family and talk to Ms. Cohoon to see if she would delete her post. (Dec. of Klump, ¶ 15; Ex. 2.)

111.    Mrs. Cohoon then responded "okay," which Patrol Sergeant Klump interpreted as her agreement to take the post down, though he understood that Mrs. Cohoon may not have been speaking for her daughter, who appeared to have actually authored the post.  (Dec. of Klump, ¶ 16; Ex. 2.)

112.    At approximately 19:07:05 on the video, Ms. Cohoon stepped outside of the residence for the first time. (Dec. of Klump, ¶ 17; Ex. 2.)

113.    Sergeant Klump explained to the Cohoon family that all he was there for was to figure out what the post was about, seeing that Ms. Cohoon tested negative, and to see if she would take the post down.  (Dec. of Klump, ¶ 17; Ex. 2.)

114.    In response to Sergeant Klump's statement, Ms. Cohoon immediately responded by saying "I'll do it." (Dec. of Klump, ¶ 17; Ex. 2.)

115.    Sergeant Klump took Ms. Cohoon's statement to be a voluntary willingness to delete her Instagram post.  (Dec. of Klump, ¶ 17.)

116.    At approximately 19:08:24 in the video, Sergeant Klump spoke directly to Ms. Cohoon further explaining the situation and why he was there. He informed Ms. Cohoon that with her being in Florida with other parents and students, there was concern about her stating she had COVID-19 and that these parents and students were never notified. (Dec. of Klump, ¶ 18; Ex. 2.)

117.  After additional conversation about Ms. Cohoon's medical course during the past week, at approximately 19:10:16 in the video, Patrol Sergeant Klump stated: "Nonetheless, can we get the post taken down?"  (Dec. of Klump, ¶ 19; Ex. 2.)

118.  In response to his question, both Ms. Cohoon and Mrs. Cohoon immediately agreed to take down the post, by stating "yes." (Dec. of Klump, ¶ 19; Ex. 2.)

119.  Sergeant Klump took Ms. Cohoon's additional statement to express a voluntary willingness to delete the Instagram post.  (Dec. of Klump, ¶ 19.)

120.  Up through the point in time that Ms. Cohoon twice indicated an agreement that she would remove the Instagram post, Sergeant Klump never suggested, insinuated or threatened that anyone could face arrest or any other adverse law enforcement action if there was not an agreement to remove the Instagram post.  (Dec. of Klump, ¶ 20.)

121.  At approximately 19:10:47 of the video, Ms. Cohoon walked inside of the residence, outside of Patrol Sergeant Klump's presence, and closed the door behind her. (Dec. of Klump, ¶ 21; Ex. 2.)

122.  While Ms. Cohoon was outside of Patrol Sergeant Klump's presence and after Ms. Cohoon had already twice indicated that she would remove the Instagram post, at approximately 19:10:48 of the video, Sergeant Klump did state to Mr. Cohoon: "Richard, I don't want to go this far, it was as simple as me coming out here and just getting the post taken down and walking away."  (Dec. of Klump, ¶ 22; Ex. 2.)

123.  After Ms. Cohoon agreed to take down the post and while Ms. Cohoon was inside of her home, presumably to take down the post, Sergeant Klump did tell Mr. Cohoon the potential for disorderly conduct due to the fact that the post was causing a

disturbance to the public by posting that their daughter was positive for COVID-19 and the other parents were upset over this post. (Dec. of Klump, ¶ 22; Ex. 2.)

124. It was only after Ms. Cohoon had already twice agreed to remove the social media post that Sergeant Klump made any statement about the potential for disorderly conduct and arrest. (Dec. of Klump, ¶ 23; Ex. 2.)

125. When Sergeant Klump made these statements about disorderly conduct and arrest, Ms. Cohoon was not present, but rather, was inside the home with the door closed. (Dec. of Klump, ¶ 23; Ex. 2.)

126. Sergeant Klump did not have a plan to immediately issue any citations or make any referrals for disorderly conduct or arrests at that time, even if Ms. Cohoon would not agree to voluntarily remove the posts. (Dec. of Klump, ¶ 24.)

127. Sergeant Klump had previously discussed with Sheriff Konrath that there were a wide range of options if Ms. Cohoon refused to voluntarily remove the post. While this potentially included disorderly conduct, it also included working with the County Health Department to take other actions or potentially contacting the social media platform. (Dec. of Klump, ¶ 24.)

128. If Ms. Cohoon refused to take the social media post down, Sergeant Klump would have further evaluated the situation and discussed the situation with Sheriff Konrath before proceeding with any of the options, including issuance of disorderly conduct citations or arrest for disorderly conduct. (Dec. of Klump, ¶ 24.)

129. At approximately 19:11:25 of the video, Mrs. Cohoon partially entered the home, presumably to check with Ms. Cohoon inside, and then Mrs. Cohoon stated to

Sergeant Klump, "she [Ms. Cohoon] is taking it down now." (Dec. of Klump, ¶ 25; Ex. 2.)

130. Mr. Cohoon re-emerged from the residence and stated that if the post was not there anymore, it should not show up on the phone. (Dec. of Klump, ¶ 26-27; Ex. 2.)

131. Sergeant Klump got the impression that Mr. Cohoon had believed and expected that the post was already removed but suggested to Sergeant Klump that he look at his phone. (Dec. of Klump, ¶ 27.)

132. Mr. Cohoon then appeared to obtain his own phone to check to verify that the post was removed. (Dec. of Klump, ¶ 27; Ex. 2.)

133. Mr. Cohoon then stated to Sergeant Klump: "I kinda understand where you are coming from, like I said, we are failing to understand each other." (Dec. of Klump, ¶ 28; Ex. 2.)

134. At approximately 19:18:44 of the video, Ms. Cohoon re-emerged from the house with her phone in hand and reported to Sergeant Klump that the social media post had been completely taken down. Ms. Cohoon then proceeded to show Patrol Sergeant Klump her phone confirming that the post had been deleted. (Dec. of Klump, ¶ 29; Ex. 2.)

135. Sergeant Klump told Ms. Cohoon that he appreciated her taking the social media post down and she responded "of course." (Dec. of Klump, ¶ 30; Ex. 2.)

136. At no time did Patrol Sergeant Klump ever state or threaten Ms. Cohoon that if she did not take down the social media post, he would arrest her or issue her a disorderly conduct citation. In fact, he never made any threat or other statements to Ms.

Cohoon or in her presence that suggested or referenced arrest or disorderly conduct. (Dec. of Klump, ¶ 31; Ex. 2.)

137.    Sergeant Klump never told Ms. Cohoon that if she did not remove the social media post, he had direct orders from the Sheriff to issue citations for disorderly conduct and taking people to jail.  (Dec. of Klump, ¶ 32-34; Ex. 2.)

138.    At no time did Mr. Cohoon bring Ms. Cohoon outside and explain to Ms. Cohoon that she did not have to delete her post, that he would not delete it if it were his post but that she could decide for herself.  (Dec. of Klump, ¶ 33; Ex. 2.)

139.    All of Sergeant Klump's interactions with the Cohoon family on March 27, 2020 were professional, and he neither raised his voice nor ever threatened Ms. Cohoon with arrest.  (Dec. of Klump, ¶ 35; Ex. 2.)

140.    It was Sergeant Klump's intention to speak with Ms. Cohoon to explain the negative impact her post was having with the hope that she would voluntarily remove the post as requested by the County's Health Department. (Dec. of Klump, ¶ 36.)

141.    Sergeant Klump had significant concerns over this social media post, which was already causing an unfounded concern, a disturbance and panic with parents, students, the County Health Department and other County residents and could continue to cause further panic in the community.   (Dec. of Klump, ¶ 36.)

142.    Ms. Cohoon's social media post, which was believed to be inaccurate, not only tended to cause or provoke a disturbance, but actually did cause a disturbance in the community. (Dec. of Popp, ¶ 8-12; Dec. of Kraft, ¶ 7, 10-13; Dec. of LaFave, ¶ 7, 10-12; Dec. of Ezell, ¶ 8, 10-13.)

143.     Mr. Cohoon has continued to voice his opinions and thoughts about his daughter's diagnosis and the encounter with the Marquette County Sheriff's Department. (Dec. of Mills, ¶ 3, Ex. 6.)

144.     On March 28, 2020, Mr. Cohoon posted on Facebook about the conversation with Sergeant Klump. In a lengthy posting, Mr. Cohoon relayed his version of what took place and encouraged all to share his post by stating "SHARE THE HELL OUT OF IT."  (Dec. of Mills, ¶ 3, Ex. 6.)

145.     Mr. Cohoon continued to post about the incident by referencing a photograph of Ms. Cohoon in the hospital and asserting that the Sheriff and School Administrator "forced Amyiah to remove by threats of arrest and disorderly conduct citations." (Dec. of Mills, ¶ 3, Ex. 6.)

146.     The highly contagious novel coronavirus with which Ms. Cohoon publically claimed to be afflicted had already resulted in the World Health Organization declaring a public health emergency, declarations of a public health emergency by multiple states including Florida and Wisconsin, a proclamation of a national emergency by the President of the United States, and the closure of all public and private schools in the State of Wisconsin. (Dec. of Mills, ¶ 2, Ex. 5.)

147.     As of March 23, 2020, positive cases of COVID-19 in the United States had risen 119% in the previous 72 hours and five Wisconsinites had already died. (Dec. of Mills, ¶ 2, Ex. 5.)

148.     There was and still is no known cure or vaccine for COVID-19. (Dec. of Mills, ¶ 2, Ex. 5.)

Dated this 24th day of April, 2020.

By:     s/ Sara C. Mills
                SAMUEL C. HALL, JR.
                State Bar No.: 1045476
                SARA C. MILLS
                State Bar No.: 1029470
                CRIVELLO CARLSON, S.C.
                Attorneys for Defendants, Joseph
                Konrath and Cameron Klump
                710 N. Plankinton Avenue
                Milwaukee, WI 53203
                Telephone: 414.271.7722
                Fax: 414.271.4438
                Email: shall@crivellocarlson.com
                        smills@crivellocarlson.com