IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

AMYIAH COHOON, a minor,
by and through her parents,
Richard Cohoon and Angela Cohoon,

     Plaintiff,

                                      Case No. 2:20-CV-620-JPS

v.

JOSEPH KONRATH and CAMERON KLUMP,

     Defendants.

---

## DECLARATION OF JAYME SOPHA

---

STATE OF WISCONSIN     )
                           ) ss.
MARQUETTE COUNTY   )

     I, JAYME SOPHA, being first duly sworn upon oath, deposes and states as follows:

     1.     I am the Director and Health Officer of the Marquette County Health Department, and have been in that position since August 2015.  This Declaration is based upon my personal knowledge and review of records and documents in the possession or control of the Health Department.

     2.     Prior to my appointment as Director for the County Health Department, I was employed as an Environmental Health Specialist and later the Supervisor for the Tri-County Environmental Health Consortium.   In these capacities, I provided Environmental Health services, communicable disease investigation, and Food, Safety, and Recreational Licensing programs for Waushara, Green Lake, and Marquette Counties.

1

3.     I obtained my Bachelor's of Science in Environmental and Public Health from the University of Wisconsin-Eau Claire.  I maintain my Registered Environmental Health Specialist certification through the state of Wisconsin.  I also serve as chair of the Northeast Region's Wisconsin Association of Local Health Departments and Boards.

4.     Marquette County has a population of approximately 15,200.  The County's Health Department has a staff of approximately eight employees, all of whom have had to devote most of their daily tasks to responding to COVID-19, including policy making, documentation for incident command, tracking financial data, disclosing public information, responding to issues from public business, contact tracing, and responding to issues and concerns of businesses and individual citizens.

5.     Contact tracing duties for the Health Department staff include following up with citizens who have tested positive, are presumed positive, or have seen their doctors and have been reported as having symptoms consistent with COVID-19.  In all cases, the doctors order these citizens to stay at home to isolate themselves until they are well.  Health Department staff follow up with all of these citizens to screen them for symptoms, interview them for their recent contacts and whereabouts, and continue to monitor the health of these citizens by telephone calls for the duration of their quarantine or infectious periods.

6.     Local public health departments like the County's Health Department have close working relationships with the Wisconsin Bureau of Communicable Disease and the Wisconsin State Lab of Hygiene.  These state agencies have issued guidelines to local public health departments to respond to the COVID-19 crisis.

7.     The most widely used laboratory test for the virus is the PCR, which stands for Polymerase Chain Reaction.  State officials from the Bureau of Communicable Disease and

2

Wisconsin State Lab of Hygiene have stated to local health departments the PCR yields a high degree accuracy rate.

8.    Recent data from the state shows that of 49,660 COVID-19 tests, 4,346 returned positive, meaning 8.7% of tests administered to (likely symptomatic) cases returned as positive.

9.    Failures of the PCR are generally attributable to three circumstances:  using an improper testing method, improper storage or shipping methods, or testing outside of the infectious period.

10.    An improper testing method under the PCR test means the biological sample taken from the tested subject was insufficient to test.  An insufficient sample could be due to an unsuccessful Nasopharyngeal Swab that is necessary for the test.  This swab can physically uncomfortable for the tested individual, and is thus at times difficult for the individual to complete at times.  Regardless of the reason why a sample is insufficient, an insufficient sample yields no results to the test, meaning neither a positive or negative result is obtained.  Re-testing a sufficient sample is the only way the test will yield a positive or negative result.

11.    The state notifies local health departments if a COVID-19 testing sample is inadequate, or, when the sample was sufficient, the positive or negative result of the test.

12.    Improper storage or shipping methods means that the collected sample was not stored in the correct transfer media, was not kept adequately cool, or was not received by the lab within the required timeframe.  In cases of improper storage or shipping, the lab indicates that the sample was not tested due to these factors.

13.    The testing period for COVID-19 is during the infectious period.  Based upon data to date, a person becomes infectious about 48 hours before they develop symptoms and remain infectious until they have been symptom free for the past 72 hours, without the aid of

medication. If a person has COVID-19 and is experiencing symptoms, they are shedding the virus regardless of the medical treatment received. This means the person will test positive for the virus with a significant degree of certainty within the infectious period, including when they are symptomatic.

14. If the person is tested outside this infectious period, they are asymptomatic.

15. If the person is tested outside this infectious period, confirmation of the disease is unlikely.

16. Diagnosing the virus without testing is not recommended by the state agencies because the symptoms of COVID-19 have continually changed over the last month and a half. For example, the original symptoms were identified as fever, cough, and shortness of breath. These symptoms were also characteristic of the common cold, pneumonia, and influenza, to name a few other illnesses. Symptoms have expanded to include gastrointestinal symptoms like nausea, vomiting, and diarrhea, as well as loss of taste, smell, and other symptoms. These symptoms are also found in cases of food poisoning, allergies, or the common cold. Accordingly, anyone experiencing the above symptoms could be incorrectly diagnosed as having COVID-19 without proper testing. The state guidelines do not require investigation by local health departments without a confirmed positive test.

17. I have reviewed Exhibits 1 and 2 to the complaint in this matter, which are discharge instructions for Amyiah Cohoon from Divine Savior Healthcare on March 22, 2020, and a work release form for Amyiah's mother, Angela. The diagnosis on the discharge instructions was for "acute upper respiratory infection, unspecified." There is no diagnosis for COVID-19 on this medical note because there was no PCR completed of Amyiah by the time of

4

her discharge. Similarly, while the work release note mentions "symptoms consistent with COVID-19," there is no diagnosis for the virus noted, untested or otherwise..

18. When a citizen tests positive for COVID-19, the County Health Department is notified of that result through the state's reporting system, the Wisconsin Electronic Disease Surveillance System.

19. Every other year the Westfield School District takes a district-wide band trip to Disney World in Florida. In March 2020, I understand the District took approximately 100 students, teachers, and chaperones on this trip.

20. Before the School District took the band trip, Public Health Nurse Allison Davey and I met with School District Superintendent Robert Meicher and School District Nurse Wollert to discuss the public health issues in taking the trip, including states that were facing community spread issues at the time, quarantine requirements, or no-travel recommendations. I shared with the School District data on the virus spread at the time. We told the School District that the County would support the School District's decision and was available for any assistance. The School District took the bus trip to Florida, during which states increased their responses to the spreading virus, including issuing stay-at-home orders and no-travel recommendations.

21. Leading up to the School District's trip, the County Health Department received telephone calls from concerned citizens in the community who were supposed to go on the trip and other community members who were concerned about their fellow citizens taking the trip under the then current health circumstances.

22. I understand the School District returned from its band trip on March 15th. After, through communications between School District personnel and Health Department personnel, including Public Nurse Allison Davey from our Department, I learned the School District

5

received numerous telephone calls from concerned parents regarding social media postings by Amyiah Cohoon in which she had apparently claimed to have COVID-19. Our Health Department also received calls from concerned citizens about Amyiah Cohoon's claim she had COVID-19, including questions about whether Amyiah's claim was true, if there was a threat of exposure for parents, teachers, or children who attended the trip, and expressions of fear for a positive case.

23. Because of the increasing telephone calls to the School District and County Health Department from concerned citizens and people who went on the band trip regarding Amyiah Cohoon's social media postings about having COVID-19, I contacted Sheriff Joseph Konrath to give him a heads-up that there appeared to be increasing concern or unrest in the community regarding a potential positive COVID-19 case, even though we in the Health Department knew there were no confirmed positive cases in the County since we were notified of tests results by the state through the Wisconsin Electronic Disease Surveillance System.

24. Before March 27, 2020, the Sheriff and I discussed possible options for responding to the escalating situation. We discussed a neighboring community's (Lodi, Wisconsin) response to a false claim by a citizen of having tested positive for COVID-19 that had been recently covered in the media. That community's law enforcement recommended the citizen for charges of disorderly conduct. I understand the citizen in that matter posted on social media she was diagnosed with COVID-19, which led other local citizens to contact local government officials about the threat and a local business to not allow its employees to report to work, all allegedly because of the false claim. Attached hereto as Exhibit 4 is a true and correct copy of the press release from the Lodi Police Department regarding this incident.

6

25.     I had discussed with Health Department staff, including Public Health Nurse Allison Davey, the option of contacting the Sheriff's Department to request assistance in dealing with the increasing unrest and fear in the community regarding Amyiah Cohoon's claim of a positive COVID-19 case. After careful consideration and discussions with staff and the Sheriff, I determined that contacting the Sheriff's Department may be an option in our efforts to present accurate information on the virus to the community and may allow my Department to continue to respond to the community's needs as effectively as possible.

26.     As Director and Health Officer of the Health Department, my biggest concern during this COVID-19 crisis has been maximizing our Department's ability to prevent the spread of the virus and to effectively respond to the community's needs. False reporting of COVID-19, like Amyiah Cohoon's social media posting, caused an unnecessary disturbance and additional mental distress and panic in our community.

27.     A positive test result of COVID-19 for Amyiah would have required contacting each of the people who were on the band trip to screen for their symptoms. Each person would have been expected to quarantine themselves at home for 14 days, including being off from work in critical positions within the community, such as healthcare. The County Health Department would have had to check-in with each person by phone twice a day to screen for symptoms. Those who reported symptoms would have been referred for testing. If symptoms or positive tests occurred, each of those who tested positive would have been interviewed for contact tracing – they would have been asked who they had had recent contact with, and for contact information for those people so the County could follow up with them as well.

28.     While we waited for Amyiah's test result and to be able to properly respond to a potential positive test of Amyiah, I discussed with my staff and other County officials resource

requirements for such a response, including pulling other County employees, including from the Human Services and Zoning Departments, into the Health Department's efforts. We also discussed summoning on-call EMTs to assist with contact-tracing. New staff for responding to this purported positive test would have had to be trained on confidentiality and screening policies and procedures.

29. I have reviewed Exhibit 3 to the complaint in this matter, which I understand to be an Instragram posting by Amyiah Cohoon on March 22, 2020, in which she stated she had COVID-19. I also reviewed Exhibit 5 in this matter, which I understand is a March 26, 2020, Instagram posting by Amyiah, which stated she had beaten "the corona virus," which is more formally known as COVID-19. While she was reporting symptoms during these posts, the Health Department learned during the morning of March 26th that Amyiah's PCR test returned as negative.

30. Increased civil unrest in the community about a false positive test added to the significant strain on resources within the Marquette County Health Department in its efforts of responding to the virus. Staff resources were diverted to responding to community concerns about Amyiah's social media postings and claim of having COVID-19. These diverted resources hinder the Department's ability to attempt to respond to the changing circumstances of the virus.


Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of April, 2020.


s/ Jayme Sopha
Jayme Sopha