UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

AMYIAH COHOON, a minor, by and through her parents
and legal guardians, RICHARD COHOON and ANGELA
COHOON,

       Plaintiff,

                                     Case No. 20-CV-620

v.

JOSEPH KONRATH, in his personal and official capacity
as Sheriff of Marquette County, Wisconsin, and

CAMERON KLUMP, in his personal and official capacity
as Patrol Sergeant for the Marquette County Sheriff's
Office,

       Defendants

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT,
RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND
REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

---

Rick Esenberg (SBN 1005622)
Luke N. Berg (SBN 1095644)
  *Counsel of Record*
Anthony F. LoCoco (SBN 1101773)
Lucas T. Vebber (SBN 1067543)

Wisconsin Institute for Law & Liberty
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-7361
Fax: (414) 727-6385
luke@will-law.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT ......................................................................................................................9

    I.   Plaintiff is Entitled to Summary Judgment Based on the Video Alone..............................9

        A.  The Video Shows a Clear First Amendment Violation .................................9

        B.  Plaintiff is Entitled to Declaratory and Injunctive Relief ...........................16

        C.  Qualified Immunity Does Not Shield Defendants from Damages for Threatening Jail over a Social Media Post.................................................18

        D.  Even if Qualified Immunity Applies to the Individual Capacity Claims, Konrath is Still Liable Under *Monell* in His Capacity as Sheriff ...............................21

    II.  At the Very Least, Plaintiff is Entitled to a Preliminary Injunction .................................24

CONCLUSION...................................................................................................................25

## INTRODUCTION

The Cohoons filed this First Amendment action on behalf of their sixteen-year-old daughter, Amyiah Cohoon, because a deputy sheriff came to their home and demanded that Amyiah delete her social media post about her scare with COVID-19 and even threatened citation or arrest if the post was not removed. The Cohoons first attempted to resolve this issue without litigation, but the Sheriff refused to acknowledge the violation, to admit that Amyiah's speech about her experience was protected by the First Amendment, or to provide any mitigating explanation for the actions of his deputy. In their complaint and declarations in support of a preliminary injunction—filed almost three weeks after the incident—the Cohoons recounted what happened at their home as best they could recall.

Defendants have moved for summary judgment based on a video recording of the incident that they argue undermines the Cohoons' factual account and defeats their First Amendment claim. Yet the video *confirms* the First Amendment violation and proves that the Cohoons—not Defendants—are entitled to summary judgment. The video shows Sergeant Klump threatening Rick and Angela Cohoon that "if [Amyiah's post] doesn't come down, the Sheriff has directed me to issue disorderly conduct citations if not start taking people to jail." Defendants place great emphasis on the fact that this threat was made to Amyiah's parents and not directly to her, and claim that Amyiah had already voluntarily agreed to delete her post. But the latter is a mischaracterization of what occurred and the former is irrelevant. The video shows that the first thing Amyiah heard from a deputy sheriff at her doorstep was a *demand* (not a request) that she delete her post. And while, without any reflection, she immediately agreed to do so (as any sixteen-year-old would), her father objected on her behalf, and in her presence, that the officer had no authority to issue such a demand. Amyiah went inside to delete her post only after Sergeant Klump

insisted that he did have such authority. And there is no question Amyiah became aware of the threat while Sergeant Klump was there. The video shows Amyiah's father protesting the threat of jail in front of her; Sergeant Klump did not deny making the threat, he confirmed it, and he even told Amyiah he did not want anyone to "get in trouble." Once Sergeant Klump left their home, Amyiah deleted another, earlier post, and the Sheriff's continued refusal to acknowledge that Amyiah's speech was protected—even in Defendants' most recent filing—has an ongoing chilling effect. Thus, the video alone shows that the Cohoons are entitled to summary judgment or, at the very least, a preliminary injunction.

## BACKGROUND

A lengthier description of the circumstances leading up to the incident at the Cohoons' home on March 27 is set forth in Plaintiff's brief in support of their motion for preliminary injunction and Plaintiff's proposed findings of fact. In short, Amyiah Cohoon, a sophomore at Westfield Area High School in Westfield, Wisconsin, went on a school spring break trip to Florida and a week later began having symptoms consistent with COVID-19, including a fever, dry cough, and significant difficulty breathing. Plaintiff's Proposed Findings of Fact (PPFOF) ¶¶ 1–10. She visited the hospital twice, first on March 22 and then again on March 25 when her symptoms worsened. PPFOF ¶¶ 11–25. During her first visit, the doctors said her symptoms matched COVID-19 but she could not be tested, so they sent her home with instructions to strictly self-quarantine. PPFOF ¶¶ 12–14. Her symptoms became much more serious three days later, so she was ambulanced from the hospital in Portage to the UW Children's Hospital in Madison, where she was finally tested. PPFOF ¶¶ 18–20. Her test came back negative, but the doctors told the Cohoons that she still may have it and had missed the window for testing positive, so they told the Cohoons to continue quarantining. PPFOF ¶¶ 21–24.

Amyiah posted three updates to her Instagram account throughout this experience. PPFOF ¶¶ 32–34. On March 22, she posted that she had COVID-19 and was in quarantine, Berg Decl. Ex. 3, PPFOF ¶ 32; on March 25, she posted that she was going to the ER, PPFOF ¶ 33; and on March 26, after she returned home from the hospital in Madison, she posted that she had "beaten the coronavirus. Stay home and be safe," Berg Decl. Ex. 4; PPFOF ¶ 34.

A day later, on March 27, Defendant Deputy Sergeant Cameron Klump came to the Cohoons' home with a screenshot of this last Instagram post, demanded that Amyiah delete the post, and even threatened citation, arrest, or jail if the post did not come down. PPFOF ¶¶ 35–52. Amyiah deleted her post, and after Sergeant Klump left, deleted her first post out of fear that he would return and follow through on his threat. PPFOF ¶¶ 49, 53.

Later that evening, the Cohoons learned that Bob Meicher, the administrator of Amyiah's school district, had sent out a blast news update stating that her post was "a foolish means to get attention" and that "there is NO truth to this." PPFOF ¶¶ 54–55. Amyiah wants to respond to those accusations, but has felt unable to do so given Sergeant Klump's threat. PPFOF ¶¶ 56–57.

On April 3, undersigned counsel sent a letter to Sheriff Konrath on the Cohoons' behalf. Berg Decl. Ex. 8. The letter described the Cohoons' recollection of what happened on March 27 and asked Sheriff Konrath to either acknowledge the violation and provide some assurance that the Marquette County Sheriff's Office would not cite, arrest, or jail Amyiah or her parents for sharing their story. They further asked that, if any portion of their recollection was inaccurate, the Sheriff explain and provide "any and all documents in your possession which would support your belief as to the facts" under Wisconsin's open-records law. Berg Decl. Ex. 8. Sheriff Konrath declined to acknowledge the violation or to provide any mitigating explanation. Instead, he hired counsel who responded in an email on April 10 that Amyiah's speech was not protected by the

First Amendment, but was the equivalent of "screaming fire in a crowded movie theater." Berg Decl. Ex. 9 at 1. The *only* thing Sheriff Konrath offered the Cohoons was a letter stating that "his Department's investigation into [Amyiah's *prior* posts] is complete," Berg Decl. Ex. 9 at 1, but of course, the investigation was closed because Amyiah did exactly what Sergeant Klump unlawfully demanded and deleted her posts.

The records Sheriff Konrath provided in response to the Cohoons' open-records request confirmed all of the material facts necessary to establish a violation of Amyiah's rights. Sergeant Klump's contemporaneous incident report states that he went to the Cohoons' home, at Sheriff Konrath's direction, to "have the post removed from [Amyiah's] social media" and notes that he "advise[d] Richard that if they were not willing to take the post down, that there would be the possibility of a County Ordinance Disorderly Conduct or being arrested for Disorderly Conduct." Berg. Decl. Ex. 5 at 4–5. Sergeant Klump asked Sheriff Konrath to review his incident report to "see if you would like me to make any corrections," and Sheriff Konrath confirmed these basic facts: "I reviewed your report and it is accurate and to the point." Berg Decl. Ex. 11.

On April 16, the Cohoons filed this action, along with a temporary injunction motion, explaining that, as a result of Sergeant Klump's prior threat and Sheriff Konrath's unwillingness to acknowledge the First Amendment violation, Amyiah reasonably fears that another deputy may show up at her door if she posts anything in the future about her experience or responds to Meicher's accusation that her posts were false. Dkts. 1, 3.

Then, on April 24, Defendants filed a motion for summary judgement based on a video and audio recording of Sergeant Klump's stop at the Cohoons' home, which they say undermines the Cohoons' description of what happened on March 27. Yet, apart from a few minor inconsistencies,

the video confirms the Cohoons' recollections. And it establishes beyond dispute a straightforward First Amendment violation.

The video shows that, consistent with his incident report, Sergeant Klump came to the Cohoons' home to "have [Amyiah's] post removed from her social media." Berg Decl. Ex. 6 at 4. Sergeant Klump first spoke with Rick Cohoon, Amyiah's father, and began the conversation by noting that the Marquette County Sheriff's Office was aware that Amyiah "maybe … was having the COVID stuff and had gotten tested." Video at 1:07–1:11.[1] Rick explained that Amyiah had just returned from the UW Children's hospital the day before, but "Sunday was when this all started." Video at 1:11–1:39. Amyiah "was having a lot of problems breathing, … a fever, and a dry cough," so they had taken her to Divine Savior Hospital in Portage. Video at 1:39–2:26. Rick explained that "the doctor's best guess" was that she had COVID-19, but "they didn't test" her, so she was "not an actual confirmed test." Video at 2:27–2:50. Rick then described how, three days later, they "took her back to [the] ER, to Portage" because she was again having difficulty breathing. Video at 3:00–3:15. The hospital took her blood labs and found that "her white blood cell count was low," and, still believing "she … had it," they ambulanced her to the UW Children's Hospital in Madison. Video at 3:15–3:36. Rick then told Sergeant Klump that Amyiah was finally tested on Wednesday evening and the test came back negative the following morning. Video at 3:36–4:32. Rick explained, however, that the doctors at UW believed she still may have COVID-19, so they told the Cohoons to continue quarantining. Video at 4:32–50.

Sergeant Klump then explained to Rick and Angela (who was outside at that point) that he was at their home because Amyiah had posted "that she has beat the COVID-19." Video at 4:50–

---

[1] The video and audio recording of Sergeant Klump's stop at the Cohoons' home was submitted to the Court as Exhibit 2 to the Declaration of Stephanie Warren. Dkt. 20. The timestamps referenced herein refer to the time elapsed on the video.

5:07. Rick immediately responded, "Well, that's what they're telling her." Video at 5:08–5:09. Sergeant Klump then began arguing with him: "Well, but she tested negative. It wasn't like she tested positive, was in the hospital like all these other people were, and now has finally been released." Video at 5:09–5:20. Rick attempted to explain, for a second time, that the doctors hadn't "tested [Amyiah] on Sunday, like they should have," and "because that's the way they're doing this, there's no way to prove who has it and who doesn't have it." Video at 5:21–5:55.

Undeterred, Klump went on, "the concern that we have is now parents whose kids were in Florida have seen this … and now they're calling the school." Video at 6:11–6:21. Rick jumped in to say that they had "already called the school," Video at 6:21–6:22, but Klump pressed ahead, "just let me talk. They're calling the school saying, bitching, why aren't we being notified?" Video at 6:22–6:27. Klump then told the Cohoons that he was there to "get her to delete this," Video at 7:10–7:22, and to ask them to add a new post apologizing and stating that she was not actually positive, Video at 7:22–7:32. Rick responded, "Well we don't know that. We're not gonna do that. We don't know that." Video at 7:32–7:37. Klump shot back, "But you said the test results came back negative," Video at 7:50–53. "Five days later," Rick repeated for the third time, "when we had to take her back to the ER and she got ambulanced to the Children's Hospital for two days. She didn't get put in Children's Hospital [be]cause she didn't have it. They believe that she had it. She just tested [negative] by the time somebody … tested her." Video at 7:53–8:13.

A little later, Angela brought Amyiah out of the house for the first time. Video at 9:05. When she came out, Sergeant Klump was arguing with Rick about who was getting tested and why, Video at 9:05–9:35, and Amyiah listened to them until Klump said, audibly frustrated, "I don't know the circumstances that you were in. All I'm here for is to figure out what this post is about, seeing she tested negative … and *we need to get it taken down*." Video at 9:35–9:48

(emphasis added). Thus, the first thing Amyiah heard, from a deputy sheriff who had just been arguing with her father, was a *demand* to delete her social media post—not a request, as Defendants characterize it. As any sixteen-year-old would do when issued an order by a uniformed law enforcement officer, she quickly said, "will do." Video at 9:48–49.

Klump then began explaining directly to Amyiah the reason for his demand, that "parents [are] concerned that you're saying that you had corona and that [they] aren't being notified," Video at 10:30–10:44. Angela then interjected, "Well they should have been notified, because I talked to [the principal] myself, personally." Video at 10:44–10:52. Klump responded, "we're well aware cause he's contacted the Sheriff." Video at 10:52–10:54. Rick then said, "We've talked to everybody, nobody gives a shit. Nobody wants to be the person to have the information available, so that [if] parents do call and say hey, is there any other cases—because if she did positively have it, we don't know where it came from. I could have given it to her. I worked at the casino. We didn't close down until a week ago, Thursday. I haven't had any symptoms, [Angela] hasn't had any symptoms. But with her working at the gas station and me working at the casino it could have very easily come from there. Now, I find this to be very silly and asinine to be arguing about … a silly little post, because it's upsetting people. Well people need to be upset, they need to understand what happened to her." Video at 10:52–11:43.

A half minute later, Klump interrupted, "Nonetheless, can we get the post taken down?" Video at 12:15–12:17. Both Amyiah and Angela quickly said "yes," but Rick objected, "Wait a minute, why does it need to come down? What has been violated here lawfully?" Video at 12:17–12:26. Klump responded in a cautionary tone, "Because the health department has the information of her test results, that she is not positive." Video at 12:26–12:33. "But they don't have the information from when she was originally seen," Rick reiterated, now for the fourth time. Video

at 12:32–12:35. Klump said, "I guess you're not understanding me," to which Rick replied, "we're not understanding each other." Video at 12:35–12:40.

Angela then told Amyiah to go inside the house, Video at 12:45–12:49, and as she began stepping inside, Klump said, "Richard, I don't want to go this far. It was as simple as me coming out here and just getting the post taken down." Video at 12:46–12:55. Rick insisted, "And I don't believe the post needs to come down." Video at 12:55–12:57. Sergeant Klump then directly threatened, "**If it doesn't come down, the Sheriff has directed me to issue disorderly conduct citations if not start taking people to jail**." Video at 12:58–13:04. After hearing this threat, Angela waited a moment to see if Rick would continue to resist Sergeant Klump's demand, and, seeing that he did not, she went briefly inside, then poked her head back out and said, "She's taking it down now." Video at 13:23–13:31. After that, Angela went back inside by Amyiah and remained there. Video at 13:45.

For the next six minutes, while Angela and Amyiah were inside, Rick continued to try to explain to Sergeant Klump, for the fifth time, that the UW Children's hospital "believe[d] that she had it, but because she wasn't tested for it, by the time they tested her she was negative." Video at 14:28–14:36; Video at 17:28–17:34 (and later, a sixth time, "the UW says she had it. The problem is, they can't prove it because a test wasn't done."). He insisted that "should be the entire issue, but [you] want to turn … putting information out there to forewarn other people [in]to it's creating a disturbance and you're going to jail?" Video at 15:04–15:11.

Still unpersuaded, Klump eventually said, "Can she bring her phone out and show me that she's got it down?" Video at 19:58–20:03. Rick then went inside for about thirty seconds, and Amyiah came out shortly thereafter. Video at 20:04–20:44. She told Sergeant Klump, "It has been completely taken down" and showed him her phone to verify. Video at 20:45–21:20. After Amyiah

took the post down, Sergeant Klump said, "I appreciate you taking it down … like I said, I don't want anyone to get in trouble …" Video at 21:20–27.

While Amyiah was still outside, and in her presence, Rick continued to express frustration with Sergeant Klump's threat: "[Y]ou have a student in the school that is possibly positive. Most likely was. And you guys want to threaten somebody with going to jail over it and add insult to injury?" Video at 21:50–22:04. And a minute later he said, "people need to know that this shit is going on. And it doesn't do any good when you can't warn them when you got a Sheriff's department threatening to throw people in jail over it." Video at 23:16–23:27. Sergeant Klump's only response, again in front of Amyiah, was, "I'm just doing what we can do as a Sheriff's Office. Okay?" Video at 23:29–23:32. In other words, he did not deny that he threatened jail, but instead confirmed it.

After Sergeant Klump left, Amyiah also deleted her first post from March 22, afraid that Sergeant Klump would return to her home and follow through on his threat. PPFOF ¶ 53.

## ARGUMENT

### I.  Plaintiff is Entitled to Summary Judgment Based on the Video Alone

#### A.  The Video Shows a Clear First Amendment Violation

Defendants do not dispute the well-established First Amendment principle that law enforcement may not penalize, or threaten to penalize, protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Surita v. Hyde*, 665 F.3d 860, 871 (7th Cir. 2011) ("Penalties for speech protected under the First Amendment are forbidden.") *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("[T]hreats of penalties also are forbidden"). Nor do Defendants dispute—in light of video confirmation—that Sergeant Klump came to the Cohoons' home and told Rick and Angela

Cohoon that "[i]f [Amyiah's post] doesn't come down, the Sheriff has directed me to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04.

Defendants also implicitly concede that Amyiah's social media post was protected by the First Amendment. In the merits portion of their brief (Part II), Dkt. 15 at 8–22, Defendants entirely skip the first element of Plaintiff's First Amendment claim, failing to even discuss whether Amyiah "engaged in activity protected by the First Amendment," *see* Dkt. 15 at 8 (quoting the standard but then moving immediately to the "adverse act[ ]" element). Defendants never affirmatively argue that Amyiah's post about her scare with COVID-19 was outside the scope of the First Amendment, so this Court should treat Defendants' silence as the concession it is.

Even if Defendants did not implicitly concede this, Amyiah's Instagram posts were unquestionably speech protected by the First Amendment. As the Supreme Court has recognized, social media is, for many, the "principal source[ ] for … speaking and listening in the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017). That is especially so during the ongoing pandemic and stay-at-home orders, when social media is one of the few avenues for communicating with the outside world. And while certain categories of speech are excluded from First Amendment protection—obscenity, defamation, true threats, inciting violence, etc.—none of those narrow exceptions apply to Amyiah's posts. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (surveying the exceptions). Through her posts, Amyiah simply wished to share with her friends and family the significant scare she had with COVID-19; and such speech is presumptively protected by the First Amendment.

Given that Amyiah's post was speech protected by the First Amendment and that there is a video showing Sergeant Klump threatening her parents with disorderly conduct citations and jail if she did not remove her post, this should be an easy case. Yet Defendants argue—indeed, their

main defense—is that they are absolved of the obvious First Amendment violation because Klump did not state this threat directly in Amyiah's presence, but instead to her parents. Dkt. 15 at 8–17. This argument fails for at least three independently sufficient reasons, all of which are self-evident from the video recording.

First, even putting aside the threat of citation or jail, a demand from a law enforcement officer standing outside one's home to remove a social media post is more than enough of an implicit threat to cause any sixteen-year-old to censor their speech, and it unquestionably caused Amyiah to censor hers. Contrary to Defendants' characterization, Sergeant Klump did not merely *ask* Amyiah to remove her post; the first thing he said to her about it was a demand: "*we need to get it taken down*." Video at 9:35–9:48. And this demand came right after an argument with her father in which Sergeant Klump was audibly frustrated, further impressing on her the seriousness of his demand. Video at 9:05–9:35. If there were any lingering question about whether Sergeant Klump was asking or demanding, his subsequent exchange with her father in her presence removed all doubt. After Sergeant Klump brought up deleting the post again, Rick protested on her behalf, "Wait a minute, why does it need to come down? What has been violated here lawfully?" Video at 12:17–12:26. Sergeant Klump *did not* respond, "Oh nothing, I'm just asking you to remove it, but it's up to you." Instead, he repeated slowly that the health department was aware of Amyiah's negative test result—clearly suggesting, especially to a sixteen-year-old, that *something* had been violated and that he was there to enforce it. Amyiah went inside right after this exchange. Video at 12:15–12:49. Thus, Amyiah did not "consent to Sergeant Klump's request," Dkt. 15 at 13–14, she acceded to his demand.

It has long been established that speech is shielded not only from punishment or threats of punishment, but is also "protected against censorship." *Terminiello v. City of Chicago*, 337 U.S.

1, 4, 69 S. Ct. 894, 93 L. Ed. 1131 (1949). Government officials may not command a person to cease or censor protected speech. *See, e.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68, (1963) ("It is true … that Silverstein was 'free' to ignore the Commission's notices, in the sense that his refusal to 'cooperate' would have violated no law. … [But] [p]eople do not lightly disregard public officers' thinly veiled threats."); *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 402 (1950) ("Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes."); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230, 236 (7th Cir. 2015) ("[A] public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment. … Dart could reasonably be seen as implying that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his 'request.'"); *see also Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) ("What matters is the distinction between attempts to convince and attempts to coerce.").

Second, even though Amyiah may not have heard the threat directly, the video shows that Sergeant Klump's threat played a causal role in Amyiah removing her post. Amyiah's father correctly recognized that Sergeant Klump's demand violated her First Amendment rights, and he resisted the unlawful demand on her behalf. Video at 12:17–12:26. Following his objection, Amyiah's parents did not assent to Amyiah removing the post until *after* Sergeant Klump issued his threat. Video at 12:26–13:30. Shortly after Rick asked "What has been violated here lawfully?" Angela told Amyiah to "go inside" while the adults continued to discuss. Video at 12:45–12:49. Just seconds after Amyiah went inside, Sergeant Klump threatened both Rick and Angela with citation or jail. Video at 12:58–13:04. Angela waited a moment to see how Rick would respond

- 12 -

and, seeing no further resistance to removing the post, she went inside, came back out briefly to say, "she's taking it down now," and then returned inside by Amyiah for the next seven minutes until Amyiah came out to show that she had removed the post. Video at 13:23–13:47; 20:45–21:20.

Finally, there is no question that Amyiah learned, while Sergeant Klump was *still there*, that he had threatened her family with jail over her posts. After Amyiah removed the post Sergeant Klump had a screenshot of, she remained outside while Klump and her father continued to discuss. Rick twice protested the threat of jail, and Sergeant Klump did not deny that he had made such a threat, but instead confirmed the threat, all in Amyiah's presence. Video at 21:50–22:04 ("[Y]ou guys want to threaten somebody with going to jail over it and add insult to injury?"); Video at 23:16–23:32 ("Rick: [I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it. Sergeant Klump: I'm just doing what we can do as a Sheriff's Office. Okay?"). After Sergeant Klump left her home, Amyiah deleted her first Instagram post (the one Sergeant Klump did not have a screenshot of), and his threat has created an ongoing chill on Amyiah's speech, including preventing her from responding to Meicher's accusations that her post was false and a "foolish means to get attention." PPFOF ¶¶ 53–58. Thus, Sergeant Klump's threat has unquestionably chilled Amyiah's First Amendment rights.

This last point in particular shows that Defendants' main defense is beside the point. Even if Defendants were correct that Amyiah's initial "contact with Sergeant Klump was not sufficient to deter First Amendment activity," Dkt. 15 at 8–13, 15–17—notwithstanding video evidence that she *did* censor her speech in response to his demand—Defendants do not dispute, nor could they, that a threat of arrest is sufficient to chill speech. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) ("The Supreme Court has often noted that a realistic threat of arrest is

enough to chill First Amendment rights.") (listing cases). The video shows that Sergeant Klump confirmed, in front of Amyiah, that his demand was backed by the threat of arrest and jail. Video at 23:16–23:32. That threat has cast a shadow over her social media usage, a shadow lengthened by the Sheriff's ongoing refusal to acknowledge the violation. PPFOF ¶¶ 53, 56–58.

Although Defendants' cause-and-effect defense fails on its own terms, this Court need not accept the Defendants' invitation to engage in a microscopic dissection of these events. The Court can watch Sergeant Klump's threating behavior for itself.

Defendants' only other argument on the merits is that they had probable cause to cite and arrest Amyiah for disorderly conduct. Dkt. 15 at 17–22. This argument fails for a variety of reasons, the most obvious of which is that it cannot square with Defendants' *other* argument that the threat was directed at Amyiah's parents and not at her. Defendants could not, even arguably, have had probable cause to arrest *Rick and Angela* for disorderly conduct, since the social media post at issue was not from them.

Even setting that threshold problem aside, Defendants quite clearly did not have probable cause to cite and arrest Amyiah for disorderly conduct, nor was it reasonable for them to think that they did. Defendants concede that Amyiah's post was in no way "violent, abusive, indecent, profane, boisterous, [or] unreasonably loud," but they argue that her post could still fall within the catchall for "otherwise disorderly conduct … tend[ing] to cause or provoke a disturbance." Marquette County Ordinance § 50.03; Wis. Stat. § 947.01(1); Dkt. 15 at 18. Yet they have no answer to the Wisconsin Supreme Court's clear holding that the disorderly conduct statute may not be applied to protected speech, *In re Douglas D.*, 2001 WI 47, ¶ 21, 243 Wis. 2d 204, 626 N.W.2d 725, and, as noted above, Defendants concede by silence that Amyiah's speech was protected. The facts in *Douglas D* further illustrate that it was unreasonable for Defendants to treat

Amyiah's post as disorderly conduct: the speech in that case was much more egregious than Amyiah's—an implicit threat from a student to decapitate his teacher—and yet the Court held this was protected speech and therefore outside the disorderly conduct statute. 2001 WI 47, ¶ 41.

Defendants argue that the concern in the community about a student on the band trip possibly contracting COVID-19 gave them probable cause for a disorderly conduct citation, but they are wrong for at least three reasons. First, the Wisconsin Supreme Court has explained that disorderly conduct does not cover anything and everything that "causes personal discomfort in others," but only conduct tending to "menace, disrupt or destroy public order." *Douglas D.*, 2001 WI 47, ¶¶ 26–27 (quoting *State v. Zwicker*, 41 Wis. 2d 497, 508, 164 N.W.2d 512 (1969)); *see also Terminiello*, 337 U.S. at 4 (overturning a disorderly conduct conviction because speech is "protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that *rises far above public inconvenience, annoyance, or unrest*."). Sharing one's scare with COVID-19 online simply does not rise to that level, nor do Defendants have evidence of anything other than some unknown level of concern. Second, the concern in the community was more directly attributable to the COVID-19 pandemic itself, to the fact that Amyiah may *actually* have had COVID-19 (even though she ultimately tested negative), and to the school's failure to notify other parents after the Cohoons informed the school, rather than to Amyiah's post. Video at 6:21–6:22; 10:44–10:55 (Angela: "Well [parents] should have been notified, because I talked to [the principal] myself, personally." Klump: "We're well aware cause he's contacted the Sheriff.").

Finally, contrary to the Defendants' arguments, the video establishes that Sergeant Klump did not have probable cause to believe that Amyiah's post was inaccurate when he issued his threat. *See* Dkt. 15 at 21. The only information Defendants had was that Amyiah tested negative for

COVID-19, yet Amyiah's father tried to explain to Sergeant Klump—at least *four times* before the threat was made—that, despite the negative test result, Amyiah's doctors believed she still may have had it but had missed the testing window. *Supra* pp. 5–8; *e.g.*, Video at 7:53–8:13 ("She didn't get put in Children's Hospital [be]cause she didn't have it. They believe that she had it. She just tested [negative] by the time somebody … tested her"). The video captures Sergeant Klump admitting, just before he threatened the Cohoons, that he "d[idn't] know the circumstances [Amyiah] w[as] in," Video at 9:35–9:38, so he cannot now claim that he had probable cause to believe her post was false, notwithstanding Rick's explanation and his own acknowledged ignorance of what the doctors told the Cohoons.

**B.      Plaintiff is Entitled to Declaratory and Injunctive Relief**

At summary judgment, a plaintiff is entitled to a permanent injunction if she has shown "(1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). For the reasons explained in detail above, the video alone shows a straightforward First Amendment violation—Sergeant Klump demanded that Amyiah remove her social media post and then threatened "to issue disorderly conduct citations if not start taking people to jail" if she did not remove it. Video at 12:58–13:04.

That threat has created ongoing, irreparable harm. The Supreme Court has "often noted that a realistic threat of arrest is enough to chill First Amendment rights," *Hodgkins*, 355 F.3d at 1056 (listing cases), and that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *see Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Amyiah would

like to speak further about her scare with COVID-19, in at least three different ways. First, and most importantly, Amyiah would like to respond to and correct District Administrator Meicher's statements to her peers, their families, and her teachers that her prior posts were lies and a "foolish means to get attention." PPFOF ¶¶ 56–58. Second, she would like to continue to share with her friends and family about her experience. PPFOF ¶ 58. Third, she would like to repost the Instagram posts Defendants made her remove. PPFOF ¶ 58. Amyiah reasonably fears that, if she speaks further about her experience in these or any other ways, another deputy will show up at her home and follow through on the prior threats. PPFOF ¶ 56–58. Since she removed her original posts, Amyiah has not posted anything further about her experience. PPFOF ¶ 59.

Defendants' continued refusal to acknowledge either the violation or that Amyiah's speech was protected has only exacerbated the chilling effect. Before filing this case, the Cohoons sent Sheriff Konrath a letter asking him to confirm that "that the Cohoons may freely exercise their First Amendment rights on social media, including reposting the posts they were told to remove, and that you and your staff will not cite them for disorderly conduct (or any other crime), arrest or jail them, or threaten any of the above, for exercising their First Amendment rights." Berg Decl. Ex. 8 at 2. Sheriff Konrath instead responded that Amyiah's speech was not protected by the First Amendment, but was the equivalent of "screaming fire in a crowded movie theater." Berg Decl. Ex. 9 at 1. All Sheriff Konrath offered was a letter stating that "his Department's investigation into [Amyiah's prior posts] is complete," Berg Decl. Ex. 9 at 1, but that simply confirmed that Amyiah had complied with Sergeant Klump's demands, which, of course, she already knew.

Even now, before this Court, Sheriff Konrath still refuses to openly acknowledge that Amyiah's post was protected speech, or to represent that she will not be cited or arrested for similar speech going forward. While, on the one hand, Sheriff Konrath claims that he never directed

Sergeant Klump to *immediately* arrest or cite the Cohoons for disorderly conduct, *but see* Video at 12:58–13:04 ("the Sheriff has directed me to…"); Berg Decl. Ex. 6 (Klump's incident report) ("I advise[d] Richard that if they were not willing to take the post down, that there would be the possibility of a County Ordinance Disorderly Conduct or being arrested for Disorderly Conduct."); Berg Decl. Ex. 11 (email from Sheriff Konrath) ("your report … is accurate and to the point"), he admits that he considered and discussed a disorderly conduct citation with Sergeant Klump, *see* Konrath Decl. ¶ 11, and he continues to assert that Amyiah's speech gave him probable cause to arrest her for disorderly conduct, Dkt. 15 at 17–22, 27–28. The prior threat, combined with the refusal to disavow that threat, combined with the insistence that the threat was actually *lawful* provides a sufficient ongoing chilling effect to warrant an injunction.

But even if this Court believes an injunction is not warranted, a declaratory judgment certainly is. The Supreme Court explained in *Steffel v. Thompson*, 415 U.S. 452, 457 (1974)—a First Amendment case premised on a threatened arrest for handbilling—that the "express purpose of the Federal Declaratory Judgment Act was to provide a milder alternative to the injunction remedy" and that "irreparable injury" is not required. All that is required is "a genuine threat of enforcement," *id*. at 475, which, for the reasons just explained, is present in this case. Thus, this Court should, at the very least, issue a declaratory judgment that Amyiah's social media post was protected by the First Amendment and that she and her family cannot be cited, arrested, or jailed for similar speech about her experience going forward.

### C. Qualified Immunity Does Not Shield Defendants from Damages for Threatening Jail over a Social Media Post

Defendants argue that they are entitled qualified immunity, but their main arguments here track their merits arguments and fail for similar reasons. Defendants do not dispute that, as a matter of clearly established law, they may not threaten citation or arrest for protected speech. Dkt. 15 at

22–28; *Nieves*, 139 S. Ct. at 1722; *Surita*, 665 F.3d at 871; *Fairley*, 578 F.3d at 525; *Hodgkins*, 355 F.3d at 1056 ("The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights.") (listing cases). Nor do Defendants dispute that Sergeant Klump threatened to arrest and jail "people" if Amyiah did not remove her post. *See* Video at 12:58–13:04.

Instead, Defendants argue that they are entitled to qualified immunity because the threat was not issued in Amyiah's presence, but to her parents. Dkt. 15 at 23–24. That is beside the point. There is no question that Amyiah became aware of the threat while Sergeant Klump was at her doorstep (the video shows her father discussing it with Klump in front of her, after all, *see supra* p. 9). That is more than enough to chill the speech of any sixteen-year-old, and it did cause Amyiah to censor hers—she deleted a second Instagram post after Sergeant Klump left out of fear that he would return and follow through on his threat. PPFOF ¶ 53.

And even setting the threat aside completely, it has also long been established (and clearly so) that government may not censor speech based on its content. *Terminiello*, 337 U.S. at 4; *Bantam Books*, 372 U.S. at 68; *Am. Commc'ns Ass'n*, 339 U.S. at 402; *Backpage.com*, 807 F.3d at 230; *Okwedy*, 333 F.3d at 344. Sergeant Klump came to the Cohoons' home and demanded—not requested—that Amyiah delete her social media post. *See* Video at 9:35–9:48 ("[W]e need to get it taken down"). That alone is a straightforward First Amendment violation.

Perhaps recognizing the logical flaw in their main argument, Defendants then assert, somewhat half-heartedly, that it is "not clearly established that [Amyiah's] social media post was protected by the First Amendment." Dkt. 15 at 25–27. Yet Defendants do not identify any ambiguity in the case law that would make it reasonable for them to believe her speech was not protected. They note that the First Amendment does not protect "obscenity, defamation, fraud,

incitement, and speech integral to criminal conduct," Dkt. 15 at 25, but they do not claim that Amyiah's post *even arguably* falls into any of these categories. Instead, confusingly, they invoke the county health department's statutory authority to "control communicable diseases," Dkt. 15 at 25–26 (quoting Wis. Stat. § 252.02(6)), which obviously has nothing to do with *Defendants'* authority, the First Amendment, or with policing social media (which clearly is not necessary to "control communicable diseases"). They also raise the "unprecedented" nature of the current pandemic, Dkt. 15 at 26, as though that makes well-established First Amendment principles suddenly unclear. That argument, if accepted, would not only turn the "clearly established" requirement on its head, it would also effectively give law enforcement carte blanche to do whatever they want until the crisis is over. That cannot be right.

The closest Defendants come to claiming some ambiguity in the case law that would warrant qualified immunity is a single sentence suggesting that it was "reasonable for Defendants to believe, even if ultimately incorrectly, that falsely claiming to have COVID-19 is the modern-day equivalent to shouting fire in a crowded theater 100 years ago," Dkt. 15 at 26. The fire-in-a-theater example comes from dicta in *Schenck v. United States*, 249 U.S. 47 (1919), which was an incitement case (obviously not applicable here) that first articulated the now-defunct "clear and present danger" test. *Id*. at 52; *see Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (replacing that test with the "incitement to imminent lawless action" formulation, also not relevant here). The Court subsequently explained that this exception requires *imminent* harm: "a clear and present danger of a serious substantive evil that rises *far above public inconvenience, annoyance, or unrest*," *Terminiello*, 337 U.S. at 5 (emphasis added). Defendants could not have relied on the fire-in-a-theater analogy because Amyiah's post, *even if false*, did not create any imminent risk of harm to anyone.

- 20 -

Defendants' fire-in-a-theater comparison is also inapt because one *can* yell fire in a theater that is actually burning. When Sergeant Klump issued the threat, he had no reason to believe that Amyiah's post was untrue. Rick Cohoon explained to Sergeant Klump, at least *four times* before he issued the threat, that the doctors believed Amyiah may have had COVID-19 even though she tested negative, and Sergeant Klump admitted, as captured on video, that he "d[idn't] know the circumstances [Amyiah] w[as] in." Video at 9:35–9:38. Regardless, Defendants concede that it is clearly established that falsity alone is insufficient for them to censor speech. Dkt. 15 at 25 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964) for the proposition that the First Amendment "even protects certain demonstrably false speech.").

If there is any doubt that Defendants should have known better than to demand that Amyiah remove a social media post and threaten her family if she did not, Sheriff Konrath has admitted that, in his 35 years as an officer, he is "not aware of the Marquette Sheriff's Department ever … ask[ing] someone to remove a social media post." Konrath Aff. ¶ 15.

### D. Even if Qualified Immunity Applies to the Individual Capacity Claims, Konrath is Still Liable Under *Monell* in His Capacity as Sheriff

Qualified immunity does not apply to *Monell* claims against local government units. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *Owen v. City of Indep., Mo.*, 445 U.S. 622, 657 (1980). And the Supreme Court has squarely held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (reversing dismissal of a *Monell* claim based upon a forced entry by deputy sheriffs that was authorized by the county prosecutor). *Pembaur* then gave an example of one "appropriate circumstance": a "Sheriff's decisions … with respect to law enforcement practices, over which the Sheriff is the official policymaker, *would give rise to municipal liability*." *Id*. at 483 n. 12 (emphasis added).

In light of *Pembaur*, the Seventh Circuit has explained that a *Monell* claim may be premised on "an allegation that the constitutional injury was caused by a person with final policymaking authority," *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1013 (7th Cir. 2000) (citations omitted); *see also Eversole v. Steele*, 59 F.3d 710, 715 (7th Cir. 1995), and has found county sheriffs to be final decision-makers for purposes of *Monell* liability, *e.g.*, *Brokaw*, 235 F.3d at 1013; *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999). Sheriff Konrath does not dispute that he is the final policymaking authority for the Marquette County Sheriff's Office. Dkt. 15 at 29–31; *see* Wis. Stat. § 59.27 (sheriff's duties); Wis. Const. art. VI, § 4.[2]

Defendants argue that something more than Sheriff Konrath's participation in the constitutional violation is required, quoting *Pembaur* for the proposition that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability." Dkt. 15 at 29–30. But *Pembaur* explained what it meant by "more" in *the very next sentence*: "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." 475 U.S. at 482–83. In other words, the Court was simply drawing a line between *discretion*, on the one hand, and *final authority*, on the other. In a footnote to that sentence, the Supreme Court gave as an example a "Sheriff's decisions … with respect to law enforcement practices … [which] *would give rise to municipal liability.*" *Id.* at n. 12 (emphasis added).

---

[2] Defendants note that Plaintiff "has not named Marquette County as a defendant," but that is irrelevant. A claim against a sheriff in his or her official capacity is equivalent to a claim against the Sheriff's Office or county. *E.g.*, *Luck*, 168 F.3d at 325; *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998); *DeGenova v. Sheriff of DuPage Cty.*, 209 F.3d 973, 975 (7th Cir. 2000); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

Likewise, in *Brokaw*, the Seventh Circuit found that allegations that a county sheriff "participated in [an unconstitutional] seizure [were] sufficient" for liability under *Monell*. 235 F.3d at 1013.

Sheriff Konrath's only other argument is that he did not direct Sergeant Klump to *immediately* arrest or cite the Cohoons for disorderly conduct, but instead told Klump merely to request that she remove her post voluntarily. Dkt. 15 at 30. That explanation is contradicted by what Sergeant Klump told the Cohoons while he was at their home: "If it doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. It's also contradicted by Sergeant Klump's incident report, which Sheriff Konrath *reviewed and approved*. The report states that Sheriff Konrath told Sergeant Klump to "respond to the residence and *have the post removed from her social media*." Berg Decl. Ex. 6 at 4 (emphasis added). The incident report further notes that Klump "advise[d] Richard that if they were not willing to take the post down, that there would be the possibility of a County Ordinance Disorderly Conduct or being arrested for Disorderly Conduct." Berg. Decl. Ex. 5 at 4–5. Sheriff Konrath reviewed the report and told Sergeant Klump in an email that it "was accurate and to the point." Berg Decl. Ex. 11. If Sergeant Klump's threat of citation or arrest was truly a deviation from Sheriff Konrath's direct orders, surely Sheriff Konrath would have noted this after reviewing the report.

Sheriff Konrath's current position in litigation is also inconsistent with his actions before this lawsuit was filed. As noted above, the Cohoons first sent Sheriff Konrath a letter explaining that Sergeant Klump had threatened them with jail over Amyiah's post and had told them he was "acting on [the Sheriff's] direct orders," and asking Sheriff Konrath to acknowledge that Amyiah had a First Amendment right to post what she did. Berg Decl. Ex. 8. If Sheriff Konrath actually intended to communicate only a voluntary request, he easily could have explained that in response

to the Cohoons' letter. Instead, all he offered was the defense that her speech was the *"2020 version of screaming fire in a crowded movie theater,"* Berg Decl. Ex. 9 at 1.

Regardless, Sheriff Konrath admits that he discussed a disorderly conduct citation with Sergeant Klump before sending him to the Cohoons' home, *see* Konrath Decl. ¶ 11, so he cannot evade liability for the fact that the Cohoons took Klump's presence as the implicit threat that it was or that it became an explicit threat.

## II.     At the Very Least, Plaintiff is Entitled to a Preliminary Injunction

As Plaintiff explained in her motion for a preliminary injunction, in First Amendment cases, the analysis often "begins and ends with … the merits," *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116–18 (7th Cir. 2017), because "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury" and "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859. Defendants do not dispute this framework, but argue primarily that a preliminary injunction is unwarranted because Plaintiff is not likely to succeed on the merits. Dkt. 16 at 1–5. For the reasons explained in detail above, that is incorrect.

Defendants' only other response is that Plaintiff's requested injunction is not specific enough. Dkt. 16 at 5–8. To the contrary, the injunction Plaintiff seeks is quite narrow: "prohibiting Defendants from citing Amyiah or her parents for disorderly conduct, arresting them, jailing them, or threatening any of the above, for future speech about Amyiah's scare with COVID-19." Dkt. 3-1 at 13. Defendants' objection that such an injunction "seeks to prohibit action that did not happen in the past," Dkt. 16 at 6, is surprising given video evidence to the contrary. Video at 12:58–13:04 ("If it doesn't come down, the Sheriff has directed me to issue disorderly conduct citations if not start taking people to jail."). Defendants also object that this injunction applies to

- 24 -

Amyiah's parents, who are not named parties, Dkt. 16 at 6, but of course, a threat to take one's parents to jail is quite coercive to a teenager, more than enough to violate *her* First Amendment rights. Finally, Defendants complain that the requested injunction covers "hypothetical" future speech and is therefore vague. Plaintiff limited her requested injunction to speech about her "scare with COVID-19," which should not be difficult for Defendants to apply, but if even if this Court agrees that there is some ambiguity, it can limit the injunction to the future speech Amyiah has identified: reposting the deleted posts, responding to Meicher's accusations, and further sharing her experience with her friends and family.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court enter summary judgment against the Defendants, or, in the alternative, a preliminary injunction.

Dated: May 15, 2020

<div style="margin-left: 50%;">

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (SBN 1005622)
(414) 727-6367 | rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (SBN 1095644)
(414) 727-7361 | luke@will-law.org

Anthony F. LoCoco (SBN 1101773)
(414) 727-7419 | alococo@will-law.org

Lucas T. Vebber (SBN 1067543)
(414) 727-7415 | lucas@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455

Attorneys for Plaintiff

</div>