UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMYIAH COHOON, a minor, by and through her parents
and legal guardians, RICHARD COHOON and ANGELA
COHOON,

     Plaintiff,

                                             Case No. 20-CV-620

v.

JOSEPH KONRATH, in his personal and official capacity
as Sheriff of Marquette County, Wisconsin, and

CAMERON KLUMP, in his personal and official capacity
as Patrol Sergeant for the Marquette County Sheriff's
Office

     Defendants

## PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

Plaintiff Amyiah Cohoon, a minor, by and through her parents and legal guardians, Richard and Angela Cohoon, by and through undersigned counsel, hereby submits the following response to Defendants' Proposed Findings of Fact. As for "additional facts," *see* Civ. L. R. 56(b)(2)(B)(ii), Plaintiff submits her own proposed findings of fact in support of her motion for summary judgment (which are less than the 100-paragraph limit):

1.     In March 2020, the Westfield School District took approximately 100 students, teachers, and chaperones on this trip. (Dec. of Sopha, ¶ 19.)

RESPONSE: Undisputed.

2.     While Ms. Cohoon and her classmates were in Florida, states, counties, and municipalities around the country began enacting various orders limiting public gatherings and

requiring the closure of non-essential businesses due to the emerging COVID-19 pandemic. (*See* Dkt. No. 1, ¶ 11; *see also* Dec. of Mills, Ex. 5 (Emergency Order # 12 "Safer at Home Order"); Dec. of Ezell, ¶ 6.)

RESPONSE: Undisputed.

3.     Before the School District's trip, the Director of Marquette County's Health Department, Jayme Sopha, and Marquette County Public Health Nurse Allison Davey met with School District Superintendent Robert Meicher and School District Nurse Wollert to discuss the public health issues in taking the trip regarding COVID-19, including states that were facing community spread issues at the time, quarantine requirements, or no-travel recommendations. (Dec. of Sopha, ¶ 20.)

RESPONSE: Undisputed.

4.     The School District decided to proceed with the bus trip to Florida, during which states increased their responses to the spreading virus, including issuing stay-at-home orders and no-travel recommendations. (Dec. of Sopha, ¶ 20.)

RESPONSE: Undisputed.

5.     Local public health departments like Marquette County's Health Department have close working relationships with the Wisconsin Bureau of Communicable Disease and the Wisconsin Lab of Hygiene. (Dec. of Sopha, ¶ 6.)

RESPONSE: Undisputed.

6.     It is State Protocol that the Health Department is notified of diagnosis and testing of Category 1 diseases immediately upon identification. (Dec. of Davey, ¶ 3).

RESPONSE: Undisputed.

7. COVID-19 is a Category 1 disease, meaning under Wisconsin Department of Health Services Administrative Codes, a diagnosis of COVID-19 must be reported immediately to the local health officer. (Dec. of Davey, ¶ 3).

RESPONSE: Undisputed.

8. These state agencies have issued guidelines to local public health departments to respond to the COVID-19 crisis. (Dec. of Sopha, ¶ 6.)

RESPONSE: Undisputed.

9. The most widely used laboratory test for the virus is the PCR test, which stands for Polymerase Chain Reaction. (Dec. of Sopha, ¶ 7).

RESPONSE: Undisputed.

10. State officials from the Bureau of Communicable Disease and Wisconsin State Lab of Hygiene have stated to local health departments the PCR test yields a high degree accuracy rate. (Dec. of Sopha, ¶ 7).

RESPONSE: Undisputed, except to clarify that the test produces both false positives and false negatives and that, regardless of the accuracy rate of a PCR test, the test Amyiah was given contained the disclaimer, "Negative results should not be used as the sole basis for patient management decisions and do not preclude SARS-CoV-2 infection." Berg Decl. Ex. 10.

11. Recent data from the state shows that of 49,660 COVID-19 tests, 4,346 returned positive, meaning 8.7% of tests administered to (likely symptomatic) cases returned as positive. (Dec. of Sopha, ¶ 8).

RESPONSE: Undisputed.

12. Failures of the PCR test are generally attributable to three circumstances: using an improper testing method, improper storage or shipping methods, or testing outside of the infectious period. (Dec. of Sopha, ¶ 9).

RESPONSE: Undisputed.

13.     An improper testing method under the PCR test means the biological sample taken from the tested subject was insufficient to test. (Dec. of Sopha, ¶ 10).

RESPONSE: Undisputed.

14.     An insufficient sample could be due to an unsuccessful Nasopharyngeal Swab that is necessary for the test. (Dec. of Sopha, ¶ 10).

RESPONSE: Undisputed.

15.     The Nasopharyngeal Swab can be physically uncomfortable for the tested individual, and is thus at times difficult for the individual to complete at times. (Dec. of Sopha, ¶ 10).

RESPONSE: Undisputed.

16.     Regardless of the reason why a sample is insufficient, an insufficient sample yields no results to the test, meaning neither a positive nor negative result is obtained. (Dec. of Sopha, ¶ 10).

RESPONSE: Undisputed.

17.     Re-testing a sufficient sample is the only way the test will yield a positive or negative result. (Dec. of Sopha, ¶ 10).

RESPONSE: Undisputed.

18.     The state notifies local health departments if a COVID-19 testing sample is inadequate, or, when the sample was sufficient, the positive or negative result of the test. (Dec. of Sopha, ¶ 11).

RESPONSE: Undisputed.

19.     Improper storage or shipping methods means that the collected sample was not stored in the correct transfer media, was not kept adequately cool, or was not received by the lab within the required timeframe. (Dec. of Sopha, ¶ 12).

RESPONSE: Undisputed.

20.     In cases of improper storage or shipping, the lab indicates that the sample was not tested due to these factors. (Dec. of Sopha, ¶ 12).

RESPONSE: Undisputed.

21.     The testing period for COVID-19 is during the infectious period. (Dec. of Sopha, ¶ 13).

RESPONSE: Undisputed.

22.     When a citizen tests positive for COVID-19, the County Health Department is notified of that result through the state's reporting system, the Wisconsin Electronic Disease Surveillance System. (Dec. of Sopha, ¶ 18).

RESPONSE: Undisputed.

23.     Based upon data to date, a person becomes infectious about 48 hours before they develop symptoms and remain infectious until they have been symptom free for the past 72 hours, without the aid of medication. (Dec. of Sopha, ¶ 13).

RESPONSE: Undisputed.

24.     If a person has COVID-19 and is experiencing symptoms, they are shedding the virus regardless of the medical treatment received. (Dec. of Sopha, ¶ 13).

RESPONSE: Undisputed.

25.     This data and infectious period criteria means the person will test positive for the virus with a significant degree of certainty within the infectious period, including when they are symptomatic. (Dec. of Sopha, ¶ 13).

> RESPONSE: Disputed. The test produces false positives and false negatives. The test Amyiah was given contains a disclaimer stating that "Negative results should not be used as the sole basis for patient management decisions and do not preclude SARS-CoV-2 infection." Berg Decl. Ex. 10. And some health professionals believe that as many as "one in three patients who are infected [with COVID-19] are nevertheless getting a negative test result." *See* Christopher Weaver, *Questions About Accuracy of Coronavirus Tests Sow Worry*, Wall Street Journal (Apr. 2, 2020).[1]

26.     If the person is tested outside this infectious period, they are asymptomatic. (Dec. of Sopha, ¶ 14).

> RESPONSE: Undisputed.

27.     If the person is tested outside this infectious period, confirmation of the disease is unlikely. (Dec. of Sopha, ¶ 15).

> RESPONSE: Undisputed.

28.     Diagnosing the virus without testing is not recommended by the state agencies because the symptoms of COVID-19 have continually changed over the last month and a half. (Dec. of Sopha, ¶ 16).

> RESPONSE: Undisputed.

29.     Original symptoms for COVID-19 were identified as fever, cough, and shortness of breath. (Dec. of Sopha, ¶ 16).

> RESPONSE: Undisputed.

---

[1] https://www.wsj.com/articles/questions-about-accuracy-of-coronavirus-tests-sow-worry-11585836001

30.    These original symptoms of COVID-19 were also characteristic of the common cold, pneumonia, and influenza, to name a few other illnesses. (Dec. of Sopha, ¶ 16).

RESPONSE: Undisputed.

31.    Symptoms of COVID-19 have expanded to include gastrointestinal symptoms like nausea, vomiting, and diarrhea, as well as loss of taste, smell, and other symptoms. (Dec. of Sopha, ¶ 16).

RESPONSE: Undisputed.

32.    These expanded symptoms of COVID-19 are also found in cases of food poisoning, allergies, or the common cold. (Dec. of Sopha, ¶ 16).

RESPONSE: Undisputed.

33.    Accordingly, anyone experiencing the original or expanded symptoms of COVID-19 could be incorrectly diagnosed as having COVID-19 without proper testing. (Dec. of Sopha, ¶ 16).

RESPONSE: Undisputed.

34.    The state guidelines do not require investigation by local health departments without a confirmed positive test. (Dec. of Sopha, ¶ 16).

RESPONSE: Undisputed.

35.    When a citizen tests positive for COVID-19, the County Health Department is notified of that result through the state's reporting system, the Wisconsin Electronic Disease Surveillance System. (Dec. of Sopha, ¶ 11, 18.)

RESPONSE: Undisputed.

36.    On March 25, 2020, Marquette County Public Health Nurse Davey received an email from the Westfield School District nurse, Nicole Wollert, stating that the school district had learned in the past week from a mother of a Marquette County student that her daughter had

contracted COVID-19 while on the recent band trip to Florida and that the student was now in a hospital and may be placed on a "respirator." (Dec. of Davey, ¶ 2.)

RESPONSE: Undisputed.

37.    In this email, Nurse Wollert asked Nurse Davey if there were any confirmed cases of COVID-19 in Marquette County. (Dec. of Davey, ¶ 2.)

RESPONSE: Undisputed.

38.    Nurse Davey called Nurse Wollert and advised her that the Department had not received any notice through the Wisconsin Electronic Disease Surveillance System and that there were no confirmed cases of COVID-19 in the County at that time. (Dec. of Davey, ¶ 3.)

RESPONSE: Undisputed.

39.    Nevertheless, Nurse Davey requested contact information for the student's family so that she could reach out to the family, ask how the student was doing, and offer the County's assistance. (Dec. of Davey, ¶ 3.)

RESPONSE: Undisputed.

40.    This was the County Health Department's standard protocol regarding potential threats of communicable diseases. (Dec. of Davey, ¶ 3.)

RESPONSE: Undisputed.

41.    Nurse Davey called Ms. Cohoon's mother, Mrs. Angela Cohoon, later on March 25, 2020. Mrs. Cohoon stated in this conversation that they had taken Ms. Cohoon to the emergency room at Divine Savior Hospital. (Dec. of Davey, ¶ 4.)

RESPONSE: Undisputed.

42.    Nurse Davey then called the Divine Savior emergency room and spoke with a nurse, named Lindsey, who confirmed that Ms. Cohoon was in the emergency room and was

most likely going to be tested for COVID-19 and transferred to the children's hospital at UW-Madison. (Dec. of Davey, ¶ 6.)

RESPONSE: Undisputed.

43.     During the morning of March 26, 2020, the Marquette County Health Department received notification through the state's reporting system that Ms. Cohoon had been tested for COVID-19 and that her test was negative. (Dec. of Davey, ¶ 9; Dec. of Sopha, ¶ 29.)

RESPONSE: Undisputed.

44.     Nurse Davey then advised Nurse Wollert on March 26th that there were still no confirmed cases of COVID-19 in Marquette County. (Dec. of Davey, ¶ 10.)

RESPONSE: Undisputed.

45.     Later on March 26, 2020, the Westfield School District's superintendent, Robert Meicher, contacted Nurse Davey advising of a social media post by Ms. Cohoon stating that she had COVID-19 and asked Nurse Davey whether there were any confirmed COVID-19 cases in Marquette County. (Dec. of Davey, ¶11.)

RESPONSE: Undisputed.

46.     Nurse Davey advised Mr. Meicher that there were no confirmed cases and that the School District would be notified of any confirmed cases through the County's Emergency Operation Center. (Dec. of Davey, ¶11.)

RESPONSE: Undisputed.

47.     The Emergency Operation Center is a Marquette County system implemented to deal with the County's coordinated response to the spreading virus operationally across County departments. Health Department Director Jayme Sopha is in charge, with different tasks delegated to different County officials. (Dec. of Davey, ¶ 12.)

RESPONSE: Undisputed.

48. Leading up to and after the School District's trip, the County Health Department received telephone calls from concerned citizens in the community who were supposed to go on the trip and other community members who were concerned about their fellow citizens taking the trip under the then-current health circumstances. (Dec. of Sopha, ¶ 21; Dec. of Davey, ¶13.)

RESPONSE: Undisputed.

49. After Ms. Cohoon's posting on social media, the Health Department received phone calls from other parents and concerned citizens regarding Ms. Cohoon's social media postings about having COVID-19. (Dec. of Davey, ¶ 13.)

RESPONSE: Undisputed.

50. Marquette County has a population of approximately 15,200. The County's Health Department has a staff of approximately eight employees, all of whom have had to devote most of their daily tasks to responding to COVID-19, including policy making, documentation for incident command, tracking financial data, disclosing public information, responding to issues from public business, contact tracing, and responding to individual citizens' issues and concerns. (Dec. of Sopha, ¶ 4.)

RESPONSE: Undisputed.

51.     As a result of the concern created by Ms. Cohoon's claim that she had tested positive for COVID-19, Heath Department resources were shifted away from other day to day tasks of dealing with COVID-19 issues and other public health issues to responding to these numerous calls. (Dec. of Davey, ¶ 13.)

> RESPONSE: Disputed in part. Amyiah's post did not "claim that she had tested positive for COVID-19." It stated that she had "beaten the coronavirus." Berg Decl. Ex. 5. The doctors told Amyiah and her parents that she may still have had it notwithstanding the negative test. Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12. The test itself says that "negative test results … do not preclude SARS-CoV-2," Berg Decl. Ex. 10. Also dispute that the shift in resources was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

52.     The Health Department, including Nurse Davey, had received telephone calls from other parents and concerned citizens regarding Amyiah Cohoon's social media postings about having COVID-19. (Dec. of Davey, ¶ 13).

> RESPONSE: Undisputed.

53.     Health Department officials explained to the concerned citizens that there were no confirmed cases of COVID-19 in the County and tried to alleviate their concerns and fear about the positive COVID-19 that Ms. Cohoon's social media posting portrayed. (Dec. of Davey, ¶ 13.)

> RESPONSE: Undisputed.

54.     However, the Department's attempts to alleviate concerns did not appear to be able to keep pace with the growing disturbance and concern within the community. (Dec. of Davey, ¶ 13.)

> RESPONSE: Dispute that Defendants have provided evidence of a "growing disturbance and concern within the community."

55.     The Health Department was also made aware by Nurse Wollert that the School District had been receiving numerous telephone call from concerned citizens and parents regarding Amyiah Cohoon's social media postings about having COVID-19, expressing increased concern and fear about the potential positive COVID-19 case. (Dec. of Davey, ¶ 13-14.)

> RESPONSE: Undisputed that the school had received some calls; dispute that the evidence Defendants have submitted shows significant "concern and fear" in the community.

56.     Director Sopha discussed with Health Department staff the option of contacting the Sheriff's Department to request assistance in dealing with the increasing unrest and fear in the community regarding Ms. Cohoon's claim of a positive COVID-19 case. (Dec. of Sopha, ¶ 25; Dec. of Davey, ¶ 17.)

> RESPONSE: Dispute that the evidence Defendants have submitted shows "increasing unrest and fear in the community."

57.     After learning of the increasing telephone calls to the School District and County Health Department from concerned citizens and people who went on the band trip, Director Sopha contacted Marquette County Sheriff Joseph Konrath to forewarn him that there appeared to be increasing concern or unrest in the community regarding a potential positive COVID-19 case, even though there were no confirmed cases. (Dec. of Sopha, ¶ 23.)

> RESPONSE: Dispute that the evidence Defendants have submitted shows "increasing concern or unrest in the community."

58. Sheriff Konrath and Director Sopha discussed possible options for responding to the escalating situation. (Dec. of Sopha, ¶ 24.)

RESPONSE: Dispute that the evidence Defendants have submitted shows an "escalating situation" in the community.

59. As part of their conversation about the unfolding events, Sheriff Konrath and Director Sopha discussed a nearby community's response to a citizen's false claim of having tested positive for COVID-19 that had been recently covered in the media. (Dec. of Sopha, ¶ 24.)

RESPONSE: Undisputed.

60. The incident occurred in Lodi, a city in neighboring Columbia County. The Lodi citizen posted on social media that she was diagnosed with COVID-19, even though she had not, which led other local citizens to contact government officials about the threat and resulted in a local business not allowing its employees to report to work, all allegedly because of the false claim. (Dec. of Sopha, ¶ 24.)

RESPONSE: Undisputed.

61. The Lodi Police Department had recommended that the citizen be charged with disorderly conduct as a result of the false claim. (Dec. of Sopha, ¶ 24, Ex. 4.)

RESPONSE: Undisputed.

62. As Director and Health Officer of the Health Department, Director Sopha's biggest concern during this COVID-19 crisis has been maximizing the Health Department's ability to prevent the spread of the virus and to effectively respond to the community's needs. (Dec. of Sopha, ¶ 26.)

RESPONSE: Undisputed.

63.     False reporting of COVID-19, like Ms. Cohoon's social media posting, caused an unnecessary disturbance and additional mental distress and panic in the community. (Dec. of Sopha, ¶ 26.)

> RESPONSE: Dispute the characterization of Amyiah's post as false. The doctors told the Cohoons that Amyiah may have had COVID-19 notwithstanding the negative test result. Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12. The test itself says that "negative test results … do not preclude SARS-CoV-2," Berg Decl. Ex. 10. Also dispute the characterization that the concern was "unnecessary" or primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

64.     After careful consideration and discussions with Health Department staff and the Sheriff, Director Sopha determined that contacting the Sheriff's Department may be an option in their efforts to present accurate information on the virus to the community and may allow the Health Department to continue to respond to the community's needs as effectively as possible. (Dec. of Sopha, ¶ 25.)

> RESPONSE: Undisputed.

65.     A positive test result of COVID-19 for Amyiah Cohoon would have required contacting each of the people who were on the band trip to screen for their symptoms. (Dec. of Sopha, ¶ 27).

> RESPONSE: Undisputed.

66. A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to advise each person on the band trip to quarantine themselves at home for 14 days, including being off from work in critical positions within the community, such as healthcare. (Dec. of Sopha, ¶ 27).

RESPONSE: Undisputed.

67. A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to check-in with each person by phone twice a day to screen for symptoms. (Dec. of Sopha, ¶ 27).

RESPONSE: Undisputed.

68. A positive test result of COVID-19 for Amyiah Cohoon would have required the County Health Department to ensure those who reported symptoms to be referred for testing for COVID-19. (Dec. of Sopha, ¶ 27).

RESPONSE: Undisputed.

69. If symptoms or positive tests occurred, each person who tested positive would have been interviewed by the Health Department for contact tracing – they would have been asked who they had had recent contact with, and for contact information for those people so the County could follow up with them as well. (Dec. of Sopha, ¶ 27).

RESPONSE: Undisputed.

70. In order to respond to a positive diagnosis of COVID-19 of Amyiah Cohoon, the County began to plan, in coordination with other County officials, for resource requirements, including pulling other County employees, including from the Human Services and Zoning Departments, into the Health Department's efforts, as well as summoning on-call EMTs to assist with contact-tracing. (Dec. of Sopha, ¶ 28).

RESPONSE: Undisputed.

71. New staff brought in for the Health Department's response to a positive COVID-19 diagnosis would have had to be trained on confidentiality and screening policies and procedures. (Dec. of Sopha, ¶ 28).

RESPONSE: Undisputed.

72. Increased civil unrest in the community about a false positive test added to the significant strain on resources within the Marquette County Health Department in its efforts of responding to the virus. (Dec. of Sopha, ¶ 30).

> RESPONSE: Dispute the implication that the strain on resources was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may still have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally."). Dispute that the evidence Defendants have submitted shows "[i]ncreased civil unrest in the community."

73. Staff resources were diverted to responding to community concerns about Amyiah's social media postings and claim of having COVID-19. (Dec. of Sopha, ¶ 30).

> RESPONSE: Dispute the implication that the strain on resources was primarily attributable to Amyiah's post. *See* Response to ¶ 72.

74. These diverted resources hinder the Department's ability to attempt to respond to the changing circumstances of the virus. (Dec. of Sopha, ¶ 30).

> RESPONSE: Dispute the implication that the strain on resources was primarily attributable to Amyiah's post. *See* Response to ¶ 72.

75.     Around 5:30 p.m. on March 27, 2020, Nurse Davey received a telephone call from School District Nurse Wollert and learned that parents of students continued to call the School District regarding Amyiah's social media postings regarding being positive for COVID-19. (Dec. of Davey, ¶ 14).

RESPONSE: Undisputed.

76.     Nurse Wollert emailed Nurse Davey a copy of Amyiah Cohoon's latest social media posting in which she stated she was "finally home after being hospitalized for a day and a half. [She was] still on breathing treatment but ha[d] beaten the corona virus. Stay home and be safe." (Dec. of Davey, ¶ 14).

RESPONSE: Undisputed.

77.     The posting forwarded by Nurse Wollert included a photograph of Amyiah Cohoon in a hospital gown, on a hospital bed, with a breathing mask on. (Dec. of Davey, ¶ 14).

RESPONSE: Undisputed.

78.     Following her communication with Nurse Wollert, Nurse Davey called Sheriff Joseph Konrath and asked if he would follow up with Amyiah Cohoon regarding her social media postings on having COVID-19. (Dec. of Davey, ¶ 15; Dec. of Konrath, ¶ 3).

RESPONSE: Undisputed.

79. Nurse Davey told the Sheriff the County has not had any confirmed COVID-19 cases to date, yet Amyiah Cohoon was still posting she had the virus and had been treated for it, which was causing a disturbance within the community, including unfounded panic and fear. (Dec. of Davey, ¶ 15).

> RESPONSE: Dispute the characterization of Ms. Cohoon's post as false. The doctors told the Cohoons that Amyiah may have had COVID-19 notwithstanding the negative test result. Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12. The test itself says that "negative test results … do not preclude SARS-CoV-2," Berg Decl. Ex. 10. Also dispute the implication that the strain on resources was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

80. Nurse Davey's intent in requesting the Sheriff to follow up with Amyiah Cohoon was to hopefully have the social media postings voluntarily taken down. (Dec. of Davey, ¶ 16).

RESPONSE: Undisputed.

81. Nurse Davey sent Sheriff Konrath an email showing a recent social media post made by Ms. Cohoon in which Ms. Cohoon stated as follows: "I am finally home after being hospitalized for a day and a half. I am still om (sic) breathing treatment but have beaten the corona virus. Stay home and be safe" (Dec. of Konrath, ¶ 4.)

RESPONSE: Undisputed.

82. Sheriff Konrath understood from Nurse Davey that this post had been made after Ms. Cohoon returned from the UW Hospital and after she tested negative for COVID-19. (Dec. of Konrath, ¶ 5.)

RESPONSE: Undisputed.

83.    Nurse Davey also advised Sheriff Konrath that this social media post was creating unfounded concern, disturbance, and panic amongst the parents and students who had been on the same high school band trip to Florida, among the Westfield School District, in other individuals who had contact with those on the trip, and even from people who had simply seen the posting. (Dec. of Konrath, ¶ 6.)

> RESPONSE: Undisputed that Nurse Davey told Sheriff Konrath this. Dispute the characterization that her post was creating "unfounded" concern, or that the concern was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may still have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally."). Dispute that the evidence Defendants have submitted shows "disturbance and panic."

84.    Sheriff Konrath was advised that the Marquette County Health Department also received several calls from community residents who were disturbed and inquiring about this posting and whether Ms. Cohoon had tested positive for COVID-19. (Dec. of Konrath, ¶ 6.)

> RESPONSE: Undisputed.

85.    These calls to the Health Department were negatively impacting the already-strained resources of the Marquette County Health Department. (Dec. of Konrath, ¶ 6.)

> RESPONSE: Dispute the implication that the strain on resources was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may still have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

86.    Sheriff Konrath was also advised that school officials also were forced to respond to repeated inquiries related to this social media post. (Dec. of Konrath, ¶ 6.)

> RESPONSE: Undisputed.

87.    Ms. Cohoon's social media post was concerning to Sheriff Konrath as well, because it appeared to convey false information, given the negative test result as described to the Sheriff by the County Health Department. (Dec. of Konrath, ¶ 7.)

> RESPONSE: Dispute the characterization of Ms. Cohoon's post as false. The doctors told the Cohoons that Amyiah may have had COVID-19 notwithstanding the negative test result. Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12. The test itself says that "negative test results … do not preclude SARS-CoV-2," Berg Decl. Ex. 10.

88.    It was also concerning because it was causing panic, concern, and disturbance with community members who may have had contact with Ms. Cohoon or others on the class field trip. (Dec. of Konrath, ¶ 7.)

> RESPONSE: Dispute the characterization that the concern was primarily attributable to Amyiah's post. *See* Response to ¶ 85.

89.    It was the Sheriff's understanding that these individuals understandably expressed concern over whether they potentially had COVID-19 in light of being in contact with Ms. Cohoon on the school trip and were worried whether they needed to be tested and whether they needed to call off of work and self-isolate away from other family members. (Dec. of Konrath, ¶ 7.)

> RESPONSE: Undisputed.

90.    Given the panic, concern, and disturbance within the community created by this social media post, and in light of the fact Ms. Cohoon actually tested negative for COVID-19, Nurse Davey requested that the Sheriff's Department talk to the Cohoon family to see if Ms. Cohoon would agree to remove the social media post in which she stated she had beaten COVID-19. (Dec. of Konrath. ¶ 8.)

> RESPONSE: Dispute the characterization that the concern was primarily attributable to Amyiah's post. *See* Response to ¶ 85. Dispute that the evidence Defendants have submitted shows "panic, concern, and disturbance within the community."

91.     Shortly after speaking with Nurse Davey, Sheriff Konrath spoke with Patrol Sergeant Klump, who was on duty at the time. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 3-4.)

RESPONSE: Undisputed.

92.     Sheriff Konrath relayed to Sergeant Klump that Ms. Cohoon had made a post on social media in which she reported that she had beat COVID-19, but the Marquette County Health Department had advised that Ms. Cohoon tested negative. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 4, Ex. 3.)

RESPONSE: Undisputed.

93.     Sheriff Konrath also relayed to Sergeant Klump that such posting was concerning as it was conveying false information given the negative result and it was now creating a disturbance, panic, and unfounded concerns with the parents and students in the Westfield School District, the Marquette County Health Department, and other County residents. (Dec. of Konrath, ¶ 9; Dec. of Klump, ¶ 4.)

> RESPONSE: Dispute the characterization that the concern was primarily attributable to Amyiah's post. *See* Response to ¶ 85. Dispute that the evidence Defendants have submitted shows "disturbance" and "panic" in the community.

94.     Sheriff Konrath explained to Sergeant Klump that both the Marquette County Health Department and the school district were having their resources depleted due to the need to attempt to respond to all of the inquiries related to the inaccurate social media post. (Dec. of Konrath, ¶ 9.)

> RESPONSE: Dispute the characterization that the resource strain was primarily attributable to Amyiah's post. *See* Response to ¶ 85.

95.     Sheriff Konrath forwarded to Sergeant Klump the email of the social media post and requested that Sergeant Klump respond to the Cohoon residence, make contact with the

Cohoon family, and inquire whether Ms. Cohoon would voluntarily remove the social media post stating that she had beat COVID-19. (Dec. of Konrath, ¶¶ 9-10; Dec. of Klump, ¶ 4.)

> RESPONSE: Dispute that Sheriff Konrath directed Sergeant Klump to make only a voluntary request. Sergeant Klump told to the Cohoons that, "If [Amyiah's post] doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. Likewise, Sergeant Klump's incident report states that Sheriff Konrath told him to "respond to the residence and *have the post removed from her social media*," and notes that he threatened citation and arrest while he was there, Berg Decl. Ex. 6 at 4–5 (emphasis added), and Sheriff Konrath reviewed and approved that incident report, Berg Decl. Ex. 11. And, despite a letter sent to him by the Cohoons, Sheriff Konrath refused to acknowledge that Amyiah was free to post what she did or to provide any assurance that she would not be cited if she reposted it. Berg Decl. Exs. 8, 9.

96.    If Ms. Cohoon would not agree to remove the social media post voluntarily, Sheriff Konrath mentioned to Sergeant Klump that the Sheriff's Department could proceed with several options. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5.)

> RESPONSE: Dispute the implication that Sheriff Konrath did not order Sergeant Klump to do what he did. *See* Response to ¶ 95.

97.    Sheriff Konrath discussed with Sergeant Klump that there would be a wide range of options if Ms. Cohoon refused to remove the post, including a referral for Disorderly Conduct, working with the Health Department, and contacting Facebook to see if the posting could be removed. (Dec. of Konrath, ¶ 11.)

> RESPONSE: Dispute the implication that Sheriff Konrath did not order Sergeant Klump to do what he did. *See* Response to ¶ 95.

98.     Sheriff Konrath never directed Sergeant Klump to arrest or issue a disorderly conduct ticket to Ms. Cohoon if she did not agree to voluntarily remove the posting. (Dec. of Konrath, ¶ 11.)

> RESPONSE: Disputed. Sergeant Klump told to the Cohoons that, "If [Amyiah's post] doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. Likewise, Sergeant Klump's incident report states that Sheriff Konrath told him to "respond to the residence and *have the post removed from her social media*," and notes that he threatened citation and arrest while he was there, Berg Decl. Ex. 6 at 4–5 (emphasis added), and Sheriff Konrath reviewed and approved that incident report, Berg Decl. Ex. 11. And, despite a letter sent to him by the Cohoons, Sheriff Konrath refused to acknowledge that Amyiah was free to post what she did or to provide any assurance that she would not be cited if she reposted it. Berg Decl. Exs. 8, 9.

99.     Rather, if Ms. Cohoon refused to take the social media post down, Patrol Sergeant Klump would assess the situation further. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5, 24.)

> RESPONSE: Dispute the implication that Sheriff Konrath did not order Sergeant Klump to do what he did. *See* Response to ¶ 98.

100.    Sergeant Klump would contact Sheriff Konrath before he proceeded with any further action, particularly the issuance of a citation or making a referral for disorderly conduct. (Dec. of Konrath, ¶ 11; Dec. of Klump, ¶ 5, 24.)

> RESPONSE: Dispute that Sheriff Konrath did not order Sergeant Klump to do what he did. See Response to ¶ 98.

101.    The law enforcement contact at the Cohoon home on March 27, 2020 was the subject of both an audio and video recording. (See generally, Dec. of Warren ¶ 2-4, Ex. 2; Dec of Klump, ¶ 7.)

> RESPONSE: Undisputed.

102.    Upon arriving at the Cohoon home, Sergeant Klump requested to speak to Amyiah Cohoon's father. Mr. Richard Cohoon came to the door and then stepped outside to

speak with Patrol Sergeant Klump, closing the front door behind him while Ms. Cohoon remained in the home. (Dec. of Klump, ¶ 6-9; Ex. 2.)

RESPONSE: Undisputed.

103. Sergeant Klump initially asked Mr. Cohoon questions about his daughter, her school trip, about whether she thought she had COVID-19, and whether she had been tested. (Dec. of Klump, ¶ 10; Ex. 2.)

RESPONSE: Undisputed.

104. Mr. Cohoon began to explain Ms. Cohoon's hospital course and offered to show Sergeant Klump a copy of records from Ms. Cohoon's emergency room visit on March 22, 2020. Mr. Cohoon then stepped into the home briefly, presumably to ask Mrs. Cohoon to bring the record outside, and then re-emerged from the house and indicated that Mrs. Cohoon would bring the hospital record. (Dec. of Klump, ¶ 11; Ex. 2.)

RESPONSE: Undisputed.

105. Shortly thereafter, Mrs. Cohoon provided Patrol Sergeant Klump with a Divine Savior record from March 22, 2020, which he reviewed. When provided these records by the Cohoons, Patrol Sergeant Klump never said anything remotely similar to the allegation contained in the Complaint that he stated that he "was not there to gather information, just to complete Sheriff Konrath's orders." (Dec. of Klump, ¶ 12; Ex. 2.)

> RESPONSE: Disputed in part. Rick attempted to explain to Sergeant Klump, at least six different times, that the doctors believed Amyiah may have had COVID-19 even though she tested negative. Video at 4:32–50; 5:21–5:55; 7:53–8:13; 12:32–12:35; 14:28–14:36; 17:28–17:34. Sergeant Klump demonstrated that he was not interested in this explanation, stating, "I don't know the circumstances that you were in. All I'm here for is to figure out what this post is about, seeing she tested negative and *we need to get it taken down*." Video at 9:35–9:48.

106. Rather, Mr. Cohoon described Ms. Cohoon's medical history over the course of the last week. This included information confirming Ms. Cohoon had been tested for COVID-19

at the UW Children's Hospital on March 25, 2020 and that the test came back negative on the morning of March 26, 2020. (Dec. of Klump, ¶ 13; Ex. 2.)

RESPONSE: Undisputed.

107.    Mr. Cohoon confirmed the negative test a second time during their conversation. (Dec. of Klump, ¶ 13.)

RESPONSE: Undisputed.

108.    At approximately 19:02:51 in the video, for the first time, Sergeant Klump explained the reason he was there: to discuss Ms. Cohoon's social media[2] post in which she stated she had "beaten COVID-19," even though she had in fact tested negative. (Dec. of Klump, ¶ 14; Ex. 2.)

RESPONSE: Undisputed.

109.    Sergeant Klump relayed to Mr. and Mrs. Cohoon that this post was causing many issues with students and parents within the school district and showed Mr. Cohoon the screenshot of the post he had received via email from the Sheriff. (Dec. of Klump, ¶ 14; Ex. 2.)

RESPONSE: Undisputed.

110.    Sergeant Klump explained to Mr. and Mrs. Cohoon that Sheriff Konrath had been contacted by the Marquette County Health Department requesting that the Sheriff's Department make contact with the Cohoon family and talk to Ms. Cohoon to see if she would delete her post. (Dec. of Klump, ¶ 15; Ex. 2.)

> RESPONSE: Disputed in part. Klump told the Cohoons that he was there to "get her to delete this," Video at 7:10–7:22, and to ask them to add a new post apologizing and stating that she was not actually positive, Video at 7:22–7:32, to which Rick responded, "Well we don't know that. We're not gonna do that. We don't know that," Video at 7:32–7:37.

---

[2] At the time their encounter began, Sergeant Klump believed that the post in question had been made on Facebook. It was later confirmed that the post had been made on Instagram. (Dec. of Klump, ¶ 15.)

111.    Mrs. Cohoon then responded "okay," which Patrol Sergeant Klump interpreted as her agreement to take the post down, though he understood that Mrs. Cohoon may not have been speaking for her daughter, who appeared to have actually authored the post. (Dec. of Klump, ¶ 16; Ex. 2.)

RESPONSE: Undisputed.

112.    At approximately 19:07:05 on the video, Ms. Cohoon stepped outside of the residence for the first time. (Dec. of Klump, ¶ 17; Ex. 2.)

RESPONSE: Undisputed.

113.    Sergeant Klump explained to the Cohoon family that all he was there for was to figure out what the post was about, seeing that Ms. Cohoon tested negative, and to see if she would take the post down. (Dec. of Klump, ¶ 17; Ex. 2.)

RESPONSE: Disputed. Sergeant Klump did not tell Amyiah that he was there to "see if she would take the post down." Rather, he said, "I don't know the circumstances that you were in. All I'm here for is to figure out what this post is about, seeing she tested negative and *we need to get it taken down*"—a demand, not a request. Video at 9:35–9:48.

114.    In response to Sergeant Klump's statement, Ms. Cohoon immediately responded by saying "I'll do it." (Dec. of Klump, ¶ 17; Ex. 2.)

RESPONSE: Dispute the characterization of Sergeant Klump's statement. What he said—"we need to get it taken down"—was a demand. Video at 9:35–9:48.

115.    Sergeant Klump took Ms. Cohoon's statement to be a voluntary willingness to delete her Instagram post. (Dec. of Klump, ¶ 17.)

RESPONSE: Disputed. Regardless of what Sergeant Klump understood, the video shows that Amyiah responded to his demand, which does not suggest a "voluntary willingness" to delete her post.

116.    At approximately 19:08:24 in the video, Sergeant Klump spoke directly to Ms. Cohoon further explaining the situation and why he was there. He informed Ms. Cohoon that with her being in Florida with other parents and students, there was concern about her stating she

had COVID-19 and that these parents and students were never notified. (Dec. of Klump, ¶ 18; Ex. 2.)

RESPONSE: Undisputed.

117.    After additional conversation about Ms. Cohoon's medical course during the past week, at approximately 19:10:16 in the video, Patrol Sergeant Klump stated: "Nonetheless, can we get the post taken down?" (Dec. of Klump, ¶ 19; Ex. 2.)

RESPONSE: Undisputed.

118.    In response to his question, both Ms. Cohoon and Mrs. Cohoon immediately agreed to take down the post, by stating "yes." (Dec. of Klump, ¶ 19; Ex. 2.)

RESPONSE: Undisputed, but incomplete. Immediately thereafter, Rick objected on his daughter's behalf, "Wait a minute, why does it need to come down? What has been violated here lawfully?" Video at 12:17–12:26. Sergeant Klump *did not* respond, "Oh nothing, I'm just asking you to remove it, but it's up to you." Instead, Klump responded in a cautionary tone, "Because the health department has the information of her test results, that she is not positive." Video at 12:26–12:33. Amyiah went inside right after this exchange. Video at 12:15–12:49.

119.    Sergeant Klump took Ms. Cohoon's additional statement to express a voluntary willingness to delete the Instagram post. (Dec. of Klump, ¶ 19.)

RESPONSE: Disputed. Regardless of what Sergeant Klump understood, the video does not show Amyiah's "voluntary willingness" to delete her post, but rather Amyiah complying with Klump's demand. *See* Response to ¶¶ 113, 118.

120.    Up through the point in time that Ms. Cohoon twice indicated an agreement that she would remove the Instagram post, Sergeant Klump never suggested, insinuated or threatened that anyone could face arrest or any other adverse law enforcement action if there was not an agreement to remove the Instagram post. (Dec. of Klump, ¶ 20.)

RESPONSE: Disputed. A deputy sheriff at one's doorstep demanding the removal of a social media post—"we need to get it taken down," Video at 9:35–9:48—is an implicit threat, and Sergeant Klump reinforced that coercive implication by failing to disavow any threat in response to Rick's question, "what has been violated here lawfully?" Video at 12:17–12:26.

121. At approximately 19:10:47 of the video, Ms. Cohoon walked inside of the residence, outside of Patrol Sergeant Klump's presence, and closed the door behind her. (Dec. of Klump, ¶ 21; Ex. 2.)

RESPONSE: Undisputed.

122. While Ms. Cohoon was outside of Patrol Sergeant Klump's presence and after Ms. Cohoon had already twice indicated that she would remove the Instagram post, at approximately 19:10:48 of the video, Sergeant Klump did state to Mr. Cohoon: "Richard, I don't want to go this far, it was as simple as me coming out here and just getting the post taken down and walking away." (Dec. of Klump, ¶ 22; Ex. 2.)

RESPONSE: Dispute the characterization that Amyiah had twice indicated a willingness to take the post down. *See* Responses to ¶¶ 113–115; 118–119.

123. After Ms. Cohoon agreed to take down the post and while Ms. Cohoon was inside of her home, presumably to take down the post, Sergeant Klump did tell Mr. Cohoon the potential for disorderly conduct due to the fact that the post was causing a disturbance to the public by posting that their daughter was positive for COVID-19 and the other parents were upset over this post. (Dec. of Klump, ¶ 22; Ex. 2.)

RESPONSE: Undisputed, but incomplete. Sergeant Klump stated, "If it doesn't come down, the Sheriff has directed me to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04.

124. It was only after Ms. Cohoon had already twice agreed to remove the social media post that Sergeant Klump made any statement about the potential for disorderly conduct and arrest. (Dec. of Klump, ¶ 23; Ex. 2.)

RESPONSE: Dispute the characterization that Amyiah had twice indicated a willingness to take the post down, or that Sergeant Klump's prior statements and actions were not coercive. *See* Responses to ¶¶ 113–115; 118–120,

125.     When Sergeant Klump made these statements about disorderly conduct and arrest,

Ms. Cohoon was not present, but rather, was inside the home with the door closed. (Dec. of

Klump, ¶ 23; Ex. 2.)

> RESPONSE: Undisputed, but incomplete. The video shows that Amyiah learned, while Sergeant Klump was *still there*, that he had threatened her family with jail over her posts. After Amyiah removed the post Sergeant Klump had a screenshot of, she remained outside while Klump and her father continued to discuss, and Rick twice protested the threat of jail, and Sergeant Klump confirmed the threat, in Amyiah's presence. Video at 21:50–22:04 ("[Y]ou guys want to threaten somebody with going to jail over it and add insult to injury?"); Video at 23:16–23:32 ("Rick: [I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it. Sergeant Klump: I'm just doing what we can do as a Sheriff's Office. Okay?").

126.     Sergeant Klump did not have a plan to immediately issue any citations or make

any referrals for disorderly conduct or arrests at that time, even if Ms. Cohoon would not agree

to voluntarily remove the posts. (Dec. of Klump, ¶ 24.)

> RESPONSE: Disputed. Sergeant Klump told the Cohoons that, "if [Amyiah's post] doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. Likewise, Sergeant Klump's incident report states that Sheriff Konrath told him to "respond to the residence and *have the post removed from her social media*," Berg Decl. Ex. 6 at 4 (emphasis added).

127.     Sergeant Klump had previously discussed with Sheriff Konrath that there were a

wide range of options if Ms. Cohoon refused to voluntarily remove the post. While this

potentially included disorderly conduct, it also included working with the County Health

Department to take other actions or potentially contacting the social media platform. (Dec. of

Klump, ¶ 24.)

> RESPONSE: Dispute the implication that Sheriff Konrath did not order Sergeant Klump to do what he did. *See* Response to ¶ 98.

128.     If Ms. Cohoon refused to take the social media post down, Sergeant Klump would

have further evaluated the situation and discussed the situation with Sheriff Konrath before

proceeding with any of the options, including issuance of disorderly conduct citations or arrest for disorderly conduct. (Dec. of Klump, ¶ 24.)

> RESPONSE: Disputed. Sergeant Klump told the Cohoons that, "if [Amyiah's post] doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04.

129. At approximately 19:11:25 of the video, Mrs. Cohoon partially entered the home, presumably to check with Ms. Cohoon inside, and then Mrs. Cohoon stated to Sergeant Klump, "she [Ms. Cohoon] is taking it down now." (Dec. of Klump, ¶ 25; Ex. 2.)

> RESPONSE: Undisputed.

130. Mr. Cohoon re-emerged from the residence and stated that if the post was not there anymore, it should not show up on the phone. (Dec. of Klump, ¶ 26-27; Ex. 2.)

> RESPONSE: Undisputed.

131. Sergeant Klump got the impression that Mr. Cohoon had believed and expected that the post was already removed but suggested to Sergeant Klump that he look at his phone. (Dec. of Klump, ¶ 27.)

> RESPONSE: Undisputed.

132. Mr. Cohoon then appeared to obtain his own phone to check to verify that the post was removed. (Dec. of Klump, ¶ 27; Ex. 2.)

> RESPONSE: Undisputed.

133. Mr. Cohoon then stated to Sergeant Klump: "I kinda understand where you are coming from, like I said, we are failing to understand each other." (Dec. of Klump, ¶ 28; Ex. 2.)

> RESPONSE: Undisputed.

134. At approximately 19:18:44 of the video, Ms. Cohoon re-emerged from the house with her phone in hand and reported to Sergeant Klump that the social media post had been

completely taken down. Ms. Cohoon then proceeded to show Patrol Sergeant Klump her phone confirming that the post had been deleted. (Dec. of Klump, ¶ 29; Ex. 2.)

RESPONSE: Undisputed.

135.   Sergeant Klump told Ms. Cohoon that he appreciated her taking the social media post down and she responded "of course." (Dec. of Klump, ¶ 30; Ex. 2.)

RESPONSE: Undisputed.

136.   At no time did Patrol Sergeant Klump ever state or threaten Ms. Cohoon that if she did not take down the social media post, he would arrest her or issue her a disorderly conduct citation. In fact, he never made any threat or other statements to Ms. Cohoon or in her presence that suggested or referenced arrest or disorderly conduct. (Dec. of Klump, ¶ 31; Ex. 2.)

> RESPONSE: Disputed. A deputy sheriff at one's doorstep demanding the removal of a social media post—"we need to get it taken down," Video at 9:35–9:48—is an implicit threat, and Sergeant Klump reinforced the coercive implication by failing to disavow any threat in response to Rick's question, "what has been violated here lawfully?" Video at 12:17–12:26. The video also shows that Sergeant Klump confirmed the threat in Amyiah's presence. Video at 23:16–23:32 ("Rick: [I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it. Sergeant Klump: I'm just doing what we can do as a Sheriff's Office. Okay?").

137.   Sergeant Klump never told Ms. Cohoon that if she did not remove the social media post, he had direct orders from the Sheriff to issue citations for disorderly conduct and taking people to jail. (Dec. of Klump, ¶ 32-34; Ex. 2.)

> RESPONSE: Undisputed, but incomplete. Sergeant Klump told her *parents* that, "if it doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. Immediately after hearing that threat, Angela went inside by Amyiah. Video at 13:23–13:45. Later, Rick discussed the threat, and Sergeant Klump confirmed it, in Amyiah's presence. Video at 23:16–23:32 ("Rick: [I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it. Sergeant Klump: I'm just doing what we can do as a Sheriff's Office. Okay?").

138. At no time did Mr. Cohoon bring Ms. Cohoon outside and explain to Ms. Cohoon that she did not have to delete her post, that he would not delete it if it were his post but that she could decide for herself. (Dec. of Klump, ¶ 33; Ex. 2.)

> RESPONSE: Undisputed that the video does not show this statement, but Rick was inside by Amyiah at various points.

139. All of Sergeant Klump's interactions with the Cohoon family on March 27, 2020 were professional, and he neither raised his voice nor ever threatened Ms. Cohoon with arrest. (Dec. of Klump, ¶ 35; Ex. 2.)

> RESPONSE: Disputed. A deputy sheriff at one's doorstep demanding the removal of a social media post—"we need to get it taken down," Video at 9:35–9:48—is an implicit threat, and Sergeant Klump reinforced the coercive implication by failing to disavow any threat in response to Rick's question, "what has been violated here lawfully?" Video at 12:17–12:26. Sergeant Klump *explicitly* threatened her *parents*: "if it doesn't come down, *the Sheriff has directed me* to issue disorderly conduct citations if not start taking people to jail." Video at 12:58–13:04. And the video also shows that Sergeant Klump confirmed the threat in Amyiah's presence. Video at 23:16–23:32 ("Rick: [I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it. Sergeant Klump: I'm just doing what we can do as a Sheriff's Office. Okay?").

140. It was Sergeant Klump's intention to speak with Ms. Cohoon to explain the negative impact her post was having with the hope that she would voluntarily remove the post as requested by the County's Health Department. (Dec. of Klump, ¶ 36.)

> RESPONSE: Dispute the implication that Sergeant Klump had no intention to do what he did. *See* Response to ¶ 139.

141.    Sergeant Klump had significant concerns over this social media post, which was already causing an unfounded concern, a disturbance and panic with parents, students, the County Health Department and other County residents and could continue to cause further panic in the community. (Dec. of Klump, ¶ 36.)

> RESPONSE: Dispute the characterization that the concern was primarily attributable to Amyiah's post, rather than to the pandemic itself, to the fact that Amyiah may still have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

142.    Ms. Cohoon's social media post, which was believed to be inaccurate, not only tended to cause or provoke a disturbance, but actually did cause a disturbance in the community. (Dec. of Popp, ¶ 8-12; Dec. of Kraft, ¶ 7, 10-13; Dec. of LaFave, ¶ 7, 10-12; Dec. of Ezell, ¶ 8, 10-13.)

> RESPONSE: Disputed. Any disturbance was more directly attributable to the pandemic itself, to the fact that Amyiah may have had COVID-19 even though she ultimately tested negative, Amyiah Cohoon Decl. ¶ 12; Angela Cohoon Decl. ¶ 12, and to the school's failure to notify families that a student on the trip may have had COVID-19, Angela Cohoon Decl. ¶¶ 7, 10; *supra* ¶ 36; Video at 10:30–10:52 ("Klump: Parents [are] concerned that you're saying that you had corona and that [they] aren't being notified. Angela: Well they should have been notified, because I talked to [the principal] myself, personally.").

143.    Mr. Cohoon has continued to voice his opinions and thoughts about his daughter's diagnosis and the encounter with the Marquette County Sheriff's Department. (Dec. of Mills, ¶ 3, Ex. 6.)

> RESPONSE: Undisputed, but irrelevant. Amyiah has explained that *she* fears posting further on social media as a result of Sergeant Klump's threat. Amyiah Cohoon Decl. ¶¶ 21, 23–25.

144.    On March 28, 2020, Mr. Cohoon posted on Facebook about the conversation with Sergeant Klump. In a lengthy posting, Mr. Cohoon relayed his version of what took place and

encouraged all to share his post by stating "SHARE THE HELL OUT OF IT." (Dec. of Mills, ¶ 3, Ex. 6.)

RESPONSE: Undisputed, but irrelevant. *See* Response to ¶ 143.

145.   Mr. Cohoon continued to post about the incident by referencing a photograph of Ms. Cohoon in the hospital and asserting that the Sheriff and School Administrator "forced Amyiah to remove by threats of arrest and disorderly conduct citations." (Dec. of Mills, ¶ 3, Ex. 6.)

RESPONSE: Undisputed, but irrelevant. *See* Response to ¶ 143.

146.   The highly contagious novel coronavirus with which Ms. Cohoon publically claimed to be afflicted had already resulted in the World Health Organization declaring a public health emergency, declarations of a public health emergency by multiple states including Florida and Wisconsin, a proclamation of a national emergency by the President of the United States, and the closure of all public and private schools in the State of Wisconsin. (Dec. of Mills, ¶ 2, Ex. 5.)

RESPONSE: Undisputed.

147.   As of March 23, 2020, positive cases of COVID-19 in the United States had risen 119% in the previous 72 hours and five Wisconsinites had already died. (Dec. of Mills, ¶ 2, Ex. 5.)

RESPONSE: Undisputed.

148.   There was and still is no known cure or vaccine for COVID-19. (Dec. of Mills, ¶ 2, Ex. 5.)

RESPONSE: Undisputed.

Dated: May 15, 2020.

Respectfully submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (SBN 1005622)
(414) 727-6367 | rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (SBN 1095644)
(414) 727-7361 | luke@will-law.org

Anthony F. LoCoco (SBN 1101773)
(414) 727-7419 | alococo@will-law.org

Lucas T. Vebber (SBN 1067543)
(414) 727-7415 | lucas@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385

Attorneys for Plaintiff