_____

AMYIAH COHOON, a minor,
by and through her parents,
Richard Cohoon and Angela Cohoon,

     *Plaintiff*,

                              Case No. 2:20-CV-620-JPS

v.

JOSEPH KONRATH and CAMERON KLUMP,

     *Defendants*.

_____

### DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

_____

### INTRODUCTION

Plaintiff commenced this action against Defendants alleging retaliation in violation of her First Amendment rights. (Dkt. No. 1, p. 61-65, 69-70, 75-78; Dkt. No. 3-1, p.11-12.) This claim of retaliation was based on declarations that went far beyond "a few minor inconsistencies" with the facts (*see* Dkt. No. 29, p. 6). Rather, Plaintiff submitted supporting declarations that materially misstated the facts upon which her claim is based.

Now, with the benefit of Officer Klump's dashcam video showing exactly what happened and what was said between Plaintiff, her parents, and Sergeant Klump, and contrary to the sworn declarations submitted by Plaintiff and her father, it is clear that Amyiah Cohoon was never actually threatened with arrest or citation for her Instagram post. As a result, Plaintiff now claims that this is "beside the point" (*see* Dkt. No. 29, p.

1

21) and appears to shift her theory of liability. Mindful that Sergeant Klump did not actually threaten her with arrest, Plaintiff now asserts that Sergeant Klump's mere presence and statements recorded on audio and video must somehow be construed as a threat of arrest.

Using that as context, Plaintiff now asserts that Defendants were attempting to censor her speech through implied threats. (Dkt. No. 29, p. 13-15, 21-23.) Plaintiff relies on case law dealing with challenges to the constitutionality of statutes and ordinances and with content-based censorship, rather than the First Amendment retaliation theory that she pled. In her combined moving and response brief, Plaintiff has all but abandoned the concept of retaliation upon which she pled her claim. (*See generally* Dkt. No. 29, which does not mention retaliation even once.) For this reason alone, her claims should be dismissed.

Moreover, Plaintiff's evolving theory of liability only further supports the defense of qualified immunity: There is no legal authority that clearly established that a constitutional deprivation occurred at the Cohoons' home on March 27, 2020. Plaintiff is seeking to impose First Amendment liability for an officer's reference to arrest that was made to a third party, outside of her presence, and after she already agreed—twice—to remove the post. Under any First Amendment theory that Plaintiff cares to advance, she has failed to cite to any closely analogous case that would put an officer on notice in a "particularized sense" necessary to defeat qualified immunity. Therefore, her claim should also be dismissed on the basis of qualified immunity.

2

# I. PLAINTIFF FAILS TO MEET HER BURDEN IN OPPOSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff has failed to establish a *prima facie* case that could justify summary judgment in her favor, and she has not met her burden in responding to the merits of Defendants' motion. When applying the proper framework for a First Amendment retaliation claim, Plaintiff's claim must be dismissed because she cannot establish that she was threatened, coerced, or intimidated into removing the Instagram post. Additionally, even if Plaintiff had demonstrated a *prima facie* case, the existence of probable cause defeats her claim.

## A. Plaintiff Relies on Inapplicable Case Law Pertaining to Censorship That Fails to Establish That She Was Threatened or Coerced.

Plaintiff's motion for summary judgment and her response to Defendants' motion hinges on three meritless arguments that fail to establish that Sergeant Klump threatened her, coerced her, or intimidated her, or that his actions otherwise constituted a deprivation for purposes of a First Amendment claim of retaliation. First, Plaintiff argues that a "demand from a law enforcement officer standing outside one's home to remove a social media post" is an implicit threat of arrest that amounts to censorship. (Dkt. No. 29, p. 13.) But Plaintiff has not identified a single case holing that a law enforcement officer's request (or even "demand") that triggers voluntary compliance constitutes a threat that punishment will immediately follow as is required to state a First Amendment retaliation claim. (*See* Dkt. No. 29, p. 13); *see also Black v. Clarke*, 285 F. Supp. 3d 1070, 1081 (E.D. Wis. 2018), *quoting Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

The cases cited by Plaintiff are distinguishable and inapplicable because they either do not examine First Amendment retaliation, or they do not analyze an officer

3

making a request (or "demand") to which the recipient voluntarily agrees. In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), the plaintiff challenged his disorderly conduct conviction under a city ordinance outlawing "breach of the peace" along with the language included in the jury instructions given to jurors at his trial. There was absolutely no discussion of requests or demands by law enforcement or whether retaliation may have occurred. *See id*. In *Bantam Books*, *Inc. v. Sullivan*, 372 U.S. 58 (1963), the plaintiff sought a declaration that a state's "Commission to Encourage Morality in Youth" was unconstitutional and an injunction prohibiting the Commission from circulating notices to publishers advising that certain books and magazines had been declared to be "objectionable" or obscene by the Commission. There was no discussion of First Amendment retaliation or requests or demands by law enforcement whatsoever.

The Second Circuit case cited by Plaintiff falls short as well. In *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), the plaintiffs sued the borough president of Staten Island and a billboard company, PNE, after the borough president wrote to PNE expressing concerns about billboards denouncing homosexuality that had been posted by the plaintiffs in a neighborhood containing a significant number of gay and lesbian residents. The letter asked PNE to contact his legal counsel. The main issue examined by the *Okwedy* Court was whether the borough president's comments could trigger First Amendment retaliation concerns where the borough president did not have regulatory or other direct decisionmaking authority related to billboard companies like PNE. The court held that "the fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive" of the issue of First

4

Amendment retaliation. *Id.* at 344. As for whether the content of the message was coercive, the court did not decide the issue and held that factual issues precluded summary judgment. Law enforcement was not involved in any way. Thus, the case is irrelevant to the current analysis because Plaintiff has not challenged Defendants' authority to convey the Marquette County Health Department's request to Plaintiff that she remove her post.

Similarly, in *American Communications Association v. Douds*, 339 U.S. 382 (1950), the plaintiff sued the regional director of the National Labor Relations Board challenging a provision in the Labor Management Relationship Act of 1947 that required officers of labor organizations to file affidavits averring that they did not belong to the Communist Party and did not believe in the overthrow of the government by force. The court examined the constitutionality of laws regulating specific conduct or beliefs in the interest of maintaining public order; it did not address First Amendment retaliation or actions by law enforcement officers.

In *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), the operator of a website that included advertisements for escorts and sex workers sued a sheriff who was pressuring credit card companies to prohibit the use of their cards to purchase any ads on the website. While the case examined the sheriff's intimidation of the third-party credit card companies, it did not analyze or even reference First Amendment retaliation. Rather, the court specifically noted that First Amendment censorship is "distinct" from punishment for speech, because censorship (often referred to as a prior restraint) seeks to prevent dissemination of <u>future</u> speech, whereas retaliatory punishment applies to speech that has already occurred. *See Backpage.com*, 807 F.3d at 235.

5

Importantly, the *Backpage.com* decision shows that Plaintiff cannot simply shift between two <u>distinct</u> First Amendment frameworks or mix the two together in order to advance her otherwise meritless claim. She is not challenging the constitutionality of a statute or ordinance, and her Complaint does not allege censorship of future speech. Moreover, the dashcam video shows that Sergeant Klump was focused on the Instragram post and never made any statements to Plaintiff about future speech. Plaintiff pled a claim of First Amendment retaliation and must confine her analysis to the appropriate legal framework. Thus, to prevail on her claim, Plaintiff must establish that Sergeant Klump threatened her, coerced her, or intimidated her by indicating that "punishment, sanction, or adverse regulatory action will immediately follow." *Black*, 285 F. Supp. 3d at 1081. She has not established this necessary element and therefore her claim should be dismissed.

To wit, Plaintiff has failed entirely to address this Court's holding in *Black v. Clarke*. In *Black*, the plaintiff was stopped and questioned by law enforcement officers after engaging in protected speech. The plaintiff voluntarily responded to the officers' questions but alleged that their stopping and questioning him constituted First Amendment retaliation. However, this Court explained that voluntarily cooperating with officers' requests does not give rise to a First Amendment claim of retaliation. *See id.*, at 1082-3. Similarly, simply being "stopped for fifteen minutes in order to voluntarily respond to deputies' questions" would not likely deter First Amendment activity in the future. *Id*. While "campaigns of petty harassment" and threats of physical violence stated in "aggressive and combative language" may be understood as retaliation (e.g. "[n]ext time [the plaintiff] or anyone else pulls this stunt on a plane they may get knocked out,"

6

*see Black*, 285 F.Supp.3d at 1083), voluntarily agreeing to an officer's request (or demand) is simply insufficient for purposes of First Amendment retaliation.

In fact, in other constitutional contexts such as stops and seizures under the Fourth Amendment, case law is clear that the mere presence of an officer does not implicate constitutional concerns. *See*, *e.g.*, *Florida v. Royer*, 460 U.S. 491, 497 (1983); *U.S. v. Mendenhall*, 446 U.S. 544 (1980). While Plaintiff places great emphasis on her belief that "any sixteen-year-old" would comply with the request of a "uniformed law enforcement officer" (*see* Dkt. No. 29, p. 9; *see also* p. 13), a law enforcement officer may approach a citizen and ask questions and make requests, including requesting identification, without triggering the applicability of the Fourth Amendment. *See*, *e.g.*, *U.S. v. Simmons*, 918 F.2d 476 (5th Cir. 1990) ("one's self-identification as a law enforcement officer is not so coercive that this statement alone renders an encounter between citizen and police a seizure"). Moreover, a plaintiff's perception of an action as being threatening, or a plaintiff's "less generalized yet speculative apprehensiveness" about possible future government action, are insufficient for purposes of First Amendment retaliation. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Plaintiff has not produced any admissible evidence to contradict the audiovisual evidence showing that she voluntarily consented to Sergeant Klump's request to remove the post. Nor has she identified any case law holding that voluntary consent to an officer's request can give rise to a First Amendment claim of retaliation. More to the point, Plaintiff has not pointed to any case that has held that an officer's request or demand, without more, is sufficient to show a "realistic threat of arrest." Plaintiff cites to *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004) for the proposition

7

that a realistic threat of arrest is enough to chill First Amendment rights. While this is undisputed, the case does not provide any analogous analysis or examples that could support Plaintiff's position in the present case. *Hodgkins* dealt with a plaintiff who had actually been arrested. And the cases relied upon by the *Hodgkins* Court for its holding similarly dealt only with arrests and direct threats of arrest. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 454 (1987) (the plaintiff was arrested); *Steffel v. Thompson*, 415 U.S. 452, 461 (1974) (the plaintiffs were twice directly told to stop handbilling or they would be arrested, and then one plaintiff was arrested).

Plaintiff's arguments regarding the allegedly coercive effect of the request coming from a law enforcement officer are wholly unsupported by case law and do not bridge the gaps in her position. Because she has not shown that she suffered any deprivation, her claim of First Amendment retaliation fails and must be dismissed.

**B. Plaintiff's Arguments About Causation Have No Bearing on the Merits of Her Claim.**

Plaintiff's other arguments are similarly unavailing. Plaintiff next asserts that Sergeant Klump's request for her to remove the Instagram post "played a causal role in Amyiah removing her post." (Dkt. No. 29, p. 14.) This tautology is beyond dispute. Plaintiff spends a great deal of time detailing the actions her parents took and the statements that were made <u>after she agreed to remove the post and while she was inside the house</u>. But the only activity or statements that are relevant to the causation analysis are those made <u>prior</u> to her agreement to remove the post. A uniformed officer came to her home, asked her to remove the post, and "she quickly said, 'will do'" after the request was made. (*See* Dkt. No. 29, p. 9.) In Plaintiff's presence, the conversation continued and Mr. Cohoon discussed his frustration with the situation while Sergeant Klump listened

8

silently. Sergeant Klump then said, "Nonetheless, can we get the post taken down?" Plaintiff again agreed to remove the Instagram post and then went inside the home.

This is the sum total of actions or statements that could be considered "causal" for purposes of Plaintiff's response agreeing to remove the post. Plaintiff cannot claim that things that were said <u>after</u> she had already agreed to remove the post and entered the home to do so were causally related to the decision she had already made and reiterated. She also cannot claim that things that were said outside of her presence had any impact on her decision (a decision that had already been made and communicated to Sergeant Klump).

Without support, Plaintiff notes that later, after she had twice agreed to remove her post and while Sergeant Klump was still at her home, she learned that Sergeant Klump "had threatened her family with jail." (Dkt. No. 29, p. 15.) For the same reasons explained above, this is entirely irrelevant to the analysis, even if Plaintiff's characterization of this later exchange as a "threat" is taken at face value. Defendants do not dispute that Sergeant Klump's requests to Plaintiff at 9:48-49 and 12:15 of the dashcam video that she remove her post played a causal role in her agreement to remove the post—because she immediately agreed to do so after each request. Nothing said after her agreement and nothing said outside of her presence could be causally related to her decision.

Ultimately, Plaintiff misses the essence of the causation requirement. It is not enough to simply show that a plaintiff engaged in protected speech that caused some result. "Establishing the causation element of retaliation requires a showing that the <u>fact</u> of the plaintiff's engagement in protected activity was a motivating factor of the alleged

adverse action, not merely that the <u>substance</u> of the plaintiff's complaint motivated a response the plaintiff did not particularly like." *See Holleman v. Zatecky*, 961 F.3d 873, 879 (7th Cir. 2020) (emphasis in original). Plaintiff must show that Defendants retaliated against her because of the fact that she engaged in protected activity, but she has failed to even allege as much. Because Plaintiff cannot establish the causation necessary to support her claim, it should be dismissed.

### C. Plaintiff Has Not Demonstrated That A Person of Ordinary Firmness Would be Deterred From Engaging in Future First Amendment Activity.

Plaintiff provides nothing but anecdotal evidence regarding the allegedly deterrent effect of Sergeant Klump's request. But the appropriate question in not whether <u>the plaintiff</u> would be deterred by the alleged deprivation; rather, the question is whether a "person of ordinary firmness" would be deterred from engaging in future activity. *Black*, 285 F. Supp. 3d at 1082, *discussing Hutchins v. Clarke*, 661 F.3d 947 (7th Cir. 2011). Moreover, while a "realistic threat of arrest is enough to chill First Amendment rights," Plaintiff all but concedes that Defendants did not threaten her with arrest before she agreed to remove her post. (*See*, *e.g.* Dkt. No. 29, p. 14, 21.) Therefore, she has not established this element of her claim and it should be dismissed.

### D. Defendants Had Probable Cause to Cite Plaintiff for Disorderly Conduct.

The Supreme Court recently clarified that the existence of probable cause defeats a claim of First Amendment retaliation. *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019). While Plaintiff cites to the *Nieves* decision, she does not substantively discuss its holding. Nevertheless, it appears that Plaintiff understands that probable cause would defeat her claim because she argues that Defendants did not have probable cause to cite her for

10

disorderly conduct. However, her arguments are unavailing when considered within the "flexible concept" of probable cause, which "eschews technicality and legalisms" and inherently allows room for reasonable mistakes. *See Ornelas v. U.S.*, 517 U.S. 690, 695-696 (1996); *State v. Weber*, 2016 WI 96, ¶ 20, 372 Wis.2d 202, 887 N.W.2d 554; *Brinegar v. U.S.*, 338 U.S. 160, 176 (1949).

Plaintiff asserts that Defendants could not possibly have had probable cause to cite her for disorderly conduct because Sergeant Klump's comments about citation and arrest were made outside of her presence. (*See* Dkt. No. 29, p. 16.) This contention is illogical at best. The existence of probable cause does not depend on who is present when the topic is discussed. Regardless, Plaintiff has not explained how her conduct did not fall within the "otherwise disorderly conduct" language of Wis. Stat. § 947.01 and Marquette County Ordinance § 50.03. Nor has she established that it would have been unreasonable for Defendants to believe, even mistakenly, that there was a probability that Plaintiff's actions occurred under circumstances that would tend to cause or provoke a disturbance. *See Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998).

Instead, Plaintiff simply relies on the decision in *In re Douglas D*. and asserts that Sergeant Klump lacked probable cause because her conduct was, essentially, not as bad as the "egregious" conduct at issue in *In re Douglas D*. where the court held that there was no disorderly conduct. (Dkt. No. 29, p. 16-17, citing *In re Douglas D*., 2001 WI 47, ¶ 21, ¶ 41.) But this rationale fails on two fronts. First, *In re Douglas D*. did not examine probable cause. The court was tasked with reviewing the petitioner's conviction and not whether probable cause existed for the arrest or citation. Thus, the case offers no

11

guidance on the issue of whether Defendants had probable cause to cite Plaintiff in the present case.

Second, Plaintiff ignores the fact-specific nature of the disorderly conduct analysis. "[W]hether particular conduct is disorderly conduct depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the surrounding circumstances." *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987). "[T]he mosaic which is analyzed for a … probable-cause inquiry is multi-faceted, [and] 'one determination will seldom be a useful "precedent" for another.'" *Ornelas*, 517 U.S. at 698, *quoting Illinois v. Gates*, 462 U.S. 213, 238 n. 11 (1983). "An objective analysis of the conduct and circumstances of each particular case must be undertaken because what may constitute disorderly conduct under some circumstances may not under others." *State v. Schwebke*, 2002 WI 55, ¶ 24, 253 Wis.2d 1, 644 N.W.2d 666. Probable cause existed based on the conduct at issue and the surrounding circumstances.

Additionally, Plaintiff relies heavily on Mr. Cohoon's statements to Sergeant Klump about his daughter's medical treatment—including the fact that she had tested negative for COVID-19—as if these statements in some way negate probable cause. They do not. It is undisputed that according to the information that Sheriff Konrath and Sergeant Klump received from the Marquette County Health Department, Plaintiff actually tested negative for COVID-19, despite posting online that she had COVID-19. (Dkt. No. 17, ¶ 82; Dkt. No. 33, ¶ 82.) Mr. Cohoon confirmed that Plaintiff tested negative. (Dkt. No. 29, p. 7.) Sergeant Klump was further informed that Plaintiff's social media posting was causing significant disturbance, anxiety, fear, concern, and even panic among other citizens. (Dkt. No. 17, ¶ 83-84.) Nothing said by Mr. Cohoon to Sergeant

12

Klump rebutted this information. Yet Plaintiff downplays the consequences of her Instagram post as "some unknown level of concern" (Dkt. No. 29, p. 17), despite the sworn declarations of Health Department staff and community members articulating very specific concerns and the ways in which their lives were upended by Plaintiff's post. (*See* Dkt. Nos. 18, 22 – 26.) She states, without any support whatsoever, that the concern generated by her post "was more directly attributable to the COVID-19 pandemic itself." (Dkt. No. 29, p. 17.)

But had Plaintiff not claimed to have "beaten COVID-19," Jamie Popp's son would not have been "panicked, scared, and worried that he would also come down with COVID-19 because of his close proximity to Ms. Cohoon." (Dkt. No. 25, ¶ 8.) Had Plaintiff not claimed to have "beaten COVID-19," Ms. Popp and her husband would not have been "on pins and needles" concerned for their son's safety and the safety of their other family members. Similarly, Kristine Kraft would not have been "extremely concerned, … anxious, scared and worried" that she and her son and husband may have been exposed to COVID-19. (Dkt. No. 26, ¶ 7.) Had Plaintiff not claimed to have "beaten COVID-19," Candace La Fave and Daniel Ezell's daughter would not have been "panicked, scared, and worried that she would also come down with COVID-19 because of her close proximity to Ms. Cohoon." (Dkt. No. 23, ¶ 7; Dkt. No. 24, ¶ 8.) Mr. Ezell would not have taken their daughter, who suffers from a rare brain condition and is immune compromised, to the emergency room to be tested. (Dkt. No. 23, ¶ 7-10; Dkt. No. 24, ¶ 8-11.) Absent Plaintiff's post, none of these families would have needlessly endured the resulting panic, disturbance, and disruption. Had Plaintiff not claimed to have "beaten COVID-19," the Marquette County Health Department would not have

experienced the added strain on its resources needed to respond to the resulting community concerns. (Dkt. No. 22, ¶ 30.)

Whether Ms. Cohoon ever actually had COVID-19, Defendants understood Plaintiff's Instagram post to be knowingly false and touching on an area of significant consequence to public health. This constituted at least probable cause for the "otherwise disorderly conduct" element under Wis. Stat. § 947.01 and Marquette County Ordinance § 50.03. The social media post, which was believed to be inaccurate, not only tended to cause or provoke a disturbance, but actually did cause a disturbance in the community. Therefore, Defendants possessed probable cause that Plaintiff engaged in disorderly conduct prior to any law enforcement interactions with her or her parents. Even assuming she could establish a *prima facie* retaliation case, this probable cause defeats her claim of First Amendment retaliation.

## II. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

### A. Plaintiff Has Not Shown That it was Clearly Established that Sergeant Klump's Contact with Her Amounted to Any Form of Actionable Retaliation.

In light of the dashcam video, Plaintiff does not dispute that she was not actually threatened with arrest or citation. Instead, Plaintiff now claims that for purposes of qualified immunity, it "is beside the point" that the threat of citation or arrest was not made in her presence. (Dkt. No. 29, p. 21.) She fails to explain why this critical fact is not relevant, particularly when she had already voluntarily agreed to remove the Instagram post—twice—prior to the statement regarding disorderly conduct being made. As explained above, a law enforcement officer's request that triggers voluntary compliance is insufficient to state a First Amendment retaliation claim. Likewise, events or

14

statements that occurred after Plaintiff voluntarily agreed to remove her post have no bearing on the analysis and she has not cited a single case that would suggest as much—in a qualified immunity setting or otherwise. Thus, Plaintiff has failed to show that it was clearly established that Sergeant Klump's statements, made outside of her presence, could plausibly constitute a threat of arrest sufficient to support a First Amendment claim of retaliation.

Moreover, Plaintiff now claims that it was a "straightforward First Amendment violation" for Sergeant Klump <u>to simply go to the Cohoons' home and "demand" that she remove the post</u>. (Dkt. No. 29, p. 21.) The cases cited in support of this assertion—*Terminiello*, *Bantam Books*, *American Communications Association*, *Backpage.com*, and *Okwedy*—are inapplicable for the reasons discussed above and because they simply do not stand for Plaintiff's proffered position. The cases apply to allegations of prior restraint and challenges to the constitutionality of ordinances or statutes. At most, the cases constitute a recitation of First Amendment rights that do not define the right in question with the requisite specificity for purposes of the qualified immunity analysis. *See Volkman v. Ryker*, 736 F.3d 1084, 1089–91 (7th Cir. 2013) (holding that, by only "demonstrate[ing] little more than that the First Amendment right against retaliation, writ large," the plaintiff failed to cite to clearly established law).

Plaintiff also fails to recognize that it is <u>her</u> burden to establish the existence of the allegedly clearly established constitutional right with the requisite specificity. *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987); *see also Archer v. Chisholm*, 188 F.Supp.3d 866 (E.D. Wis. 2016). Defendants explained the reasons why any alleged right was not clearly established under the unprecedented circumstances created by the COVID-19

pandemic, considering the information provided to them by the County Health Department, and in light of the request made by the County Health Department to make contact with Plaintiff and ask that she remove the post because of the panic is was causing in the community. Plaintiff claims that Defendants have failed to show that these circumstances make "well-established First Amendment principles suddenly unclear." (Dkt. No. 29, p. 22.) But again, Plaintiff has not identified any such "well-established First Amendment principles," nor has Plaintiff even attempted to undertake the necessary inquiry "in light of the specific context of the case." *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (emphasis added).

It was not clearly established that Sergeant Klump's request that Plaintiff remove her Instagram post could plausibly give rise to a First Amendment claim of retaliation. Likewise, it was not clearly established that Sergeant Klump's statements, made outside of Plaintiff's presence and after the Plaintiff already agreed to remove the subject posting, could plausibly give rise to a First Amendment claim of retaliation. Plaintiff has also not identified any closely analogous case law establishing that the nature of the contact between herself and Sergeant Klump could deter First Amendment activity in a person of ordinary firmness. Therefore, Defendants are entitled to qualified immunity.

### B. Plaintiff Has Not Shown That it was Clearly Established that Defendants Lacked Probable Cause.

Even if Defendants are not entitled to qualified immunity for the reasons above, Defendants are nevertheless shielded by qualified immunity arising from their objectively reasonable belief that probable cause existed for either disorderly conduct or a violation of Marquette County Municipal Code 50.15. Qualified immunity shields officers from "suit for damages if 'a reasonable officer could have believed [the arrest] to be lawful, in

light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Often termed "arguable probable cause," qualified immunity protects officers who reasonably but mistakenly believe that probable cause exists. *See Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714–15 (7th Cir. 2013). This arguable-probable-cause inquiry is separate from the probable-cause inquiry. *Id.* at 715. Given the context of the case, Plaintiff has not explained why it would be unreasonable for Defendants to believe that probable cause existed. Nor has Plaintiff cited to any case that could have arguably put Defendants on notice that their belief about probable cause was unreasonable even if it was ultimately mistaken. *See Hope v. Pelzer*, 536 U.S. 730, 739-740 (2002). Therefore, Defendants are protected by qualified immunity.

III. **PLAINTIFF'S *MONELL* CLAIM FAILS BECAUSE SHE HAS NOT IDENTIFIED ANY CONSTITUTIONAL DEPRIVATION AND CANNOT ESTABLISH PARTICIPATION IN A CONSTITUTIONAL DEPRIVATION BY SHERIFF KONRATH**

Plaintiff cannot proceed on her official capacity claim because she cannot establish any underlying constitutional deprivation. All Plaintiff has contended is that Sheriff Konrath "discussed a disorderly conduct citation" with Sergeant Klump, so Sheriff Konrath is allegedly liable "for the fact that the Cohoons took Klump's presence as the implicit threat that it was or that it became an explicit threat." (Dkt. No. 29, p. 26.) As a matter of law, this does not constitute a violation of the First Amendment.

Further, even if Plaintiff could demonstrate an underlying deprivation, Sheriff Konrath's discussions with Sergeant Klump would, at most, establish *respondeat superior* liability for the alleged "threat." As a matter of law, this is insufficient to establish *Monell* liability. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir.

2011); *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978). Undisputed sworn declarations of both Sheriff Konrath and Sergeant Klump show that Sheriff Konrath never ordered Sergeant Klump to go to the Cohoon home and threaten Plaintiff with arrest for disorderly conduct. (*See* Dkt. No. 33, p. 22-23; *see also* Dkt. No. 19, ¶ 9-11 and Dkt. No. 21, ¶ 4-5, 24.) Sheriff Konrath's general awareness of Sergeant Klump's actions or his review and approval of Sergeant Klump's after-the-fact incident report have no bearing on whether Sheriff Konrath made a deliberate choice to follow a course of action from among various alternatives. In fact, Sheriff Konrath's and Sergeant Klump's unrefuted sworn declarations put any such argument to rest. (*See* Dkt. No. 19, ¶ 11; Dkt. No. 21, ¶ 5, 24.)

Municipal liability does not inexorably flow from a constitutional tort committed by a policymaker. Absent the existence of a policy or practice, plaintiffs who seek to impose liability on local governments under § 1983 must show that a "policymaker responsible for establishing final policy with respect to the subject matter in question made a deliberate choice to follow a course of action from among various alternatives." *De Smet v. Snyder*, 653 F. Supp. 797, 802 (E.D. Wis. 1987); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Under the *Monell* theory advanced by Plaintiff, the policymaker must participate in the act causing the constitutional injury in order for municipal liability to exist. *See Brokaw v Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000). But Sheriff Konrath was not present at the Cohoon home on March 27, 2020 and did not personally communicate anything at all to Plaintiff. In terms of his direction of events that day, Sheriff Konrath never made a deliberate choice to adopt or follow a specific course of action that caused a

18

constitutional deprivation. Instead, it remains undisputed that the Sheriff directed Sergeant Klump to go to the Cohoon home and ask whether Plaintiff would remove the Instagram post in question. Any official action beyond this request was to take place only after additional discussion between Sheriff Konrath and Sergeant Klump. Sheriff Konrath's participation was limited to directing his sergeant to make a request. As a matter of law, this is insufficient to impose municipal liability.

The only other argument forwarded by Plaintiff on the question of *Monell* liability is a non-starter. Plaintiff inexplicably focuses on inadmissible pre-suit communications and attempts to use those communications as evidence of Sheriff Konrath's "direct orders" or "current positions." (*See*, *e.g*., Dkt. No. 29, p. 25); s*ee also* Fed. R. Evid. 408; *Kritikos v. Palmer Johnson, Inc*., 821 F.2d 418, 423 (7th Cir. 1987); *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1482 (7th Cir. 1990). Plaintiff seems to believe that a defendant must immediately acquiesce to any demand, and any attempt to defend oneself—including retaining counsel in the face of legal threats—is somehow evidence of an unconstitutional municipal policy. In fact, Plaintiff actually asserts that Defendants' "refusal" to "acknowledge" that they violated Plaintiff's First Amendment rights serves as evidence that Sergeant Klump's request that Plaintiff remove the Instagram post was not a voluntary one. (Dkt. No. 29, p. 25-26.) Plaintiff appears reluctant to accept that "defendants are not second-class citizens in our courts. The fact of being sued creates no presumption that the person or institution sued has in fact committed a wrong." *Ball v. City of Chicago*, 2 F.3d 752, 759 (7th Cir. 1993).

Plaintiff's attempt to establish *Monell* liability is based on nothing more than the prohibited theory of *respondeat superior*. Because Plaintiff has not identified any

19

unconstitutional policy implemented or created by Sheriff Konrath and cannot demonstrate any participation in the act that allegedly caused constitutional injury, her official capacity claim fails and must be dismissed.

## IV. PLAINTIFF IS NOT ENTITLED TO DECLARATORY JUDGMENT.

Plaintiff has failed to meet her burden for purposes of obtaining a permanent injunction. Nevertheless, she urges the Court to grant a declaratory judgment in her favor in which the Court declares "that she and her family cannot be cited, arrested, or jailed for similar speech about her experience going forward." (Dkt. No. 29, p. 20.) This is a blatant attempt to obtain injunctive relief styled as a request for a declaration of legal rights.

Declaratory relief is intended to define the legal relationship and obligations between parties where one of the parties could invoke a coercive remedy but has not done so. *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc*., 819 F.2d 746, 749 (7th Cir. 1987). Where a party has already filed suit to enforce its claim that a defendant has violated its rights, "a declaratory judgment would serve no useful purpose" and should be denied. *Id*., *citing Int'l Harvester Co. v. Deere & Co*., 623 F.2d 1207, 1218 (7th Cir. 1980) and *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1169 (7th Cir. 1969). Further, where a court enters a declaratory judgment defining legal rights or obligations, the judgment provides adequate prospective relief and an injunction enjoining future actions is at best unnecessary and at worst a waste of judicial resources. *See Roman Catholic Found. v. Regents of Univ. of Wisconsin Sys*., 590 F.Supp.2d 1083, 1092 (W.D. Wis. 2008); *see also Freedom From Religion Found. v. Concord Cmty. Sch*., 240 F.Supp.3d 914, 924-5 (N.D. Ind. 2017).

Plaintiff has not met her burden on summary judgment of establishing that she is entitled to any relief whatsoever. Regardless, even if the Court determines that Plaintiff is entitled to declaratory judgment, she cannot obtain injunctive relief for herself—and nonparties—in the guise of a declaration prohibiting speculative, vague, future actions. This is especially true where, as here, the Constitution already defines the contours of protection available for Plaintiff's future speech. Therefore, Plaintiff's motion should be denied.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction, deny Plaintiff's Motion for Summary Judgment, and grant the Defendants' Motion for Summary Judgment, dismissing this action with prejudice and costs.

Dated this 29th day of May, 2020.

By:   <u>s/ Sara C. Mills</u>
       SAMUEL C. HALL, JR.
       State Bar No.: 1045476
       SARA C. MILLS
       State Bar No.: 1029470
       CRIVELLO CARLSON, S.C.
       Attorneys for Defendants, Joseph Konrath and Cameron Klump
       710 N. Plankinton Avenue
       Milwaukee, WI 53203
       Telephone: 414.271.7722
       Fax: 414.271.4438
       Email: shall@crivellocarlson.com
             smills@crivellocarlson.com

21