UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMYIAH COHOON,

        Plaintiff,

   v.                                             Case No. 20-cv-0620-bhl

JOSEPH R KONRATH,
CAMERON KLUMP,

        Defendants.

## ORDER GRANTING PLAINTIFF DECLARATORY JUDGMENT

      The SARS-CoV-2 virus and COVID-19 have had a tremendous impact on American society. But, as this case makes clear, that impact has its limits and, more specifically, does not extend to overriding the protections of the First Amendment. On April 16, 2020, teenage plaintiff Amyiah Cohoon (Amyiah or Plaintiff), by and through her parents, Rick and Angela Cohoon (Mr. Cohoon and Mrs. Cohoon), filed a complaint alleging defendants Sheriff Joseph Konrath and Patrol Sergeant Cameron Klump violated Amyiah's First and Fourteenth Amendment rights when Sergeant Klump, at Sheriff Konrath's direction, demanded that Amyiah remove a social media post detailing her repeated hospitalizations with COVID-like symptoms. (ECF No. 1 at 11.) As a remedy, Amyiah seeks both declaratory and injunctive relief, including an order barring Defendants from threatening or taking coercive action against her if she posts on social media in the future about her scare with COVID-19. (ECF Nos. 1 & 3.) On April 24, 2020, Defendants moved for summary judgment (ECF No. 14 at 1), and on May 15, 2020, Amyiah filed her own summary judgment motion. (ECF No. 31 at 1.)

      The parties agree that the facts are not disputed. Indeed, the entirety of Sergeant Klump's encounter with Amyiah and her parents is captured in a dash-cam video. That video, along with other record evidence, establishes that Defendants violated Amyiah's free-speech rights by demanding that she take down her social media posts or face criminal citation or arrest. Accordingly, Amyiah is entitled to summary judgment on her declaratory judgment claim, and,

for the same reasons, Defendants' summary judgment motion must be denied.  The Court will deny Amyiah's request for injunctive relief, however.  Her counsel conceded that a declaratory judgment would be a sufficient remedy, and the injunction she requests is premised on speculative and ill-defined assertions about what she might post in the future and what Defendants might do in response, making injunctive relief inappropriate.

## FACTUAL BACKGROUND[1]

In March 2020, Amyiah, then a sophomore at Westfield Area High School, traveled with her school band on a spring break trip to Disney World and Universal Studios in Florida.  (ECF No. 32 at 1.)  During that trip, various states, including Florida and Wisconsin, declared public health emergencies in response to the then just-emerging COVID-19 pandemic.  (*Id*. at 2.)  Four days after returning home from Florida, Amyiah began feeling ill.  (*Id*.)  Her symptoms included a fever and dry cough.  (*Id*. at 3.)  Two days later, she began having trouble breathing, so her mother took her to the emergency room at Divine Savior Hospital in Portage, Wisconsin.  (*Id*.)

The doctors at Divine Savior evaluated Amyiah and diagnosed her with an "acute upper respiratory infection."  (*Id*.)  They informed her that her symptoms were consistent with COVID-19 but said they could not test her for the virus due to the testing criteria in effect at the time.  (*Id*.)  They then discharged her with an inhaler and instructions to strictly self-quarantine for 14 days and return if her condition worsened.  (*Id*.)  They also instructed her parents to self-quarantine for 14 days, consistent with the COVID-19 protocols in place at the time.  (*Id*.)  After returning home, Amyiah posted about her experience on Instagram, captioning a photo of herself from the spring break trip with: "Hey guys… sorry I've been on a long break.. I won[']t be back for a while longer due to me no[w] having the COVID-19 virus… I don't want the attention it[']s just the truth… I am now in self quarantine and am not allow[e]d to leave my room and have an inhaler since they said to go home… best of wishes. love you guys."  (ECF No. 32 at 5.)

Three days later, on March 25, 2020, Amyiah's symptoms worsened.  Her mother promptly took her back to Divine Savior, which then redirected her via ambulance to University of Wisconsin Children's Hospital in Madison.  (*Id*. at 3-4.)  Once admitted to UW Children's, Amyiah was finally tested for COVID-19.  (*Id*. at 4.)  Her test came back negative the following morning, but the doctors told the Cohoons that she may still have had COVID-19 and simply missed the

---

[1] These facts are drawn from the proposed statements of undisputed facts (and responses) filed by the parties. (ECF Nos. 17, 32, 33, & 35.)  Disputed facts are viewed in the light most favorable to the non-moving party.

window for testing positive.  (*Id*.)  To that end, they released her with orders to continue her 14-day quarantine.  (*Id*.)

After arriving home from the hospital, Amyiah again took to Instagram.  (*Id*. at 6.)  She posted a photo of herself with an oxygen mask on her face, captioned: "I am finally home after being hospitalized for a day and a half. I am still o[n] breathing treatment but have beaten the corona virus. Stay home and be safe[.]"  (*Id*.)  At the time of this post, Marquette County, Wisconsin had yet to register even a single confirmed positive COVID case.[2]  (ECF No. 17 at 7.)  In response to Amyiah's post, the County Health Department and the Westfield School District received numerous phone calls from concerned citizens.  (*Id*. at 8.)

In hopes of convincing Amyiah to voluntarily remove the post, the County Health Department referred the matter to County Sheriff Konrath.  (*Id*. at 10-13.)  Sheriff Konrath relayed the necessary information to Sergeant Klump, who was on duty at the time.  (*Id*. at 14.)  The content of this conversation was later summarized in Sergeant Klump's Detail Incident Report, which Sheriff Konrath reviewed and approved.  (ECF No. 1-6 at 4.)  The Report states: "Sheriff Konrath advised he wished for me to respond to the residence and have [Amyiah's] post removed from her social media . . . When I advised [Mr. Cohoon] that I was there to have [Amyiah] remove the post, he became upset . . . ."  *Id*.

On the evening of March 27, 2020, Sergeant Klump arrived at the Cohoons' home.  (ECF No. 32 at 6.)  A microphone and dash-cam captured the audio and video of the ensuing interaction.  (ECF No. 20.)  Sergeant Klump spoke for some time with Mr. Cohoon before Mrs. Cohoon and Amyiah joined them outside the house.  (ECF No. 32 at 6.)  Upon exiting the house, Amyiah heard Sergeant Klump explain: "All I'm here for is to figure out what this post is about, seeing she tested negative . . . . And we need to get it taken down."  (ECF No. 20 at 9:35-9:48.)  Amyiah then agreed to go inside and take the post down.  (ECF No. 32 at 7.)  While she was inside, Sergeant Klump threatened Mr. Cohoon: "If [the post] doesn't come down, the Sheriff has directed me to issue disorderly conduct citations, if not start taking people to jail."  (ECF No. 20 at 12:58-13:04.)

After removing the post, Amyiah exited the house again and showed Sergeant Klump her Instagram page.  (*Id*. at 20:52-21:14.)  While outside, Amyiah heard her father twice repeat

---

[2] As of September 21, 2021, Marquette County has reported more than 1830 confirmed COVID-19 cases and 29 deaths.  USA FACTS, https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/state/wisconsin/county/marquette-county (last visited Sept. 21, 2021).

Sergeant Klump's earlier threat: "[Y]ou guys want to threaten somebody with going to jail over it and add insult to injury?" (*Id.* at 21:50-22:04), and "[I]t doesn't do any good when you can't warn [people] when you got a Sheriff's department threatening to throw people in jail over it." (*Id.* at 23:16-23:32). Sergeant Klump did not correct Mr. Cohoon's recitation of the threat, instead saying, "I'm just doing what we can do as a Sheriff's Office. Okay?" (*Id.* at 23:16-23:32).

After Sergeant Klump departed, Amyiah also deleted her March 22 Instagram post about her first trip to Divine Savior. (ECF No. 32 at 8.) Later that evening, the Cohoons discovered that Westfield School District Superintendent Robert Meicher had sent a news update to families in the district that included a statement about Amyiah's posts. (*Id.* at 8-9.) The update read: "It was brought to my attention today that there was a rumor floating out there that one of our students contracted Covid-19 while on the band trip to Florida two weeks ago. Let me assure you there is NO truth to this. This was a foolish means to get attention and the source of the rumor has been addressed." (*Id.*) Amyiah has not posted about her experience with COVID-19 on social media since. (*Id.* at 9.)

## ANALYSIS

In her complaint, Amyiah alleges that Defendants violated her First and Fourteenth Amendment rights when Sheriff Konrath sent Sergeant Klump to her home and coerced her into taking down her social media posts. (ECF No. 1 at 11.) She seeks two remedies: (1) a declaratory judgment establishing that Defendants violated her First Amendment rights, and (2) an injunction enjoining Defendants from citing her or her parents for disorderly conduct, arresting them, jailing them, or threatening any of the above, for future posts on social media about her scare with COVID-19. (ECF No. 3 at 1.) The Court will grant the first request for relief but deny the second.

I.  **Plaintiff Is Entitled to a Declaratory Judgment on Her First Amendment Retaliation Claim.**

The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party" when there is "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. To establish "a case of actual controversy," Plaintiff must prove that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

To establish injury-in-fact under the First Amendment, "a plaintiff may show a chilling effect on h[er] speech that is objectively reasonable, and that [s]he self-censors as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). Amyiah alleges that she removed her Instagram posts and has continued to self-censor since her encounter with Sergeant Klump. She also contends that she fears posting about COVID-19 again because it might subject her or her parents to citation or arrest under the Sheriff's Department's broad reading of the disorderly conduct statute. That Amyiah's posts were silenced as a result of Defendants' conduct, allegedly in violation of the First Amendment, establishes injury-in-fact for her declaratory judgment claim. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Further, the Seventh Circuit has held that Amyiah's assumed fear of future sanctions for engaging in protected speech is itself objectively reasonable. *See Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012) ("[W]hen one cannot know what triggers the ordinance such that it will be enforced, he may fairly assume that it can and will always be enforced and that total abstention from the protected activity is necessary to avoid arrest and prosecution.").

There is no dispute that Amyiah's injuries are the direct result of, and thus "fairly traceable" to, Defendants' conduct. She took down her social media posts only after Sergeant Klump's visit to her home. And, because the chilling effect on her protected speech is her injury, and that chilling effect persists to this day, it is likely to be redressed by a favorable judicial decision. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998) (holding that redressability is established when "plaintiff 'personally would benefit in a tangible way from the court's intervention.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). Thus, Plaintiff has met the standing requirements necessary to trigger this Court's authority to issue declaratory relief.

**A. The Record Establishes All Three Elements of a First Amendment Retaliation Claim.**

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). "First, [s]he must show [s]he engaged in protected First Amendment activity." *Id*. "Second, [s]he must

show an adverse action was taken against h[er]." *Id*. "Third, [s]he must show h[er] protected conduct was at least a motivating factor of the adverse action." *Id*. Here, Plaintiff has satisfied all three elements.

### 1. Plaintiff's Instagram Post Was Unquestionably Protected Speech Under the First Amendment.

Even if short and often grammatically scurrilous, social media posts do not fall outside the ambit of the First Amendment. To the contrary, they are exactly what the First Amendment seeks to protect. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017) (explaining that social media is often the "principal source[] for . . . speaking and listening in the modern public square"). In the eyes of the law, when Amyiah Cohoon took to Instagram, she was no different than John F. Tinker wearing his black armband in the halls of the Des Moines public schools, or Paul Robert Cohen donning his "Fuck the Draft" jacket in the corridors of the Los Angeles County Courthouse, and her speech deserved the same degree of protection. *See Tinker v. Des Moines Independent Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *Cohen v. California*, 403 U.S. 15 (1971); *see also Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2042 (2021) (holding that a student's social media posts containing derogatory remarks about her school's cheerleading team were protected by the First Amendment).

But Defendants disagree. In their view, Amyiah forfeited her constitutional protection when she published a post that caused concern in the community and led to an influx of phone calls to the Westfield School District and Marquette County Health Department. (ECF No. 17 at 13.) According to Sheriff Konrath, this was akin to "screaming fire in a crowded movie theater." (ECF No. 1-9 at 1.) Even setting aside that the popular movie theater analogy actually referred to "*falsely* shouting fire in a theater and causing a panic," *Schenck v. United States*, 249 U.S. 47, 52 (1919) (emphasis added), Defendants' argument still fails. While content-based speech restrictions are permissible in limited circumstances (incitement, obscenity, defamation, fighting words, child pornography, etc.), the Supreme Court "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage . . . based on an ad hoc balancing of relative social costs and benefits.'" *U.S. v. Alvarez*, 567 U.S. 709, 717 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

Labeling censorship societally beneficial does not render it lawful. If it did, nearly all censorship would evade First Amendment scrutiny. Defendants may have preferred to keep

Marquette County residents ignorant to the possibility of COVID-19 in their community for a while longer, so they could avoid having to field calls from concerned citizens, but that preference did not give them authority to hunt down and eradicate inconvenient Instagram posts. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (holding that speech is protected against censorship or punishment unless likely to produce "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest"). Amyiah's post is not captured by any of the categorical exceptions to the First Amendment, so this Court will not balance the social utility of curtailing it against its government-assigned value.

But Defendants persist. They cast Amyiah's characterization of her illness as a lie, insisting that because she ultimately tested negative, she was prohibited from publicly proclaiming that she had beaten COVID-19. But the very doctors who tested her also informed her that she may have had COVID-19 in spite of the negative test. Her Instagram posts were, therefore, at worst, incomplete. The notion that the long arm of the government—redaction pen in hand—can extend to this sort of incomplete speech is plainly wrong. The Marquette County Sheriff had no more ability to silence Amyiah's posts than it would to silence the many talking heads on cable news, who routinely pronounce one-sided hot takes on the issues of the day, purposefully ignoring any inconvenient facts that might disrupt their preferred narratives. Indeed, even if Amyiah's posts had been untruthful, no court has ever suggested that noncommercial false speech is exempt from First Amendment scrutiny. *See Alvarez*, 567 U.S. at 720. The Supreme Court has emphasized: "[t]he remedy for speech that is false is speech that is true. This is the ordinary course in a free society." *Id.* at 727. The government here had every opportunity to counter Amyiah's speech, but it opted instead to engage in the objectionable practice of censorship. Because her Instagram post was undoubtedly protected by the First Amendment, the Court finds that Amyiah has satisfied the first element of her retaliation claim.

### 2. Defendants Took Adverse Action Against Plaintiff.

"The standard for determining whether an action is sufficiently adverse to constitute retaliation is well established: it must be 'likely to deter a person of ordinary firmness from continuing to engage in protected activity.'" *Holleman*, 951 F.3d at 880 (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). "The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights." *Hodgkins ex rel. Hodgkins v. Peterson*, 355

F.3d 1048, 1056 (7th Cir. 2004). Thus, the realistic threat of arrest establishes adverse action for retaliation purposes.

The audiovisual recording of the police encounter at the Cohoon home captured Sergeant Klump threatening Mr. Cohoon: "If [the post] doesn't come down, the Sheriff has directed me to issue disorderly conduct citations, if not start taking people to jail." (ECF No. 20 at 12:58-13:04.) According to Defendants, though, because Sergeant Klump never made this threat to Amyiah directly—instead uttering the threat when only her father was present—she could not have personally experienced any threat of adverse action. (ECF No. 15 at 8-13.) This superficial analysis fails for a number of reasons. First, the record makes clear that Sergeant Klump's intention throughout his 30-minute visit was to get Amyiah to remove her social media posts through the use of threats against her and perhaps her parents. That he expressed this intent only during his discussions with Amyiah's father, after Amyiah had retreated into the house to comply with the police officer's demand, does not mean that she was not the realistic subject of threatened police action. Indeed, it appears that Amyiah made the logical 'hop' necessary to infer the sergeant had threatened her arrest because, in her sworn declaration, she recalled, "After [Sergeant Klump] left, I was afraid that he would find my first post and come back for that one, so I deleted that post too." (ECF No. 3-2 at 3.) Moreover, she stated, "I would also like to post further about my scare with COVID-19 on social media, and to repost the posts I removed, but I am afraid that another officer will come to my home and cite or arrest my parents or me." (*Id*.) So not only was Sergeant Klump's threat of arrest likely to deter a person of ordinary firmness from engaging in protected conduct, in this case it did just that.

Further, the video of Sergeant Klump's interaction with Mr. Cohoon shows that the police officer twice, in Amyiah's presence, declined to contradict Mr. Cohoon's assertions that the Sheriff's Department was threatening to take the Cohoons to jail over Amyiah's Instagram posts. (ECF No. 20 at 21:50-22:04 and 23:16-23:32.) This was a very real threat of arrest both to a person of ordinary firmness and, particularly, to a 16-year-old child watching a policeman argue with her father over her exercise of her own free speech rights.

Analogizing to a citizen's ability to consent to a warrantless police search of their property, Defendants argue that Amyiah's decision to acquiesce in deleting her Instagram post rendered her action voluntary and, therefore, outside the scope of First Amendment protection. (ECF No. 14 at 13-15.) Defendants correctly allude to the important "difference between government expression

and . . . intimidation—the first permitted by the First Amendment, the latter forbidden by it." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015). In the First Amendment retaliation context, "'[w]hat matters is the distinction between attempts to convince and attempts to coerce.'" *Id*. (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam)).

Defendants ask the Court to lump Sergeant Klump's efforts into the "attempts to convince" basket. Amyiah agreed to delete her Instagram post prior to learning of Sergeant Klump's threats. How then, Defendants ask, can she possibly claim coercion? This argument ignores the inherently chilling and coercive nature of a uniformed police officer showing up at a teenager's home and demanding that she cease otherwise protected speech.

Sergeant Klump's dash-cam footage shows that it was not his persuasive rhetoric that led Amyiah to delete her social media post, but rather his demand made under the auspices of the Sheriff's Department: "[W]e need to get it taken down." (ECF No. 20 at 9:35-9:48.) That was coercion by any metric. The state cannot dispatch a law enforcement officer to the home of a teenager to demand that she remove an Instagram post that government officials disagree with and then claim the officials were only engaging in the Socratic method. It is possible that a Westfield administrator or Marquette County Health Department employee could have engaged in a mutually-respectful discussion with Amyiah to try to convince her to retract her post voluntarily, but that is not the method they chose. (ECF No. 17 at 10.) They elected, instead, to rely on the coercive power of the Sheriff's Department, and any attempt to obfuscate that fact by casting Sergeant Klump as an earnest public relations expert must fail. Because she was subjected to the realistic threat of arrest, Amyiah has satisfied the second element of her retaliation claim.

### 3. Plaintiff's Protected Conduct Was the Motivating Factor for the Adverse Action.

The third element of a claim for retaliation under the First Amendment requires a plaintiff to show that the adverse action she suffered was motivated by her protected conduct. *See Massey v. Johnson*, 457 F.3d 711, 716-17 (7th Cir. 2006). "[A] motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's action." *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2006). On this element, Defendants graciously carry Plaintiff's burden for her. Following the encounter at the Cohoon house, Sergeant Klump filed a Detail Incident Report that Sheriff Konrath reviewed and approved. (ECF No. 29 at 23.) Within the report, Sergeant Klump conceded, "Sheriff Konrath advised he wished for me to respond to the residence and have [Amyiah's] post removed from her social media" (ECF No. 1-6 at 4), and

"When I advised [Mr. Cohoon] that I was there to have [Amyiah] remove the post, he became upset . . . ." (ECF No. 1-6 at 4.) By Defendants' own admission, then, the entire purpose for Sergeant Klump's visit and, by extension, the motivation for his threat of arrest, was to achieve the removal of Amyiah's protected speech from her Instagram account. Here, protected conduct was the *only* motivating factor for the adverse action, so Amyiah has satisfied the third element of her retaliation claim as well.

> **B. Defendants Cannot Escape Liability by Invoking Probable Cause or Qualified Immunity.**

Defendants argue that even if Amyiah can establish a First Amendment Retaliation Claim, her request for relief fails because: (1) they had probable cause to arrest her under the Wisconsin Disorderly Conduct statute (ECF No. 14 at 18-22); and (2) they are entitled to qualified immunity. (ECF No. 13 at 13.) Both arguments fail.

Defendants' probable cause defense is based on the Supreme Court's holding in *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019), that a plaintiff bringing a retaliatory arrest claim based on speech protected by the First Amendment must prove the absence of probable cause for the arrest. If the officer had probable cause to arrest the plaintiff, the plaintiff may not assert a retaliatory arrest claim. *Id.* The test for probable cause is an objective one, asking "whether a reasonable officer would have believed the person had committed a crime." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). "'If so, the arrest is lawful even if the belief would have been mistaken.'" *Id.* (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057-58 (7th Cir. 1992)).

Defendants insist that, based on his knowledge at the time of the encounter, Sergeant Klump had probable cause to arrest Amyiah under the Wisconsin and Marquette County Disorderly Conduct provisions. In relevant part, these provisions punish "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance[.]" Wis. Stat. §947.01.[3]

Defendants appear to recognize that none of the statute's specific enumerations even remotely apply to Amyiah's Instagram post and thus focus on the "otherwise disorderly conduct" language. Wisconsin courts have interpreted this phrase to encompass acts that corrupt public

---

[3] The language of Marquette County Ordinance 50.03 Disorderly Conduct mirrors the state statute in all relevant respects.

morals or outrage the sense of public decency. *See State v. Givens*, 28 Wis. 2d 109, 115-16 (1965); *State v. Vinje*, 201 Wis. 2d 98, 102 (Ct. App. 1996). Defendants argue that, even if his belief was ultimately mistaken, Sergeant Klump had a reasonable basis to believe there was probable cause to arrest Amyiah under the catchall disorderly conduct language because he had been informed that her Instagram post was causing significant disturbance, anxiety, fear, concern, and even panic among other citizens. (ECF No. 15 at 19.)

Defendants' probable-cause argument dramatically understates the probable-cause analysis for disorderly conduct. If accepted, Defendants' position would largely gut the First Amendment's protection for free speech, allowing police officers a free hand to wrongfully arrest anyone engaging in protected speech so long as the offending officer could point to a possible disturbance or perceived anxiety among those who opposed the speech. Accordingly, the Wisconsin Supreme Court has held that speech that "falls within the protection of the First Amendment . . . may not be punished as disorderly conduct." *In re Douglas D.*, 2001 WI 47, ¶47, 243 Wis. 2d 204, 239-40, 626 N.W.2d 725, 743. Defendants offer no answer to this precedent, which removes any basis for probable cause. Because Amyiah's social media posts were protected speech, Sergeant Klump could not have reasonably believed he had probable cause to arrest her or her family. Defendants' probable-cause defense fails as a matter of law.

Defendants fare no better with their invocation of qualified immunity. It is well-established that qualified immunity does not apply to requests for declaratory relief. *See Denius v. Dunlap*, 330 F.3d 919, 928 (7th Cir. 2003). As a result, Defendants cannot use qualified immunity as a defense to Amyiah's declaratory judgment claim. Since money damages are not in issue, the Court will not reach the question of whether qualified immunity would have applied in that instance.

## II. Plaintiff's Proposed Injunction Is Too Broad and Is Unnecessary in Light of Declaratory Relief.

Plaintiff's motion for injunctive relief seeks to "enjoin[] Defendants from citing [her] or her parents for disorderly conduct, arresting them, jailing them, or threatening any of the above, for future posts on social media about her scare with COVID-19." (ECF No. 3 at 1.) The Court denies this motion.

Normally, injunctions should be narrowly drawn to prohibit only the violation established in litigation or conduct reasonably related. *See E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013). Plaintiff's motion requests something more akin to carte blanche. Even injunctions

ordering a party to obey a specific law are often struck down for overbreadth. *See id.* ("An injunction that does no more than order a defeated litigant to obey the law raises several concerns. One is overbreadth."); *see also N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941) (holding that "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute"). But Plaintiff's proposed injunction would do even more than simply order Defendants to obey the law. It would also subject them to contempt proceedings for *enforcing* the law if that enforcement required them to cite, arrest, or jail Amyiah or her parents for future social media posts, even if those posts venture into a type of unprotected speech. This is certainly improper. *See Roman Catholic Found. v. Regents of Univ. of Wisconsin Sys.*, 590 F.Supp.2d 1083, 1093 (W.D. Wis. 2008) (holding that, although the University's refusal to fund certain religious activities amounted to content-based discrimination, the Court could not enter an injunction requiring the University to fund *every* possible religious activity students might propose). While the Court agrees that a repeat performance of what occurred on March 27, 2020 would violate Plaintiff's constitutional rights, it cannot grant Amyiah complete immunity for any future posts about her COVID-19 scare. These possible posts encompass infinite permutations, some of which might not be entitled to First Amendment protection.

Additionally, the issuance of declaratory relief vitiates the need for Plaintiff's proposed injunction. A declaratory judgment is a mechanism for ordering a litigant to abandon an unconstitutional policy. *Id.* at 1092. There is no need for duplicative, prospective relief, as counsel conceded at a recent hearing. (ECF No. 40 at 20:07-20:15.) Therefore, the Court denies Plaintiff's motion for a preliminary injunction.

## CONCLUSION

The First Amendment is not a game setting for the government to toggle off and on. It applies in times of tranquility and times of strife. While Defendants in this case may have believed their actions served the greater good, that belief cannot insulate them. Demanding a 16-year-old remove protected speech from her Instagram account is a First Amendment violation. Declaratory judgment is granted. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 31) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF No. 3) is DENIED.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 14) is DENIED.

The Clerk of Court is directed to enter a Declaratory Judgment in Plaintiff's favor.

Dated at Milwaukee, Wisconsin on September 24, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge